**UNITED STATES DISTRICT COUR**
**SOUTHERN DISTRICT OF INDIANA**
**EVANSVILLE DIVISION**

| | | |
|---|---|---|
| CITIZENS INSURANCE COMPANY OF THE MIDWEST, and Indiana Corporation, as Subrogee of William Magee, | ) ) ) ) | |
| Plaintiff, | ) | Case No. 3:11-cv-40 RLY-WGH |
| v. | ) ) | |
| LG ELECTRONICS USA, INC., a New Jersey Corporation, And SEARS ROEBUCK & COMPANY, a New York Corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT WITNESSES**

Defendants LG ELECTRONICS USA, INC. (LG) and SEARS ROEBUCK & COMPANY (SEARS) by and through their attorneys, Johnson & Bell, Ltd. respectfully move this Court to Exclude or Limit Testimony of Plaintiff's Experts William Mers Kelly and Steven Cottingham, as herein described, and in support state as follows:

## I.      INTRODUCTION

This case involves property damage as a result of a fire on May 18, 2010 at the residence of William Magee located at 6968 North Hamburg Road, Oldenburg, Indiana.  As a result of the fire, the entire house allegedly sustained extensive fire damage requiring the house to be rebuilt from the ground up. The majority of the house was consumed by the fire.  (Attached hereto as **Exhibit A** are a few post fire photographs of the house).

1

On 3/17/11, Plaintiff, Citizen's Insurance, as subrogee of William Magee, filed its complaint against Defendants, LG and Sears.   (A true and correct copy of Plaintiff's Complaint is attached hereto as **Exhibit B**). In short, the complaint alleges that LG and Sears designed, manufactured and sold a defective refrigerator which caused the fire.

Pursuant to Rule 26, Plaintiff has disclosed William C. Mers Kelly as a forensic expert. (Mr. Mers Kelly's *curriculum vitae*, report, and deposition transcript are attached hereto as **Exhibit C**, **Exhibit D**, and **Exhibit E**, respectively).  Plaintiff also disclosed Steven Cottingham as a fire origin expert. (Mr. Cottingham's *curriculum vitae*, report, and deposition transcript are attached hereto as **Exhibit F**, **Exhibit G**, and **Exhibit H**, respectively).

As the gatekeeper of the admissibility of expert testimony, this Court must bar any testimony of Mr. Cottingham and Mr. Mers Kelly.

## II.      LAW AND ARGUMENT

### A.      General Standard For Admissibility Of Expert Testimony.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence and the guiding principles declared in *Daubert v. Merrell Dow Pharms., Inc.* 509 U.S. 579, 125 L.Ed. 2d 469, 113 S.Ct. 2786 (1993).  *Owens v. Ford Motor Company*, 297 F.Supp.2d 1099, 1104 (S.D. Ind. 2003).  Rule 702 imposes five requirements on proffered expert testimony: (1) the witness must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the offered testimony or opinion must be based upon sufficient facts or data; (3) the offered testimony or opinion must be derived from reliable principles and methods; (4) the expert witness must have applied the principles and methods reliably to the facts of the case; and (5) expert or specialized knowledge must be helpful in assisting the trier of fact to understand the

evidence or to determine a fact in issue. *Owens v. Ford Motor Company*, 297 F.Supp.2d 1099, 1104 (S.D. Ind. 2003), *citing Fed. R. Evid. 702*. Under this framework, Rule 702 gives courts a "gatekeeping role" to ensure that expert opinions presented to a jury are based on an adequate factual foundation and are the product of reliable methodology. *Owens v. Ford Motor Company*, 297 F.Supp.2d 1099, 1104 (S.D. Ind. 2003), *citing Daubert*, 509 U.S. at 597. Rule 702 imposes a "special obligation upon a trial judge to 'ensure that any and all scientific testimony. . . is not only relevant, but reliable." *Clark v. Takata Corporation*, 192 F.3d 750, 755 (7th Cir. 1999) quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1174 (1999) (*citing Daubert*, 509 U.S. at 589). As will be shown below, the testimony of Plaintiff's experts should be excluded pursuant to Rule 702 along with *Daubert* and its progeny.

### B.    The testimony William C. Mers Kelly Must be Excluded Pursuant to Rule 702 and *Daubert*.

Under *Daubert*, the district court is to perform a gate-keeping function and conduct a two-step analysis before admitting expert scientific testimony under Rule 702. *Chapman v. Maytag Co.*, 297 F.3d 682, 687 (7th Cir. 2002). First, the Court must determine whether the expert's testimony reflects scientific knowledge; that is, the court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Chapman*, 297 F.3d at 687, *citing Daubert*, 509 U.S. at 592-593. This requires the court to consider whether the testimony has been subjected to the scientific method, ruling out any subjective belief of unsupported speculation. *Id.*, *citing Porter v. Whitehall Labs, Inc.*, 9 F.3d 607, 614 (7th Cir. 1993). The Court must determine whether the expert's testimony is reliable, that is, whether it is based on a reliable methodology. *Clark v. Takata Corporation*, 192 F.3d 750, 756 (7th Cir. 1999). In analyzing the reliability of proposed expert testimony, the role of the Court is to determine whether the expert is qualified in the relevant field and to examine the

methodology the expert has used in reaching his conclusions. *Smith v. Ford Motor Co.*, 215 F.3d 713, 717 (7th Cir. 2000), *citing Kumho*, 526 U.S. at 133. While extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience. *Smith v. Ford Motor Co.*, 215 F.3d at 717, *citing Kumho*, 526 U.S. at 156. Thus, "a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Id.*

1.   **William C. Mers Kelly's testimony should be excluded because he has no experience as a forensic engineer with respect to consumer refrigerators and he is not a fire origin expert.**

In the case at bar, Plaintiff disclosed William C. Mers Kelly as a Rule 26 expert. Mr. Mers Kelly is a Senior Forensic Engineer with Unified Investigations. (Ex. C). Mr. Mers Kelly has a B.S. in Mechanical Engineering. Mr. Mers Kelly testified that he has never been retained to testify as an origin and cause expert. He has always been retained as a forensic engineer. (Ex. E at 44). He testified that in this case, he was retained in his capacity as a forensic engineer. (Ex. E at 44). With respect to his education in the field of forensic engineering, Mr. Mers Kelly testified as follows:

Q:   All right did you take any coursework in forensic engineering at University of Cincinnati?

A:   Not that was specifically called that. I mean, I took courses in product liability and failure analysis.

Q:   Was this at Cincinnati?

A:   Yes.

Q:   How many courses did you take?

A:    I don't recall I mean you know we –

Q:    Product liability and failure analysis, did any of the courses that you took pertain to product liability and failure analysis with respect to refrigerators?

A:    It was very general.  Whether or not we touched upon refrigerators, I don't specifically recall.

(Ex. E at 64-65).

Q:    With respect to your experience in forensic engineering, where does that come from?

A:    Really, what it boils down to is it's a – you're relying on all your experience to understand how things are put together and how they're designed, you know, how things work. How things can fail.  You use all that in determining what's – and interpreting evidence  . . . it's a culmination of life experience.  And one of the things that's been very helpful to me is having such a broad background and large degree of hands-on experience, as well as the manufacturing, design development, commercialization, and then product support out in the field.

(Ex. E at 66).

With respect to design of consumer refrigerators like the subject refrigerator, Mr. Mers Kelly

testified that he had experience designing Slush Puppie machines which dispense cold liquid, but

with respect to consumer refrigerators like the Magee refrigerator, Mr. Mers Kelly testified as

follows:

Q:    Have you ever had any involvement with the design of refrigerators similar to the refrigerator that was involved in this case?

A:    Define similar.  I mean you're obviously looking for something specific?

Q:    In terms of --- yeah. I'm just talking about a fridge that a consumer would buy at a store, appliance store, for use in the house to keep food and drinks cold, that kind of refrigerator.

5

> A: Okay.
>
> Q: Have you ever designed refrigerators like that?
>
> A: No.

(Ex. E at 56-57).

Mr. Mers Kelly testified at his deposition that he never took any courses with respect to analysis of fire patterns or burn patterns. (Ex. E at 72). Mr. Mers Kelly is not a member of any professional organizations that pertain to fire investigation or cause and origin investigations. (Ex. E at 76). He has never studied heat and plane vector analysis. (Ex. E at 74). Nevertheless, one of Mr. Mers Kelly's opinions in this case is that the origin of the fire was internal to the refrigerator, and he testified that he relied upon the National Fire Protection Agency guide for Fire and explosion investigation, NFPA 921, in for his "failure analysis".

> Q: Is there some sort of treatise or textbook or manuals that you follow that sets forth the methodology that you would sort of be governed by in doing a failure analysis?
>
> A: There are plenty of guides available to us.
>
> Q: And are there any in particular that you use?
>
> A: Well, NFPA 921 would be obviously, would be one.
>
> Q: Is that something that you relied upon in this case?
>
> A: Yes.

(Ex. E at 67-68).

> Q: Are there instances in which it's – you think it's permissible to deviate from following that [NFPA 921] guide?
>
> A: Define Deviate?
>
> Q: To not follow it?
>
> A: To not follow it?

6

Q:     Right?

A:     I can't think of any specifically.

(Ex. E at 82-83).

The testimony of William Mers Kelly shows that he has no forensic engineering experience with respect to consumer refrigerators. He testified that his experience in forensic engineering comes from his experience in designing and manufacturing, but he admits that that he has never designed a consumer refrigerator like the subject Magee refrigerator. (Ex. E at 64-66). He could not recall if he ever took any courses involving failure analysis of refrigerators. Since Mr. Mers Kelly has limited experience in this field, his opinion should be excluded pursuant to Federal Rule 702. *See Smith v. Ford Motor Co.*, 215 F.3d at 717, *citing Kumho*, 526 U.S. at 156. (Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.) In addition, William Mers Kelly also attempts to opine that the origin of the fire was internal to the refrigerator. However, he testified that he was retained in his capacity as a forensic engineer, and he has never taken any courses with respect to analysis of fire patterns or burn patterns or studied heat and plane vector analysis. Mr. Mers Kelly should be barred from testifying because he has no experience as a forensic engineer with respect to consumer refrigerators like the Magee refrigerator. In addition, Mr. Mers Kelly should be barred from testifying that the origin of the fire was inside the refrigerator since he is being proffered as a forensic expert with a Bachelors of Science in Mechanical Engineering, and he is not a fire origin expert.

**2.     Mr. Mers Kelly should be barred from testifying that the alleged fire was caused by a "failure" within the subject refrigerator because by his own admission, he cannot testify as to what the failure was.**

In addition, William Mers Kelly's opinions are not reliable or relevant under the test set forth in *Daubert*. A "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*." *Clark v. Takata Corporation*, 192 F.3d 750, n. 5 (7th Cir. 1999). The testimony of a "well-credentialed expert who employs an undisclosed methodology" or who offers opinions lacking "analytically sound bases" must be excluded. *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585 591 (7th Cir. 2000). The *Daubert* Court identified several factors that lower courts may consider in assessing an expert's methods: (1) whether the expert's theory can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the technique; and (4) the technique's general acceptance among the relevant scientific or technical community. *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002); *Owens v. Ford Motor Company*, 297 F.Supp.2d 1099, 11008 (S.D. Ind. 2003); *Daubert*, 509 U.S. at 593-594. The goal of these factors is to filter out "subjective belief or unsupported speculation." *Owens v. Ford Motor Company*, 297 F.Supp.2d 1099, 1109 (S.D. Ind. 2003) (*citing Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002). *See also Rogers v. Ford Motor Co.*, 952 F.Supp. 606, 615 (N.D. Ind. 1997)). The *Daubert* test contemplates permissible "experience-based" testimony, but whether an expert's opinion is based on scientific studies or personal experience, he still must employ the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Owens v. Ford Motor Company*, 297 F.Supp.2d 1099, 1109 (S.D. Ind. 2003), *citing Chapman v. Maytag*, 297 F.3d 682, 688 (7th Cir.

2002).  The second part of the *Daubert* analysis requires the District Court to determine "whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue.  *Chapman*, 297 F.3d at 687, *citing Porter v. Whitehall Labs, Inc.* 9 F.3d 607, 616 (7th Cir. 1993); *see also Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010) (Before considering whether the testimony will assist the trier of fact, "a district court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid..")  In other words, "the suggested scientific testimony must "fit" the issue to which the expert is testifying."  *Chapman*, 297 F.3d at 687, *citing Porter v. Whitehall Labs, Inc.* 9 F.3d at  616.

In his report, Mr. Mers Kelly recounts the circumstances leading up to the fire as follows:

> The morning of the fire, Mr. Magee got up about 4:00 A.M. EDT, put some clothes in the dryer, took a shower, got the clothes from the dryer, put the dishes in the dishwasher, and started it before leaving about 4:25 AM EDT to go to McDonalds to get something to eat.  He turned off all of the lights and did not cook anything that morning before leaving.  It was dark and a neighbor Mr. Dan Meyer saw the fire from the road while on his way to work.  He drove up to the structure about 5:30 AM EDT . . ."

(Ex. D at 2).

Thus, Dan Meyer observed the fire about an hour after Mr. Magee turned on the dishwasher. With respect to the dishwasher, Mr. Mers Kelly testified as follows:

> Q:   Other than your visual observations of the dishwasher, did you do any other testing or analysis to rule it out as a cause?
>
> A:   Other than inspecting it there at the scene, I did not do any physical testing or destructive testing.

(Ex. E at 156).

Mr. Mers Kelly's ultimate opinions in his report are as follows:

> It is my professional opinion within a reasonable degree of engineering certainty based on the data available at the time of this report that:
>
> 1. This fire loss was caused by a failure within the involved Sears Kenmore Elite Brand Trio refrigerator.
>
> 2. This failure resulted in the ignition and consumption of the combustible internal components of this refrigerator.

(Ex. D at 4).

In his report, he opined that, "Electrical conductor and component fragments consistent with those used in this type of refrigerator were found in and around this refrigerator. A few of these fragments exhibited damage consistent with electrical activity." (Ex. D at 3). However, at his deposition, he admitted that in a fire of this nature things would be "raining down" on the fridge and thus artifacts were found inside the fridge that did not belong to the fridge. (Ex. E at 108). Moreover, Mr. Mers Kelly admitted that "most electrical activity is caused by as a result of the fire". (Ex. E at 113). He testified as follows:

> Q:   I mean, that's nothing unusual in a fire at some other house, let's say, and all the appliances get burned in the house, and you would expect to see evidence of electrical activity on those wires right?
>
> A:   Which we did.

(Ex. E at 113).

> Q:   I mean the fact that you observed electrical activity on various conductors that were found within the fridge tell you what it was in the fridge that failed?
>
> A:   No.

(Ex. E at 119).

Although Mr. Mers Kelly attempts to opine in his report within a reasonable degree of engineering certainty that a failure occurred within the refrigerator, in the same breath he states, on page 4 of his report that "The extreme extent of the fire damage and limited amount of inspection of this refrigerator during the June 2, 2010, scene examination prevented identification of the specific failure mode within this refrigerator at the time of this report." (Ex. D at 4). When questioned about this portion of his report, Mr. Mers Kelly testified as follows:

> Q:    "So I just want to say, ask you, based on what's in your report, you can't testify within any degree of engineering certainty as to what it was in the refrigerator that actually failed and caused the fire, can you?
>
> A:    That's correct.

(Ex. E at 104).

In addition, even though he opines in his report that "failure resulted in the ignition and consumption of the combustible internal components," Mr. Mers Kelly testified that he did not know what the first combustible was that actually ignited in the refrigerator.  (Ex. E at 154). With respect to engineering testing or analysis performed, he testified that his analysis was based only on his visual observations.

> Q:    Okay.   From an engineering – mechanical engineering standpoint, did you do any testing, engineering testing or engineering analysis on any of the appliances that were in the kitchen?
>
> A:    I did analysis, but I didn't do any testing per se.  I mean, you know, certainly no destructive testing.
>
> Q:    And your analysis is based on your visual observation, right?
>
> A:    Yes.

(Ex. E at 70).

Thus, as a forensic engineer, Mr. Mers Kelly ultimately cannot offer any opinion as to what component of the refrigerator allegedly failed, and his opinion with respect to the origin of the fire is based upon his visual observations at the scene.  Since Mr. Mers Kelly cannot offer any opinion as to what component of the refrigerator that allegedly failed, his opinion that a defect within the refrigerator caused the fire is nothing more than "subject belief or unsupported speculation."  *See Owens v. Ford Motor Company*, 297 F.Supp.2d 1099, 1109 (S.D. Ind. 2003), *citing Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002)(The goal of *Daubert* factors is to filter out "subjective belief or unsupported speculation.").   Therefore, this Court should exclude his testimony and opinion that that the alleged fire was caused by a "failure" within the subject refrigerator because by his own admission, he cannot testify as to what the failure was.

**3.      Mr. Mers Kelly should be barred from testifying that the subject Magee refrigerator was defective because he has an insufficient basis for this opinion.**

Even though Mr. Mers Kelly could offer no opinion with a reasonable degree of engineering certainty as to what component of the refrigerator failed, he later testified at his deposition that he held the opinion that the refrigerator was defective based upon what Plaintiff's retained electrical engineer, Charles Fricke, told him the night before his deposition.  Mr. Mers Kelly testified as follows:

> Q:     Oaky.  Do you have the opinion that it was defective, Mr. Magee's fridge, yes or no?
>
> MR. MOSS:   Well I don't know if it is yes or no.  He just told you, he has told you yes, he believes there's a defect, he learned that, and the foundation for which he got from Mr. Fricke.
>
> THE WITNESS:      I mean, that – that, I think, says it all right there.
>
> Q:     Okay so you believe there is a defect in Mr. Magee's fridge? Yes?

A:      Yes.

Q:      Okay.  And that's based on what Mr. Fricke told you?

A:      Yes.
Q:      Yes. Is it based on anything else?

A:      Not at this point?

Q:      Oaky and it is your opinion within a reasonable degree of
        engineering certainty that Mr. Magee's fridge was
        defectively designed in some manner?

A:      Yes.  Designed and manufactured.  I mean there was a
        basically, there was a defect that caused this fire.

(Ex. E at 161-162).

Essentially, the night before Mr. Mers Kelly's deposition, Plaintiff's retained electrical

engineer, Charles Fricke, told Mr. Mers Kelly that the subject model refrigerator had an issue

with a light staying on continuously.  (Ex. E at 163-164).  Although a testifying expert may rely

on another expert's opinion, the testifying expert's opinion should be rejected if the underlying

basis is unreliable. *Owens v. Ford Motor Company*, 297 F.Supp.2d 1099, 1108  (S.D. Ind. 2003)

*citing Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000).  Here, the basis of Mr.

Mers Kelly's opinion is a conversation with Charles Fricke.  However, basing an opinion merely

on a conversation is not a sound analytical basis as required by *Daubert*.  *See   Tuf Racing

Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585 591 (7th Cir. 2000) (The testimony

of a "well-credentialed expert who employs an undisclosed methodology" or who offers opinions

lacking "analytically sound bases" must be excluded.)  *See also  Bourelle v. Crown Equipment

Company*, 220 F.3d 532, 539 (7th Cir. 2000) (It is well-established that an expert's work is

admissible only to the extent that it is reasoned, uses the methods of the discipline, and is

founded on data.  Talking off the cuff -- deploying neither data nor analysis -- is not acceptable methodology.).

In addition, Mr. Mers Kelly admitted that he did not do any engineering analysis to determine whether or not the problem with the light staying on existed in the Magee refrigerator. (Ex. E at 164).  Similarly, he did not perform any engineering analysis to determine if a light staying on could cause a fire within a fridge.  (Ex. E at 165-166).  Thus, Mr. Mers Kelly did not conduct any scientific tests of experiments to arrive at his conclusion that a light staying on could cause a fire within the refrigerator. *See Chapman v. Maytag*, 297 F.3d 682 (7th Cir. 2002) (Court held that expert's theory was not scientifically valid where expert did not conduct any scientific tests or experiments to arrive at his conclusions, the absence of any testing indicated that the experts proffered opinions could not fairly be characterized as scientific knowledge, and experts opinions were merely unverified statements unsupported by scientific methodology.)  *See also Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998) ("It is true that [plaintiff's expert] has impressive credentials. . . But the fact is that he did no testing on these products. . . And we have sanctioned the exclusion of speculation offered by persons with credentials as impressive as those of [plaintiff's expert].")

In this case, Mr. Mers Kelly's opinion that the refrigerator was defective should be excluded because, as stated above, he has no experience in designing consumer refrigerators.  In addition, he did no testing to determine whether the refrigerator was defective.  Finally, the only basis for this opinion that the refrigerator was defective was a conversation he had with Charles Fricke the night before his deposition.  Where an expert only offers conclusions with insufficient analysis to support his conclusions, the Seventh Circuit has held that the proffered testimony could not assist the jury, and therefore, should not be admitted.  *Rosen v. Ciba-Geigy*

*Corporation*, 78 F.3d 316, 319 (7th Cir. 1996); *Ancho v. Pentek Corporation*, 157 F.3d 512 (7th Cir. 1998).  The Seventh Circuit has held that an expert who supplies nothing but a bottom line, supplies nothing of value to the judicial process.  *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998); *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989).  Thus, this Court should exclude the opinion of Mr. Mers Kelly that the subject refrigerator was defective.

### C.  The Testimony Steven Cottingham Must be Excluded Pursuant to Rule 702 and *Daubert.*

Plaintiff also disclosed Steven Cottingham as a Rule 26 expert who would testify to the origin of the fire.  Mr. Cottingham studied music at Ball State University, but obtained no degrees. (Ex. H at 163).  He is a Senior Investigator with Unified Investigations.  (Ex. F).

As stated above, the testimony of a "well-credentialed expert who employs an undisclosed methodology" or who offers opinions lacking "analytically sound bases" must be excluded.  *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585 591 (7th Cir. 2000).  The *Daubert* Court identified several factors that lower courts may consider in assessing an expert's methods:  (1) whether the expert's theory can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the technique; and (4) the technique's general acceptance among the relevant scientific or technical community.  *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002); *Owens v. Ford Motor Company*, 297 F.Supp.2d 1099, 11008  (S.D. Ind. 2003); *Daubert*, 509 U.S. at 593-594.  Mr. Cottingham should be barred from testifying as to the origin of the fire because his opinion is unreliable.

**1.      Mr. Cottingham should be barred from testifying as to the origin of
the fire because his opinion is unreliable.**

Mr. Cottingham authored a report dated October 4, 2011.  (Ex. G).  In his report, he states
that "The precise failure mode was undeterminable; however, refrigerator internal electrical
anomalies establish the probable fire cause as internal electrical failure.  Char, oxidation, metal
degradation, electrical anomalies, and collapse patterns place the area of origin inside the kitchen
refrigerator located in the alcove."  (Ex. G at 2).  With respect to the cause of the fire, Mr.
Cottingham deferred to Plaintiff's retained electrical engineer, Charles Fricke.  Mr. Cottingham
testified as follows:

> Q:      Okay.  And with respect to whatever electrical cause or
> failure occurred, is that something you'll defer to Mr.
> Fricke?
>
> A:      Yes.
>
> Q:      Okay.  I mean, I'm only asking, you're not going to come
> and testify at trial as to what part of the fridge had an
> electrical anomaly or had a ---
>
> A:      I think that's a little above my pay grade.

(Ex. H at 50).

Mr. Cottingham was questioned with respect to the scientific methodology to be
performed in conducting a fire origin examination.

> Q:      When you wrote your October 4th report, which version of
> [NFPA] 921 were you relying upon?
>
> A:      I don't think that the current one had come out, so it would
> be under '08, wouldn't it?
>
> Q:      2008?
>
> A:      Yeah.

Q:      Would the same be true for the date of your first day at the scene? Were you relying on the 2008 version of –

A:      Right, that would have been the current edition.

Q:      Okay. All right. Are there any particular sections of [NFPA] 921 that you relied upon in formulating your opinions?

A:      Well, I'm not going to be able to sit here and call out specific sections, you know, off the top of my head.

Q:      Is there any primary section that you would say governed most of the work that you did or is there –

A:      Well, right up front, I mean, you know follow the scientific method and - -

Q:      And what's –

A:      -- using a systematic approach.

Q:      Okay. And what section is the scientific method and systematic approach discussed in [NFPA] 921?

A:      It's right up front. Is it Chapter 3? One of the introductory chapters.

(Ex. H at 14).

In actuality, the systematic approach is discussed in Chapter 4 of NFPA 921. (Ex. H at 154) (see Exhibit I). When questioned, Mr. Cottingham conceded that after the fire, there was no more floor remaining in the kitchen after the fire, and all of the appliances were found in either the basement or the crawlspace. (Ex. H at 93). In his report, Mr. Cottingham opines:

The overall interior examination established total floor consumption with the kitchen, guest bedrooms and living room collapsed into the crawl space, and the dining room, master bedroom and stairs collapsed into the basement. Two girders running north and south remained on top and just aside the concrete pilings. Heavier Char was concentrated on the east girder toward the north. This area corresponded with the wall separating the kitchen and living room . . . Particularly, the section of the

girder, which was approximately over the west kitchen wall, had distinctive char at concentrated points. (Ex. G at 3-4).

When asked if there was photograph that depicted this heavier char on the girders, Mr. Cottingham answered as follows:

> "Photograph 9 [see Ex. G at 19]. Here, again, is our girder over the living room, and then behind that, there again is the girder with that second pier. The refrigerator was just to the left of that. And you're starting to see the deformation in that girder. Now, this is at a distance so that – so, you know, we can definitely see almost a breakage point or thinning point here."

(Ex. H at 81).

> Q:    If you're unable to determine the sort of timing of how the appliances in the kitchen were consumed by fire based on burn patterns, one thing we do know is that you are able to say that the first item was the refrigerator?
>
> A:    That's – yes.
>
> Q:    Okay. And what is unique about the burn pattern that you see with respect to the refrigerator that leads you to conclude that?
>
> A:    Okay. Well, as we said before, the girder is a definite physical piece of evidence.
>
> \*       \*       \*
>
> Also- the prefire construction of that area places that refrigerator in – I think referenced an alcove. It's a 3-sided enclosure with only the front of the refrigerator exposed without, you know, having the drywall-stud-drywall at however tight it fit in there, which according to Mr. Magee, it was – it was a pretty tight fit. So that is going to prevent exterior flame impingement from three sides of that refrigerator until well into the fire if – if we have an exterior heat source.

(Ex. H at 105-106).

> Q:    Okay. Now, the alcove itself was totally consumed by the fire, right?

18

> A:   Correct.
>
> Q:   Okay. So you didn't see anything with respect to the alcove itself other than its absence, right?
>
> A:   Correct.

(Ex. H at 115).

> Q:   Okay. So I guess- but weren't the [wall] studs and base plates around the fridge completely consumed by fire?
>
> A:   Correct.

(Ex. H at 125).

With respect to his observations of other portions of the structure of the house, Mr. Cottingham testified as follows:

> Q:   Okay. And so the basis for your opinion that he fire patterns with respect to the structure [of the house] that led you to believe – again, just with respect to the structure, that led you to believe that the origin would have been in the area of the fridge is the walls that you mentioned that were still remaining on certain parts of the structure?
>
> A:   The exterior, right. And we've already discussed the girders. That was another you know –
>
> Q:   But you're saying that there was greater observable depth of char closer to the area where the fridge was?
>
> A:   Correct.

(Ex. H at 97).

However, when questioned with respect to his methodology for determining the areas of greater observable char, Mr. Cottingham testified as follows:

> Q:   Did you measure the depth of char on either of those girders there?
>
> A:   I did not specifically, you know, take out a tire gauge or anything like that.

19

Q:      Was there a reason why not?

A:      One, it's a piece of equipment that I don't carry.  And many times, you know, I'll probe with the pocket knife and, you know, maybe – maybe--- span a tape measure just to – just to have that -, you know, mental image of reference.

Q:      And would you be able to tell me the exent to which the girders had greater depth of char by measurement?

A:      I would not specifically have that recorded.

Q:      Okay.  Did you, in fact, use a pocket knife at the scene?

A:      I don't recall, you know.

(Ex. H at 79-80).

With respect to the burns patterns that he observed on the refrigerator, Mr. Cottingham admitted that of all of the appliances in the kitchen, the refrigerator would have had the highest fuel load. (Ex. H at 122).  In addition, he admitted that the entire refrigerator was pretty much consumed by the fire.

Q:      Okay.  What I'm wondering is, the fridge was obviously consumed by the fire, right?

A:      Yes.

(Ex. H at 83).

Q:      Maybe I'm not understanding.  I understand that there's – the fridge was consumed pretty much by the fire.

A:      The combustible components in it.

(Ex. H at 85).

Mr. Cottingham was asked whether there were any burn patterns with respect to the refrigerator that led him to believe that the refrigerator was the first appliance in the kitchen that was

20

attacked by fire.   In response, Mr. Cottingham referred to the heavier char that he visually observed on the girders.  He testified as follows:

> Q:      Okay.  And what is unique about the burn pattern that you see with respect to the refrigerator that leads you to conclude that?
>
> A:      Okay. Well, as we – as we said before, the girder is a definite physical piece of evidence.

(Ex. H at 105).

The 2008 edition of NFPA 921 provides as follows:

> 17.4.3 Depth of Char Analysis.  **Analysis of the depth of charring is most reliable for evaluating fire spread**, rather than for the establishment of specific burn times or intensity of heat from adjacent burning materials.  By measuring the relative depth and extent of charring, the investigator may be able to determine what portions of a material or construction were exposed the longest to a heat source.  The relative depth of char from point to point is the key to appropriate use of charring – locating the places where the damage was most sever due to exposure, ventilation, or fuel placement.;  The investigator may then deduce the direction of fire spread, with decreasing char depths being farther away from a heat source.  Certain key variables affect the validity of depth of char pattern analysis. These factors include the following:
>
> 17.4.3.2 Measuring Depth of Char.  **Consistency in method of measuring the depth of char is the key to generating reliable data.**  Sharp pointed instruments, such as pocket knives, are not suitable for accurate measurements because the sharp end of the knife will have a tendency to cut into the noncharred wood beneath.  Thin, blunt-ended probes, such as certain types of calipers, tire tread depth gauges, or specifically modified metal rulers are best.  Dial calipers with depth probes of round cross-section, shown in Figure 17.4.3.2(a) are excellent depth of char measurement tools.  Figure 17.4.3.2(b) illustrates their use.  The same measuring tool should be sued for any set of comparable measurements.  Consistent pressure for each measurement while inserting the measuring device is also necessary for accurate results.

(A true and correct copy of Section 17.4.3 and Section 17.4.3.2 of NFPA 921 is attached hereto as **Exhibit I**). (*emphasis added*).  Indeed, Section 17.4.3.2(a) and Section 17.4.3.2(b) of NFPA 921 even depicts the proper dial calipers with depth probes that should be used to measure depth of char.  (Ex. I).  By his own admission, Mr. Cottingham relied upon NFPA 921 during his investigation and the authoring of his report. However, he did not perform the "depth of char" analysis necessary for performing a reliable analysis of the fire spread.  NFPA 921 provides that

"consistency in method of measuring the depth of char is the key to generating reliable data. (Ex. I). The basis for Mr. Cottingham's opinion that the refrigerator was the first appliance attacked by fire and was the origin of the fire was the heavier char he visually observed on the girders. Section 17.4.3 of NFPA 921 provides that an analysis of the depth of charring is reliable for evaluating fire spread. Here, Mr. Cottingham referred to the heavier char that he *visually* observed on the girders. However, Mr. Cottingham did not measure the depth of the char. Indeed, Section 17.4.3.2 provides that consistency in the method of measuring the depth of char is the key to generating reliable data. (Ex. I). Thus, Mr. Cottingham did not perform any reliable testing on the char to determine the origin of the fire and the fire spread. In a case where the entire house essentially burned to the ground, Mr. Cottingham did nothing more than make visual observations at the scene. He can offer no objective data that would assist the jury in this case.

The Seventh Circuit has held that an expert witness who supplies nothing but a bottom line, supplies nothing of value to the judicial process. *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1989). It is well-established that an expert's work is admissible only to the extent that it is reasoned, uses the methods of the discipline, and is founded on data. Talking of the cuff—deploying neither data nor analysis—is not acceptable methodology. *Bourelle v. Crown Equipment Company*, 220 F.3d 532, 539 (7th Cir. 2000). Where an expert only offers conclusions with insufficient analysis to support his conclusions, the Seventh Circuit has held that the proffered testimony could not assist the jury, and therefore, should not be admitted. *Rosen v. Ciba-Geigy Corporation*, 78 F.3d 316, 319 (7th Cir. 1996); *Ancho v. Pentek Corporation*, 157 F.3d 512 (7th Cir. 1998). Under these principles, the methodology used by Mr.

Cottingham's to determine the origin of the fire was the area of the refrigerator is totally unreliable.

### 2.    Mr. Cottingham should be barred from offering "expert opinions" where the basis for the testimony contradicts the evidence.

Mr. Cottingham testified that his final hypothesis regarding the origin of the fire was in essence the conclusion of the investigation. (Ex. H at 155). When questioned whether there was any evidence that was inconsistent with his conclusion he answered as follows:

> Q:   Is there anything that you've seen in your entire investigation that's inconsistent with your conclusion?
>
> A:   Some of your discussions about the –you know, the venting at back of the house. Well, that's been a concern all along .
> . .

(Ex. H at 156).

The only eyewitness to the fire, Dan Meyer, gave a digitally recorded statement that was produced in discovery.  (A transcript of Mr. Meyer's recorded statement is attached hereto as **Exhibit J**).  Mr. Cottingham testified that he never heard the recorded statement (Ex. H at 143). In his recorded statement, Mr. Meyer unequivocally stated that he observed fire venting from the back of the house.  (Ex. J).  Mr. Cottingham was questioned about Mr. Meyer's recorded statement and Mr. Meyer's observations of fire venting from the back of the house.  (Ex. H at 149-151).  Ultimately, Mr. Cottingham testified that Mr. Meyer had to be confused.  (Ex. H at 151).  However, expert testimony is inadmissible if the facts upon which the expert bases his testimony contradicts the evidence.  *U.S. v. Chaney*, 577 F.2d 433, 435 (7th Cir. 1978).  Mr. Cottingham should not be allowed to contradict the eyewitness testimony to reach the conclusion that he desires.  As a retained expert, Mr. Cottingham seeks to contradict the factual observations of the eyewitness because by his own admission, fire venting from the back of the house

contradicts Mr. Cottingham's own conclusion that the fire originated in area of the refrigerator. This only further establishes the unreliability of his opinion.

The facts upon which Mr. Cottingham basis his opinion contradicts the evidence, namely the statement of Dan Meyer that he observed fire venting from the back of the house. As a result, Mr. Cottingham should be barred from offering any opinions or expert testimony which contradict the unequivocal factual observations of the eyewitness to the occurrence.

### III. CONCLUSION

The opinions proffered by Plaintiff's experts are not supported by admissible expert testimony. Plaintiff is unable to satisfy the standard required by Rule 702 and *Daubert* for the admissibility of such evidence and all such evidence should be excluded. In particular, Plaintiff's experts should be barred from testifying to the following:

1. Mr. Mers Kelly should be barred from testifying that the origin of the fire was inside the refrigerator since he is being proffered as a forensic expert and he has no experience in forensic engineering with respect to consumer refrigerators, and he is not a fire origin expert.

2. Mr. Mers Kelly should be barred from testifying that the alleged fire was caused by a "failure" within the subject refrigerator because by his own admission, he cannot testify as to what the failure was.

3. Mr. Mers Kelly should be barred from testifying that the subject Magee refrigerator was defective because the only basis for this opinion was a conversation he had with Charles Fricke the night before his deposition, he did no engineering testing or analysis to determine whether the refrigerator was defective.

4. Mr. Cottingham should be barred from testifying as to the origin of the fire because his opinion is totally unreliable.

5. Mr. Cottingham should be barred from offering "expert opinions" where the basis for his proffered expert testimony contradicts the evidence, in particular, the factual observations of the eyewitness, Dan Meyer.

Accordingly, pursuant to Rule 702 and *Daubert*, William C. Mers Kelly and Steven Cottingham should be barred from testifying at trial in this matter.

WHEREFORE, for all of the foregoing reasons, Defendants, LG ELECTRONICS USA, INC. and SEARS ROEBUCK & COMPANY, respectfully request that this Court Exclude or Limit Testimony of Plaintiff's Experts, William C. Mers Kelly and Steven Cottingham, as set forth herein and for all other just and proper relief this Court sees fit.

Respectfully submitted,

**JOHNSON & BELL, LTD.**

/s/ Cecilio L. Franco IV
Cecilio L. Franco IV
Johnson & Bell, Ltd.
33 West Monroe Street, Suite 2700
Chicago, IL 60603
Tel: (312) 372-0770
Fax: (312) 372-9818
IL ARDC #: 6271204
Firm ID: 60347

Dated: March 7, 2012

DOC# 2960987

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2012, the undersigned served a copy of the foregoing document upon the following parties via U.S. District Court ECF Filing System:

/s/ Cecilio L. Franco IV _____

**Michael J. Black**
BLACK & MOSS, P.C.
2301 W. Big Beaver Road
Suite 720
Troy, MI 48084
Tel: 248-458-0600
Fax: 248-458-0602
E-mail: mikeb@bdlaw.us

**Mary F. Schmid**
STEWART & IRWIN
251 East Ohio Street, Suite 1100
Indianapolis, IN 46204
Tel: (317)639-5454
Fax: (317)639-0086
E-mail: mschmid@stewart-irwin.com

**Mickey J. Lee**
STEWART & IRWIN P.C.
251 East Ohio Street
Suite 1100
Indianapolis, IN 46204
Tel: (317) 639-5454
Fax: (317) 632-1319
E-mail: mlee@silegal.com

**Edward W. Hearn**
Johnson & Bell, Ltd.
1435 E. 85th Avenue
Merrillville, IN 46410
Tel: (219) 791-1900
Fax: (219) 791-1901
E-mail: hearne@jbltd.com