# EXHIBIT E

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

**Page 1**

```
              UNITED STATES DISTRICT COURT
          IN THE SOUTHERN DISTRICT OF INDIANA
                    EVANSVILLE DIVISION


CITIZENS INSURANCE COMPANY OF
THE MIDWEST, an Indiana
Corporation, as Subrogee of
William Magee,

          Plaintiff,

  vs.                          Case No. 3:11-CV-40

LG ELECTRONICS, USA, INC., a
New Jersey Corporation, and

SEARS ROEBUCK & COMPANY, a
New York Corporation,

          Defendants.
-------------------------------
     The Videotape Deposition of WILLIAM C. MERS KELLY, PE

     Thursday, February 9, 2012

     Commencing at 12:24 p.m.

     Taken at Black and Moss, PC

     2301 West Big Beaver Road, Suite 720

     Troy, Michigan  48084


     Before Robert E. Bouck, CSR-3530
```

**Page 3**

INDEX

| | WITNESS | PAGE |
|---|---|---|
| 3 | WILLIAM C. MERS KELLY, PE | |
| 4 | Examination by Mr. Franco | 5 |

INDEX TO EXHIBITS

| | EXHIBITS | PAGE |
|---|---|---|
| 7 | Exhibit No. 1 | 33 |
| 8 | (Mers Kelly engineering report) | |
| 9 | Exhibit No. 2 | 34 |
| 10 | (Privilege log - Mers Kelly file) | |
| 11 | Exhibit No. 3 | 36 |
| 12 | (NPS view/update merchandise items list) | |
| 13 | Exhibit No. 4 | 37 |
| 14 | (Sign-in sheets) | |
| 15 | Exhibit No. 5 | 39 |
| 16 | (Office of fire marshal report) | |
| 17 | Exhibit No. 6 | 45 |
| 18 | (Mers Kelly CV) | |
| 19 | Exhibit No. 7 | 92 |
| 20 | (Mers Kelly handwritten notes) | |
| 21 | Exhibit No. 8 | 127 |
| 22 | (Exhibit 1 US&I photos) | |
| 23 | Exhibit No. 9 | 174 |
| 24 | (Mers Kelly fee schedule) | |
| 25 | (Exhibits attached) | |

**Page 2**

```
1   APPEARANCES:
2
3   MR. BRUCE N. MOSS  (P36588)
4   Black & Moss, P.C.
5   2301 West Big Beaver Road, Suite 720
6   Troy, Michigan  48084
7   (248) 458-0600
8   Email: Brucem@bdlaw.us
9
10      Appearing on behalf of the Plaintiff.
11
12  MR. CECILIO L. FRANCO, IV
13  Johnson & Bell, Ltd.
14  33 West Monroe Street, Suite 2700
15  Chicago, Illinois  60603-5404
16  (312) 984-0260
17  Email: Francoc@jbltd.com
18
19      Appearing on behalf of the Defendants.
20
21
22  ALSO PRESENT:
23      Jeff R. Gudme, Video Operator
24
25
```

**Page 4**

```
1                    Troy, Michigan
2                    February 9, 2012
3                    At or about 12:24 p.m.
4                         * * *
5          VIDEO OPERATOR:  All right.  This is DVD
6   number one to the videotaped deposition of William Mers
7   Kelly in the matter of Citizens Insurance versus LG
8   Electronics being heard before the District Court,
9   Southern District of Indiana, Case Number 3:11-CV-40.
10         This deposition is being heard -- being held
11  at 2301 West Big Beaver Road, Suite 720, in the offices
12  of Moss and Black, on February 9th, 2012.  It is
13  approximately 12:24.  My name is Jeff Gudme, I am the
14  videographer representing Esquire Deposition Solutions.
15  Our court reporter today is Bob Bouck.
16         Counsel, will you please introduce
17  yourselves and affiliations, and our witness will be
18  sworn in.
19         MR. FRANCO:  Cecilio Franco on behalf of the
20  defendants.
21         MR. MOSS:  Bruce Moss on behalf of the
22  plaintiff.
23  W I L L I A M  C.  M E R S  K E L L Y, P.E.,
24  Having first been duly sworn or affirmed by the Notary
25  Public, was examined and testified as follows:
```



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

5

1           EXAMINATION
2    BY MR. FRANCO:
3    Q.  Good afternoon, Mr. Kelly.  Could you please state and
4       spell your full name for the record.
5    A.  My name is William Charles Mers Kelly.  And Mers Kelly
6       is M-e-r-s, space, capital K-e-l-l-y.
7    Q.  And Mers Kelly is your complete last name, correct?
8    A.  That's correct.
9           MR. FRANCO:  Okay.  Let the record reflect
10       that this is the deposition of William Charles Mers
11       Kelly taken pursuant to Subpoena and Notice, and sent
12       to today's date by agreement of the parties and the
13       witness.  The record should further reflect that this
14       deposition is being conducted in accordance with and
15       pursuant to the Federal Rules of Civil Procedure, and
16       the local rules of the Federal District Court of the
17       Southern District of Indiana.
18    BY MR. FRANCO, CONTINUING:
19    Q.  Mr. Kelly, I know you've given depositions before.  But
20       just so that you and I have a mutual understanding of
21       how we'll proceed today, let me just explain a few
22       things to you.  First, as you can see, there's a court
23       reporter and he is taking down everything that's said
24       in this room.  So it's important that you make all of
25       your answers to questions verbal answers that he can

6

1       actually take down, okay?
2    A.  Yes.
3    Q.  All right.  Also, only one person can speak at a time.
4       So it's a little hard at times, but please try to -- to
5       let me finish completely asking a question before you
6       begin to answer, and then I will do my best to let
7       you -- to try and let you finish completely answering
8       the question before I begin to ask you the next
9       question, okay?
10    A.  Yes.
11    Q.  All right.  Similarly, for questions that call for a
12       yes or no answer, it's much better for the court
13       reporter if you answer a yes or no, as opposed to
14       uh-huh or huh-uh because that really doesn't make any
15       sense on the record, okay?
16    A.  Yes.
17    Q.  All right.  For all of -- strike that.
18           I don't want you to guess or speculate for
19       any of my questions.  So if you -- if I ask you a
20       question that you think requires you to guess or
21       speculate, would you please let me know?
22    A.  Yes.
23    Q.  Okay.  If you don't hear or don't understand a
24       question, let me know and I'll just ask you another
25       question, okay?

7

1    A.  Yes.
2    Q.  All right.  If you answer a question, we will assume
3       that you both heard and understood, and that the answer
4       you provided your best reasoned response, okay?
5    A.  Yes.
6    Q.  All right.  Now, Mr. Kelly, you did receive a Subpoena
7       for your deposition today, is that right?
8    A.  Yes.
9    Q.  All right.  And attached to the Subpoena was a rider
10       that required you to bring your entire file.  Is this
11       box that's on this table your -- does that represent
12       your entire file in this case?
13    A.  It does.  I did -- I also brought an additional copy of
14       the -- our office file that has the copies of the
15       invoices and things that you requested that may not be
16       in that box.
17    Q.  Okay.  Other than the invoices and your office file, is
18       there anything else that might not be contained in that
19       box?
20    A.  My personal file I brought with me has some personal
21       notes and other -- I also brought a copy of a ruling
22       for the one court case that I was involved in as far as
23       my testimony as an expert witness.
24    Q.  All right.  And those are all things -- you only
25       have one copy of that that you have here?

8

1    A.  No, I brought multiple copies.  And I also brought a
2       copy of my most current CV in case --
3    Q.  Oh, great.  All right.  Yeah, if you wouldn't mind, I'd
4       like the copies of the -- I guess everything.  The
5       invoices, the -- your personal notes in this case, and
6       then the ruling.
7           MR. MOSS:  You have more than one copy?
8           THE WITNESS:  The personal notes, I don't --
9       I only have one copy, which is my original at this
10       point.
11           MR. MOSS:  Okay.  Well, just pull out those
12       things and let's see.
13           THE WITNESS:  Okay.
14           VIDEO OPERATOR:  Bruce, could you throw your
15       mic on.
16           MR. MOSS:  I'll speak into it, I don't want
17       to wear it.
18           VIDEO OPERATOR:  Okay.
19           THE WITNESS:  Here is the compass.  And I --
20       these are the reports that are already in that box, I
21       just took them out again.
22    BY MR. FRANCO, CONTINUING:
23    Q.  Okay.
24    A.  That's up to you.
25    Q.  The reports that you have are identical to the reports



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

...

WILLIAM C. MERS KELLY, PE                    February 9, 2012

9

1   in the box?
2   A.  Yes, those are the ones that are just on file in the
3        office, they're just printouts.
4   Q.  Okay.
5           MR. MOSS:  Well, here.  Just pull out the
6        things that are not in the box.
7           MR. FRANCO:  Right.
8           MR. MOSS:  I'll let you look at them and
9        then we can copy them after.
10          MR. FRANCO:  Right.
11          THE WITNESS:  That's a list of all the
12       clients I worked for.  You want a copy of this, my CV.
13       Current CV, there we go.  And --
14          MR. MOSS:  Okay.  I'm going to hand you a
15       small grouping of materials that apparently were in a
16       separate file.
17  BY MR. FRANCO, CONTINUING:
18  Q.  All right.  And then I'll just briefly go through this
19       stuff I was just handed, and then we'll get a copy of
20       it later.  First I see there's Google maps printout.
21       This appears to be the Google map directions for the
22       location of the fire, is that right?
23  A.  That's correct.
24  Q.  Okay.  And then I also see some original prints of the
25       house.  And this appears to be pre-fire, is that

10

1        correct?
2   A.  Yes.  Those are from Mr. Magee.  They're also included
3        in my bulk photographs.  I took pictures -- everybody
4        at the scene, that participated in the scene -- the
5        joint scene exam took pictures of those, I believe.  So
6        they shouldn't be new, but I brought the originals
7        since I had them.
8   Q.  Okay.  And then there's a handwritten, small piece of
9        spiral notepad paper that says KME Trio, model
10       79577549600.  Then below that, it's repeated again.
11       And then below that it says del.10-20-06.  Are these
12       your handwritten notes?
13  A.  Yes.  That was from the refrigerator, information that
14       I'd gotten over the phone.
15  Q.  Okay.  And what did you -- who did you speak to over
16       the phone to obtain that information?
17  A.  I don't specifically recall.  I believe it was Mr.
18       Cottingham.
19  Q.  Okay.  I see a business card for Ryan Cox.  And then
20       two pages of white, looks like legal paper with blue
21       handwritten notes.  Are these your handwritten notes?
22  A.  Yes, sir.
23  Q.  Okay.
24  A.  I hope you can read them.
25  Q.  It's pretty good, pretty good, they're not bad.  These

11

1        handwritten notes appear to have information such as
2        what appliances were in the house, what was plugged in
3        when Bill Magee left the house.  Is this information --
4        strike that.
5           The top of this is dated June 2, 2010.  Are
6        these your notes that you made after speaking to Bill
7        Magee on June 2, 2010?
8   A.  Those were the notes that I made during our scene exam
9        on June 2nd, 2010.
10  Q.  Okay.  And do you have any other notes from June --
11       your scene exam or your discussions with Mr. Magee,
12       other than these two pieces of paper that I'm holding?
13  A.  No.
14  Q.  Okay.  I'm going to leave those notes on the top of
15       this pile so that we can copy that later.  All right.
16       Let's move onto the next item here.  The next item is
17       your CV.  The next item is a memorandum, opinion and
18       order from the U.S. District Court, Eastern District of
19       Kentucky, in the case of Arch Insurance Company versus
20       Broan, B-r-o-a-n, hyphen, Nutone, N-u-t-o-n-e, LLC.
21       You mentioned this before I think, but why -- what was
22       the purpose of having this document in your file?
23  A.  In your request for documents, it spoke to documents
24       concerning testimony, previous testimony, depositions
25       and those sorts of things.  And that's one.  That one

12

1        concerns a -- my trial testimony.
2   Q.  Okay.  In this case, Arch Insurance versus
3        Broan-Nutone, were you retained by Arch Insurance
4        Company?
5   A.  Yes.
6   Q.  And who were the attorneys on behalf of Arch Insurance
7        Company in that case?
8   A.  I don't recall specifically.
9   Q.  Okay.  Do you know --
10  A.  I could look it up for you.
11  Q.  No, that's okay.  What firm were they, if you know?
12       Don't recall?
13  A.  It may be on -- it would be included in that list of
14       clients that's on there, but I don't recall
15       specifically.
16  Q.  Okay, okay.  And what kind of -- I assume it was a fire
17       in that case?
18  A.  Yes.
19  Q.  What kind of fire?
20  A.  It was a fire that took the roof off of a fire station.
21  Q.  Okay.
22  A.  And it involved two Broan-Nutone bathroom fans.
23  Q.  Okay.  And did you render opinions with respect to the
24       cause of that fire?
25  A.  Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                    February 9, 2012

13

1   Q.  And ultimately, what was your opinion as to the cause?
2   A.  The -- one of the bathroom fans in the ceiling of one
3       of the bathroom stalls.
4   Q.  Okay.  Did you render any opinions with respect to the
5       origin of the fire in that case?
6   A.  Basically, came specifically down to the -- that fan in
7       that area of the bathroom, in the ceiling of the
8       bathroom stall, and identified the failure mode in the
9       fan.
10  Q.  Okay.  But were you offering expert testimony as an
11      origin expert in that case?
12  A.  I was supplementing our origin cause expert's
13      testimony.
14  Q.  Okay.  And it appears that the defendants challenged
15      whether you were qualified to testify at the trial in
16      this case?
17  A.  Yes.
18  Q.  All right.  And specifically, what opinions were they
19      challenging?
20  A.  I'm not exactly sure which opinions.  But, I mean, they
21      were just challenging my expertise as an expert
22      witness.
23  Q.  Okay.  And when you say expertise, are you referring to
24      your education and experience, or --
25  A.  Yes.

14

1   Q.  Were they critical of your investigation itself?
2       MR. MOSS:  Well, I mean, obviously, these
3       were legal motions, and you can go read the motions.
4       It's the same kind of challenge that lawyers do.  I
5       mean, I'm not sure he read the pleading or even knows.
6       MR. FRANCO:  Okay.
7       MR. MOSS:  I mean, he's not the one who
8       drafted it.
9   BY MR. FRANCO, CONTINUING:
10  Q.  If you know?
11  A.  I don't, not specifically.
12  Q.  Okay.  All right.  Did that case go to trial?
13  A.  Yes, sir.
14  Q.  Okay.  And you testified at the trial in that case
15      also?
16  A.  Yes, sir.
17  Q.  All right.  The next item after that memorandum opinion
18      order is -- one, two, three -- four pages, looks like a
19      list of a lot of insurance companies.  What is this
20      document?
21  A.  You requested a list of all the clients that I've done
22      work for in the past five years.
23  Q.  Okay.
24  A.  I apologize, it doesn't go back five years.  But it --
25      I think it goes back about three years.  And that's

15

1       what they had on file at our home office.
2   Q.  It looks like all of them are insurance.  Are there any
3       on here that are not insurance companies?
4   A.  Yes, there's -- there's several attorneys, I'm sure.
5   Q.  Okay.  All right.  The next item is a manilla folder
6       that has your name on it.  And then looks like a file
7       number KY011000717.  What is this manilla folder?
8   A.  That is a copy of our office file.  So it has documents
9       that I wouldn't have in my personal file, which would
10      be invoicing, and documents pertaining to invoicing.
11  Q.  The first item in the folder on the left side appears
12      to be your invoice, is this correct?
13  A.  They are invoices for my time -- my services, yes.
14  Q.  Okay.  Looks like one invoice for 3,278, another for
15      2,050, another for $5,435.85, and then one for $435.
16      I'm sorry, strike that.
17      One -- oh, $5,435.85 were the last one.  So
18      are those the three invoices you've sent out so far?
19  A.  Again, I don't -- that's -- the office generates those
20      and sends those out.  So I'm not real familiar with
21      them.
22  Q.  Okay.  Roughly, how many hours have you -- roughly, how
23      many hours have you put in this case so far?
24  A.  You can -- it's right on those papers.
25  Q.  Okay.  These -- well, do these paper -- you don't know

16

1       if this would contain all of your hours so far then, do
2       you?
3   A.  It does contain all my hours.
4   Q.  It does?
5   A.  With the exception of preparation for this deposition.
6   Q.  Gotcha.  Okay.  On your invoices, the first entry here
7       that I see is from May 20.  And it says teleconference
8       with Steve Cottingham and Mike Black.  And was that
9       your first contact on this case?
10  A.  I'm not sure.  It'd be the first one I documented --
11      documented.  The reason I answered that way is it's not
12      uncommon for Steve to call me from the scene during his
13      initial exam, and we have an informal conversation
14      about what he's seeing.
15  Q.  Okay.  Did Steve call you from his -- from the scene
16      when he was there and you weren't?
17  A.  I do not specifically recall on this file.
18  Q.  All right.  Okay.  So on May 20th, it sounds like, you
19      spoke with Steve and with Mr. Black.  And what did you
20      discuss on that day?
21  A.  It would have been just basically the initial --
22      getting me initially involved in the file.
23  Q.  Did you discuss any observations that Steve made at the
24      scene on May 20, 2010?
25  A.  I do not recall specifically.  But what I would -- what



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                          February 9, 2012

**17**

1  I would think we would have been talking about, since
2  this was our initial conversation, would be, generally,
3  Steve gives me some background information. And at
4  this point, I believe he was explaining to me that he
5  had narrowed the origin of this fire down to the
6  kitchen area, and there were two appliances that were
7  energized at the time, and that -- you know, he needed
8  my assistance in his origin and cause investigation.
9  Q.  Okay. When he said that he had narrowed it down to two
10  appliances, which appliances was he referring to?
11  A.  Again, he didn't narrow it down. What he said was is
12  there were two appliances. He narrowed it down to the
13  kitchen area, and he said that there were two
14  appliances that were energized at the time, a
15  dishwasher and this refrigerator.
16  Q.  Okay. So I misspoke. You said he narrowed it down to
17  the kitchen, right?
18  A.  Yes.
19  Q.  Okay. But that there were two appliances that were
20  energized, and that was the dishwasher and the
21  refrigerator?
22  A.  Yes.
23  Q.  And what specifically did he did need assistance with
24  from you?
25  A.  My role in this file was to basically assist him in his

**18**

1  origin and cause investigation, helping him narrow down
2  the origin and cause to a specific, in this case,
3  appliance, it ended up being. So I'd either rule out
4  or point to a specific appliance and a specific
5  failure, or it could have been branch wiring or what
6  have you. At this point in time it was basically, you
7  know, what in the area -- what were the competent
8  ignition sources in the area in the kitchen, and
9  helping him narrow it down and rule out what did and
10  didn't contribute to the fire.
11  Q.  Okay. And what was his role at that point, if you
12  know?
13  A.  His role is to do the primary origin and cause
14  investigation.
15  Q.  Was there some particular area of his investigation
16  that he was not capable of doing that required your
17  attention?
18  A.  Typically, and in this case, for instance, the origin
19  and cause investigators will involve a forensic
20  engineer when they start trying to narrow down the
21  origin and cause to specific either electrical or
22  mechanical systems, including appliances.
23  Q.  Okay. When Mr. Cottingham told you that there were two
24  appliances that were energized in the kitchen, was --
25  was your involvement then to determine which of those

**19**

1  two appliances it was?
2  A.  No.
3  Q.  Did you ever confirm that those were the two appliances
4  that were energized in the kitchen?
5  A.  I -- I did.
6  Q.  And how did you do that?
7  A.  Through Mr. Magee, Mr. William Magee. He was there and
8  he explained what had did that morning, plus also just
9  looking at the evidence.
10  Q.  And so no other appliances in the kitchen were
11  energized?
12  A.  When we say energized, I'd say in operation at the time
13  of the fire.
14  Q.  No other appliances were in operation at the time of
15  the fire? Was the refrigerator in operation at the
16  time of the fire?
17  A.  Yes.
18  Q.  And what do you mean by in operation?
19  A.  What I would mean is, is a refrigerator operates on its
20  own automatically when it's plugged in. And clearly,
21  someone doesn't unplug the refrigerator or turn it off
22  before they leave.
23  Q.  Okay.
24  Q.  Okay? So where as opposed to a microwave, where you
25  have to physically go over and turn it on and cause it

**20**

1  to function.
2  Q.  Even though a microwave might not be functioning like
3  cooking food at the time, it would still be energized?
4  A.  Correct. That's why I distinguished between
5  operational and energized.
6  Q.  All right. So when you spoke with Mr. Cottingham and
7  he narrowed its -- the origin to the kitchen, did he
8  tell you what he believed as to which product might
9  have -- if there was a product that might have caused
10  the fire?
11  A.  No. We always make it a point basically to not discuss
12  those sorts of things until I've had a chance to assess
13  the scene and gather my own information. And then we
14  start comparing notes.
15  Q.  And so was there a particular reason why he reference
16  the fridge and the washing machine? Was it only
17  because they were actually operating?
18  A.  The dishwasher.
19  Q.  Or the dishwasher?
20  A.  Right, because those are the two appliances that were
21  in operation basically at the time of the fire.
22  Q.  Okay, all right. And then the next entry on your
23  invoice is May 21, 2010. And it says teleconference
24  with Mr. Steve Cottingham, UIS senior investigator and
25  attorney Mr. Michael Black, research and product



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

**21**

1   information. So first, what did you and Mr. Cottingham
2   and Mr. Black discuss on the 21st?
3   A.  This is the 21st of which -- what was the date again,
4   please?
5   Q.  May 21, 2010.
6   A.  Okay. There was some information about that Steve
7   had -- Mr. Cottingham had gathered concerning the
8   appliances.
9   Q.  Which appliances?
10  A.  The refrigerator, and he was working on the dishwasher
11  as well.
12  Q.  Okay. And do you know where he got the information
13  from?
14  A.  I believe it was from an Internet search, but I didn't
15  ask him specifically.
16  Q.  And what did he say about the fridge and the
17  dishwasher?
18  A.  He had not found any specific recalls involving the
19  products that he understood were in use at the time.
20  Q.  Okay. Anything else?
21  A.  Model -- basically model number and serial number which
22  you saw on those papers.
23  Q.  Okay. And then maybe I'm not reading this correctly.
24  But did you do your own research on the 21st?
25  A.  I did not.

**22**

1   Q.  Okay. Only because it says researched product
2   information. So does that just mean you talked about
3   that with --
4   A.  Basically, I went over what they -- he sent me. I went
5   on and I verified what he was -- you know, basically
6   what the sources -- I found the same information on the
7   Internet basically, but I did not specifically dig in
8   and look.
9   Q.  Gotcha. June 1st, looks like you reviewed
10  investigation material, telephone conference with Steve
11  Cottingham. What investigation material did you
12  review?
13  A.  Just basically the information that I had in the file
14  in preparation for the scene exam the next day. So
15  essentially, you know, what I was doing is just making
16  sure we were prepared for a multi-party scene exam.
17  Q.  Okay. June 2nd, it looks like the scene exam. You met
18  with Steve Cottingham, conducted multi-party exam,
19  collected, labeled, documented evidence, photographs,
20  and then made a verbal report to Cott -- to Steve.
21  Then it says additional instructions from Steve
22  Cottingham, received instructions, set up conference
23  call with Michael Black. So first, June 2nd, was that
24  the first day that you were actually at the site?
25  A.  Yes.

**23**

1   Q.  Were you at the site on any days other than June 2nd?
2   A.  Not that I recall.
3   Q.  Okay. The verbal report to Steve Cottingham, what was
4   the verbal report that you gave him?
5   A.  Essentially, my observations and opinions of what I was
6   seeing at the scene.
7   Q.  Okay. And as of June 2nd, were your opinions the same
8   opinions that you have in the report that was produced
9   to me?
10  A.  Yes.
11  Q.  Was there anything in the verbal report that you gave
12  to Mr. Cottingham that is different from or contradicts
13  the report that I have here today?
14  A.  No.
15  Q.  What were the additional instructions that you received
16  from Mr. Cottingham?
17  A.  Essentially, we were going to have a conference call
18  with the attorney, and fill him in on our observations
19  and where we were at.
20  Q.  And so did you get other instructions or --
21  A.  They would be documented there. But after the
22  conference call, I believe in this case I was basically
23  told to await further instructions.
24  Q.  Okay.
25  A.  And ultimately, at some point, I was requested to write

**24**

1   a formal report.
2   Q.  Okay. There's a June 3rd entry here, made appointment
3   with Michael Black, e-mailed photographs for conference
4   call. So did you meet with Mr. Black on June 3rd?
5   A.  It was a teleconference.
6   Q.  A teleconference. And what did you discuss?
7   A.  Basically what -- our observations at the scene.
8   Q.  Okay. And then on that conference call, was that the
9   one where -- strike that.
10          It says right here Steve Cottingham was on
11  the call?
12  A.  Yes.
13  Q.  Okay. And did he indicate the area that he believed to
14  be the origin of the fire on June 3rd?
15  A.  Yes.
16  Q.  Okay. And what did he say on the phone?
17  A.  Clearly, I don't recall specifically. But he and I
18  were in 100 percent agreement as to what -- what we
19  were seeing. And basically, that the area of origin
20  was the kitchen, and specifically the area of this
21  refrigerator.
22  Q.  Okay. The photographs that you e-mailed, those
23  photographs are in your file?
24  A.  Yes.
25  Q.  Okay. I think they might be, but I'm just going to



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

25

1    ask, are some of those attached to your report?
2    A.  Yes.
3    Q.  Okay.  June 8th, looks like another teleconference with
4        Steve Cottingham.  But it says here he returned to the
5        scene with other experts to support seeing exam
6        completion.  And then it says and special REQU.  Do you
7        know what that conference call was about on the 8th
8        with Steve?
9    A.  The -- I believe Ryan Cox, or at least his client was
10       requesting further exam and evidence collection.  They
11       wanted to essentially sift the entire scene is my
12       understanding.
13   Q.  Okay.
14   A.  And so I was talking to Steve.  We were discussing that
15       and how to handle that, and --
16   Q.  Okay.  And what is your understanding of who Ryan Cox's
17       client was on June 8th?
18   A.  I thought he was -- you know, to be honest with you, I
19       don't recall specifically.  It would be on our sign-in
20       sheet.  But the manufacturer of the refrigerator or --
21       he knows.
22   Q.  Okay.  On June 9th, teleconference with update,
23       discussion with Steve Cottingham, return to scene to
24       support scene exam completion and special REQU.  So
25       another phone call on June 9th.  What was that one

26

1    about?
2    A.  Again, he's updating me with his further discussions
3        and plans for further scene exam activities.
4    Q.  Originally, when you were contacted, Mr. Cottingham
5        needed assistance from you to help determine the cause
6        and origin of the fire.  Is he calling you on the 8th
7        and the 9th because he still needs assistance in some
8        regard?
9    A.  He's making sure that I'm aware what's going on, and
10       that he and I are in agreement as to the plans or --
11       you know, what we think -- how we think we should
12       handle this.
13   Q.  Okay.  And when you say handle this, what are you
14       referring to?
15   A.  Any further scene exam activities, and whether I need
16       -- whether or not I need to be present, and what we
17       need to make sure happens.
18   Q.  Okay.  And I assume that's because as of May 21st --
19       strike that.
20           As of June 2nd when you had spoken with
21       Mr. Black, and also with Steve after your -- after your
22       scene examination, you and both Steve concluded that
23       the origin of the fire was in the area of the
24       refrigerator.  And if I'm reading this correctly,
25       you're telling me that Ryan Cox and/or other parties

27

1    wanted to do more scene exams after -- after you had
2    reached that conclusion?
3    A.  That's correct, yes.
4    Q.  Right, okay.  And so you're trying to communicate with
5        Steve about how evidence should be gathered, or if it's
6        okay, whatever procedures they're following, but
7        nothing that was done subsequent to June 2nd at the
8        scene had any bearing on your opinions, do it -- does
9        it?
10   A.  It did not.
11   Q.  Okay.  The next entry is June 23rd.  And it says
12       reviewed investigation material, researched product
13       information, made appointment with Steve Cottingham.
14       So what was the investigation material that was
15       reviewed on the 23rd?
16   A.  It was further investigation of the refrigerator
17       information.
18   Q.  Okay.  Were these different materials than what
19       Mr. Cottingham first forwarded to you?
20   A.  That is where I basically went out and did my own
21       search per se.  Did a -- you know, just kind of looked
22       on my own, in addition to what Steve had provided me.
23   Q.  And what did you find?
24   A.  I don't specifically recall.  But whatever I would have
25       found of -- pertinent, I would have either noted in my

28

1    notes or run a copy of, or it'd be in this file, the
2    documents that we provided.
3    Q.  Okay.  And then on June 30th, additional instructions
4        from Mr. Black.  What were the additional instructions?
5    A.  Basically, to await -- I believe.  Usually they're
6        listed on there.  But it'd be await further
7        instructions.  I mean --
8    Q.  Okay.  And then it says, also on June 30th, received
9        instructions.  Please send all engineering bulk photos
10       to Mr. Jack T. Riley, Johnson and Bell,
11       attorneys-at-law.  And I was looking through the box
12       here that was on the desk that you provided today.
13       This box, correct me if I'm wrong, but maybe 99 percent
14       of it is all photos, right?
15   A.  I don't -- I mean, certainly there's going to be a lot
16       of photographs in there.  I don't know what percentage
17       it would be.
18   Q.  But a large portion of it's photographs, right?
19   A.  Okay.
20   Q.  Is that fair?
21   A.  I don't know, to be honest with you.  I mean, I don't
22       know how many printed pages are in there.  So, I mean,
23       but there are a large number of printed photographs in
24       there.
25   Q.  Okay.  Well, I'll just represent to you that the only



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                    February 9, 2012

29

1   written materials that I found are right here, about an
2   inch thick.
3   A. Okay.
4   Q. These items. The rest of that appears to be
5   photographs is all I'm saying; does that sound right to
6   you? The rest of this box is mostly photographs?
7   A. Yes.
8   Q. Okay. Now, and I was looking at -- I'm only asking
9   this because those photographs that were on top of it,
10  they say prepared for Jack T. Riley, Jr., on the top of
11  that.
12  A. Okay.
13  Q. Now, is that because Mr. Black asked you to send them
14  to Jack T. Riley, Jr.?
15  A. Yeah. I mean, essentially what -- yes. I mean, I
16  would have taken all mine, put them in a manner where
17  basically I can send them to him so --
18  Q. Okay. I just want to --
19  A. Try to keep track of what I'm sending to whom, if you
20  know what I'm trying to say.
21  Q. Yeah. Just so you understand, I'm just trying to
22  establish, Mr. Riley did not retain you in this case,
23  did he?
24  A. No.
25  Q. Okay. All right. All right. Now, the rest of the

30

1   right side of the manilla folder now, first is an
2   e-mail to -- strike that.
3         An e-mail from you to Mike Black, with CC to
4   Steve Cottingham and Rich Varsky and Margie Crutcher.
5   Who is Margie Crutcher?
6   A. She's our office administration assistant.
7   Q. Okay.
8   A. She's the person who basically puts together and
9   maintains that file.
10  Q. Okay. And it looks like here you e-mailed -- it says
11  engineering report with exhibits; is that the same
12  report that I have here?
13  A. Yes, there's only one.
14  Q. Okay. Next is an October 27th letter from Mike Black.
15  It just says that you were assigned -- your company was
16  assigned the file on the 19th. The next item is an
17  e-mail from you to Margie Crutcher, looks like
18  September 26, 2011. And your e-mail to Margie says,
19  greetings, Margie, please reopen KY011000717. First,
20  before I ask you about this e-mail, was the file closed
21  before September 26, 2011?
22  A. Typically what we do when we're awaiting further
23  instructions for an extended period of time, we'll
24  close the file or basically make it inactive, so it's
25  not showing up on reports.

31

1   Q. Okay. And was there a particular reason why it was
2   opened -- reopened around September?
3   A. That would have been when I received further
4   instructions to do some further work.
5   Q. Gotcha. I also see here an e-mail from Margie to
6   Deborah Andrews, was CC'ed to Larry Fore, F-o-r-e.
7   Who's Deborah and Larry?
8   A. Deborah Andrews, I believe she works out of our Atlanta
9   office. She's one of the corporate administrative
10  assistants. Larry Fore was our territorial manager for
11  our office.
12  Q. Okay. I think that's just an accounting issue.
13        MR. MOSS: You can keep going, it's okay.
14        (Mr. Moss exited deposition room at 1:03
15  p.m.)
16  BY MR. FRANCO, CONTINUING:
17  Q. Okay. Then there's an e-mail here -- strike that.
18        There's another e-mail about an invoice,
19  another e-mail about an estimated invoice. There's an
20  e-mail here from Michael Black dated August 19, 2010.
21  He says, as I explained previously, our firm is not
22  responsible for the payment of your company's bills.
23  Your invoice should be forwarded directly to our
24  client's representative Michelle Henderson. You can
25  reach her at the e-mail address indicated above. And

32

1   it says her e-mail is Mighenderso@hanover.com. Have
2   you spoken to Michelle directly ever?
3   A. Michelle?
4   Q. Henderson?
5   A. Not that I recall.
6   Q. Okay.
7   A. Sounds like those are invoices -- basically e-mails
8   concerning invoicing which Margie would have been
9   generating.
10  Q. Okay. Here's another e-mail about the invoice. August
11  4th, there's a letter from Margie to Mr. Black about
12  the invoice. June 30th, letter to Mr. Black, again,
13  about the invoice. May 21, e-mail from you to Black,
14  attached is a new assignment sheet. And lastly, I
15  believe, first report and enclosure due at service
16  center, 5-27-10.
17  A. That sounds like the top of their assignment sheet.
18  Q. Gotcha, okay. And that's pretty much everything in
19  this manilla folder.
20        (Mr. Moss reentered deposition room at 1:05
21  p.m.)
22        THE WITNESS: And again, that's -- that's
23  the things that were outstanding or different from what
24  you already have in the box.
25  BY MR. FRANCO, CONTINUING:



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                    February 9, 2012

33

1    Q.  Right, gotcha.
2            MR. FRANCO:  Bruce, I'm going to want a copy
3    of this stuff.  But for the dep, can I get these?
4            MR. MOSS:  Yeah.  We can copy everything
5    right now, if you want.
6            MR. FRANCO:  Sure.  Yeah.
7            (Mr. Moss exited deposition room at 1:05
8    p.m.)
9            MR. FRANCO:  Let's get the first exhibit
10   sticker here.
11           (Exhibit No. 1 marked)
12           (Recess taken at 1:06 p.m.)
13           (Mr. Moss reentered deposition room at 1:06
14   p.m.)
15   BY MR. FRANCO, CONTINUING:
16   Q.  Okay.  Mr. Kelly, I'm going to grab the -- the
17   documents off the top of this box that you gave me
18   today, which are basically the items that are documents
19   as opposed to photographs.
20           MR. MOSS:  Let's see if you're right.
21   Ninety percent?  I think you're right.  A lot of
22   photographs.
23           THE WITNESS:  And I'll -- probably there's a
24   lot of multiples in there, as it gets sent back and
25   forth.

34

1            MR. FRANCO:  Right, that always happens.
2            THE WITNESS:  To different parties and what
3    have you.
4            MR. FRANCO:  All right.  Let's -- give me
5    your next sticker.  Actually, do you mind if I just use
6    those?
7            COURT REPORTER:  Sure.
8            (Exhibit No. 2 marked)
9    BY MR. FRANCO, CONTINUING:
10   Q.  Okay.  The first page off the top of that box that I
11   pulled is marked today Mers Kelly Exhibit No. 2.  And
12   this is a privilege log Mers Kelly file.  Did you
13   prepare this privilege log?
14           MR. MOSS:  No, he didn't.
15   BY MR. FRANCO, CONTINUING:
16   Q.  Okay.  So the first item on Exhibit 2 says Federal Rule
17   Civil Procedure 26 expert report initial draft.  And
18   then the reason for removal is listed as draft report
19   protected by FRCP 26(b)(4).  The second document is
20   engineering report initial draft.  The reason for
21   removal is draft report protected by FRCP 26(b)(4).
22   And the last document is Steve Cottingham FRCP 26 extra
23   report initial draft.  And the reason for removal is
24   draft report protected by FRCP 26(b)(4).  First I just
25   want to ask you, do you have anywhere, either here or

35

1    in your office or something here somewhere, any prior
2    drafts of the report that I have here today?
3    A.  Of my report?
4    Q.  Yes.
5    A.  No.
6    Q.  Okay.
7            MR. MOSS:  Did we -- I know it's on that
8    list, but didn't we determine that it was marked
9    initially but it really isn't because it was your --
10           THE WITNESS:  Yeah.  I apologized to him.  I
11   said basically I forgot to -- when I draft the report
12   initially --
13           MR. MOSS:  It says initial but it really
14   wasn't.  So it --
15   BY MR. FRANCO, CONTINUING:
16   Q.  Okay.  There are two documents being referenced as
17   initial drafts.  So I'm just wondering if you had ever
18   seen an initial draft of someone else's reports?
19   A.  Well, typically, Steve and I review each others'
20   reports.
21   Q.  Okay.
22   A.  So I should have seen a copy of his report, and I would
23   think he saw a copy of mine.
24   Q.  Did you ever see Steve's final report?
25   A.  I believe that's it actually.  I don't know if he --

36

1    but, yes.
2    Q.  Okay, gotcha.  Do you know if you've seen a version of
3    Steve's final report that was different than the final
4    report?
5    A.  I don't -- I'm sorry.  I don't think I understand the
6    question.
7    Q.  Sure.  You've -- I assume you've reviewed Steve
8    Cottingham's final report?
9    A.  Yes.
10   Q.  Have you ever seen a document, a version of that report
11   that he authored that's different than that final
12   report that you saw?
13   A.  When you say different, I've not seen or talked to him
14   about anything different than his conclusions that are
15   documented in his final -- or in his final report.
16   Q.  Okay.  All right.  Now, I'm going to mark Exhibit 3
17   here.
18           (Exhibit No. 3 marked)
19   BY MR. FRANCO, CONTINUING:
20   Q.  And for the record, I've just marked Mers Kelly Exhibit
21   No. 3.  There's a Bates number at the bottom Mers Kelly
22   00019.  On the top of this document is dated June 8th,
23   2010.  It says NPJ26217-54NPSU/ update merchandise item
24   list.  Let me just hand you this document and let me
25   ask you where that came from or what it is, if you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                    February 9, 2012

**37**

1  know?
2  A.  My -- first of all, I'm not exactly sure where this
3     came from.  But essentially what -- this is a printout
4     that, my understanding, Mr. Magee got from Sears, or
5     his son got from Sears.
6  Q.  Okay.
7  A.  Basically helping to identify the model number of the
8     refrigerator that was in place.
9  Q.  Gotcha.  There are a few items redacted from the
10    document.  Do you know why they're redacted?
11 A.  No.  It was like that when I got it.  It wasn't --
12 Q.  Okay.  The next exhibit I'm going to mark here is
13    Exhibit No. 4.  This is going to be a group exhibit.
14        (Exhibit No. 4 marked)
15 BY MR. FRANCO, CONTINUING:
16 Q.  For the record, group Exhibit 4 consists of Mers Kelly
17    Bates numbers 00020 to Mers Kelly 00027.  And these
18    appear to be the sign-in sheets.  The first page,
19    00020, doesn't have a date on it.  But I guess all I
20    was going to ask you with respect to these items is do
21    you have the sign-in sheet from the day that you were
22    there?
23 A.  The top one is the one from -- is a copy of the sign-in
24    sheet from when I was there.  I think my name's listed
25    first.

**38**

1  Q.  Oh.  I didn't see it because it's typed and everyone
2     else hand wrote theirs.  Okay.
3  A.  I understand.
4  Q.  How did you manage to type yours?
5  A.  Just a form I carry with me.  And Steve didn't have any
6     at the time, and I offered that one to him.
7  Q.  Okay.  So -- so presumably, the first one with the
8     sticker on it is actually June 2nd?
9  A.  Yes.
10 Q.  Okay.  I also have one from June 7th, June 8th, June
11    9th, June 10th, June 25th.  And at this one, Joe
12    McCormick was present.  Who's Joe McCormick?
13 A.  Joe McCormick at the time was our territory manager for
14    the Indianapolis or Indiana office.
15 Q.  Okay.  Did you have any conversations with Mr.
16    McCormick about the cause or origin of the fire?
17 A.  Yes.  I believe we had some conversations about the
18    origin and cause.  And he was of like opinion.
19    Basically, he -- he offered nothing contradictory to
20    what we were looking at.  In fact, he reinforced it.
21 Q.  Okay.  There's June 28th, there's another individual
22    here listed, Chad Kincaid, and Jeremy Landis.  Do you
23    know who they are?
24 A.  No, but their -- their affiliation should be listed on
25    there.

**39**

1  Q.  Oh, you know, it's quotation marks.  But I believe
2     it's -- it might be Kodiak or on behalf of LGA.
3  A.  Okay.
4  Q.  Next is June 29th.  And the only reason I'm going
5     through these is just to confirm you weren't at any of
6     those other inspections, were you?
7  A.  No.
8  Q.  All right.  Let's put that one on the bottom.  Okay.
9     I'm going to mark Exhibit 5.
10        (Exhibit No. 5 marked)
11 BY MR. FRANCO, CONTINUING:
12 Q.  For the record, Exhibit 5 appears to be the office of
13    the fire marshal report fire investigation.  There's a
14    fax stamp on the top, October 19th, 2011.  How did you
15    get the fire marshal's report?
16 A.  I believe from Steve Cottingham.  He -- typically, the
17    origin and cause investigator procures the reports and
18    then shares them.
19 Q.  Okay.  You received this on October 19th?
20 A.  I don't recall.
21 Q.  Just make sure, for the record, the fire marshal's
22    report is Mers Kelly Bates numbers 00028 to 00040.  Did
23    you review this report prior to drafting your report in
24    this case?
25 A.  I don't recall.

**40**

1  Q.  Okay.  Did you speak to the fire marshal before --
2     strike that.
3        (Recess taken at 1:16 p.m.)
4        MR. FRANCO:  Thank you.  Those are yours.
5        THE WITNESS:  Thank you, sir.
6  BY MR. FRANCO, CONTINUING:
7  Q.  Well, let me ask you this.  Who was the fire marshal?
8  A.  It would be on the report.  I don't recall
9     specifically.
10 Q.  It indicates on the -- on this report it was Timothy A.
11    Murray.  Did you speak to Mr. Murray prior to --
12 A.  I did not speak to any -- as I recall, there were --
13    none of the fire department personnel were present at
14    the exam.  And I don't recall speaking with any of
15    them.
16 Q.  Okay.
17 A.  And to answer your earlier question, I believe that
18    report was included in Steve Cottingham's -- as an
19    exhibit in Steve Cottingham's report so I would have
20    read it.
21 Q.  Oh, the fire marshal's report?
22 A.  I believe it was an exhibit in his report, so --
23 Q.  Gotcha.  This report says on page -- Bates page Mers
24    Kelly 00037, because of the severity of the damage, an
25    exact point of origin could not be determined.  Do you

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

WILLIAM C. MERS KELLY, PE                          February 9, 2012

41

1    agree with that?
2    A.   No.  I believe though he mentioned in one of the fire
3    reports, I think they mentioned the kitchen area, which
4    I do agree with.
5    Q.   The last paragraph of this report on Mers Kelly Bates
6    00040 says additional energized structural wiring and
7    appliances service cords inside the kitchen were
8    examined.  Damage to the conductors was identified as
9    resulting from direct flame impingement, radiant heat
10   and fire gases.  No evidence was found revealing damage
11   resulting from internal failures or areas of resistance
12   heating prior to the ignition of the flames.  I assume
13   you disagree with that?
14   A.   I don't know what all he was looking at.  But if it's
15   -- if that's -- you know, if he's specifically
16   referring to the refrigerator, yes.
17   Q.   All right.  I think that covers all of the actual
18   documents I got.  Nope, I'm wrong.
19   A.   There's more.
20   Q.   There's more.  A letter from Jack Riley to Mike Black.
21   Okay.  It looks like the protocol for the scene exam.
22   Mers Kelly Bates 000 -- I'm sorry, 00009, recall alert.
23   Was this one of the things that you found off the
24   Internet?  Sure, let me hand this to you.  I'll hand
25   you Mers Kelly 0009 -- strike that.

42

1              Mers Kelly 00009 through 00010.
2    A.   Too many zeros, huh?
3    Q.   Yeah.
4    A.   Yes.
5    Q.   Okay.  I'll take that back.  Thanks.  Was this the
6    information that Mr. Cottingham initially provided to
7    you, or is this information that you subsequently got
8    on your own?
9    A.   I believe it's consistent with both, but I'm not
10   totally sure.
11   Q.   Okay, all right.
12   A.   There were -- essentially, there were two recalls that
13   we had discussed, neither of which applied to this
14   particular model of refrigerator.
15   Q.   Then there's a first report with enclosures.  Looks
16   like a lot of blank pages here, just with a case
17   caption on it.
18   A.   That was my -- those are CD -- or DVD labels for when I
19   was providing, well, photographs or what have you.
20   Q.   Gotcha.  Now, I think that covers --
21   A.   And now I understand why it's so thin, is all the
22   reports and things are just referenced in there, not
23   necessarily contained in there.
24   Q.   All right.  Okay.  Let's go to -- let's hand you Mers
25   Kelly Exhibit No. 1 which is your engineering report,

43

1    initial draft, October 4, 2011.  I think we've
2    established that although it says initial draft, this
3    is your final report?
4    A.   One and only.
5    Q.   Gotcha.  I'll hand you Mers Kelly Exhibit No. 1.
6    Actually, sorry.  Yes.
7    A.   Okay.
8    Q.   All right.  Was there anyone that helped you or
9    assisted you in providing the opinions contained in
10   your own report?
11   A.   No.
12   Q.   These are your final opinions in the case?
13   A.   Yes, sir.
14   Q.   Are all the bases for your opinions set forth in the
15   report?
16   A.   I'm not sure exactly what you mean, but I believe so.
17   Q.   As far as the materials that you're relying on in
18   support of your opinions, I'm not talking about
19   evidence or artifacts from the scene, but materials
20   like documents or photographs, we have anything here
21   today, don't we?  There's nothing -- I'm just asking,
22   there's nothing back at the office that you rely on in
23   support of your opinions?
24   A.   I mean, not specifically.  I mean, you know, there's
25   obviously my experience and --

44

1    Q.   Right, right.
2    A.   -- those sorts of things.
3    Q.   I'm just talking about actual physical materials?
4    A.   Yes.  You have everything, yes.
5    Q.   Gotcha.
6    A.   To the best of my ability and knowledge.
7    Q.   Okay.  With respect to the actual origin of the fire,
8    is that an opinion that you rely upon from Steve
9    Cottingham, or is that an opinion that you also have
10   independently of Mr. Cottingham?
11   A.   Both.
12   Q.   Both.  Have you ever testified as an expert with
13   respect to, well, fire investigations?
14   A.   I'm not sure what you mean?
15   Q.   Have you ever been retained to testify with respect to
16   investigating the actual origin of a fire?
17   A.   If you're asking me if I've ever been retained as
18   origin and cause expert, no, no.  I've always been
19   retained as a forensic engineer.
20   Q.   And is that the capacity in which you were retained in
21   this case?
22   A.   Yes.
23   Q.   I assume your opinion with respect to the origin of the
24   fire is that the origin of the fire was the
25   refrigerator --

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

45

1   A.  Yes.
2   Q.  -- correct?  And more specifically, the origin of the
3       fire was internal to the refrigerator?
4   A.  Yes.
5   Q.  Is there anything that Mr. Cottingham says in his
6       report, or anything that he told you verbally, that you
7       rely upon in support of your own opinion that the
8       origin was internal to the fridge?
9   A.  Not that I recall.  I mean, like I told you, when I
10      showed up, first thing I like to do is just walk the
11      scene, take pictures, gather all the information with a
12      clear, open mind.  And then after I've had a chance to
13      process all that, we start comparing notes.  And then
14      after that, it's -- there's a lot of collaboration, so
15      --
16  Q.  But it's fair to say that you don't need to read Mr.
17      Cottingham's report in order for you to hold the
18      opinion that the origin of the fire was internal to the
19      refrigerator?
20  A.  No.
21  Q.  Okay.  Let's go to No. 6.
22              (Exhibit No. 6 marked)
23  BY MR. FRANCO, CONTINUING:
24  Q.  All right.  I'm going to hand you what is marked as
25      Mers Kelly Exhibit No. 6.  And this, I believe, is your

46

1       current CV?
2   A.  This is the one I just handed you this morning?
3   Q.  No, it's not.  That's the one that was attached to the
4       report that I received.
5   A.  Okay.  That -- I handed you my most current.
6   Q.  The CV this morning?
7   A.  Yes.
8   Q.  Okay.
9   A.  Which the primary difference is it just included a list
10      of testimony, I think.
11  Q.  Okay.  Of course, it's in the part that I left at the
12      office.
13  A.  Let me hand this back to you.  Do you want me to hang
14      onto this one?
15  Q.  Hang onto it for a second.
16  A.  Okay.  I've got two exhibits here.
17  Q.  Okay.  All right.  Let's take a look at your CV here.
18      The first thing I see on the first page there,
19      University of Cincinnati.  What year did you graduate?
20  A.  1982.
21  Q.  Okay.  And what was your degree in?
22  A.  I received a BSME.
23  Q.  Any other degrees?
24  A.  No.
25  Q.  Okay.  What was your first job out of college?

47

1   A.  I worked on my own.
2   Q.  And what'd you do?
3   A.  I had my own basically appliance, I called it Will's
4       Fix It.  Actually, that's the way I earned my way
5       through college.  One of the ways I earned my way
6       through college.  I also partnered up with a friend of
7       mine who had a van conversion business, and he was
8       getting into the handicapped, specialized handicapped
9       conversions.  And I helped him with basically some
10      design work and actually converting vans for
11      handicapped people.
12  Q.  All right.  Your work at the -- Will's Fix It, I think
13      you called it?
14  A.  It was -- basically, it was my own little fix it shop.
15      I'd fix appliances, cars, you name it.
16  Q.  All right.  Did any -- did any of that involve fixing
17      refrigerators?
18  A.  At times.
19  Q.  All right.  Did any of that involve fixing Kenmore
20      refrigerators?
21  A.  We actually owned a Kenmore refrigerator, so I'd say
22      yes.  We owned a lot of Kenmore appliances when I was
23      growing up.
24  Q.  Did any of those involves models -- or the model
25      involved in this case?

48

1   A.  No.
2   Q.  Did any of the repairs that you did involve repair as a
3       result of a fire?
4   A.  Are you talking about during the -- not that I recall.
5   Q.  Okay.  All right.  Did you ever take any coursework
6       with respect to design or manufacture of refrigerators?
7   A.  I'm not sure.  I mean, clearly, there's a lot of
8       coursework that's related to it.  I don't -- so I'm not
9       sure I understand your question.  Are you looking for
10      specifically designing -- I mean, can you clarify your
11      question?  I mean --
12  Q.  Yeah.  Specifically with respect to design of -- let's
13      just -- let me just limit it to design right now.  Did
14      you ever take any coursework specifically related to
15      design of refrigerators?
16  A.  I mean, clearly, I took a lot of coursework that
17      would -- you'd use in a design, but nothing
18      specifically for the design of a refrigerator.
19  Q.  I understand as a BSME, you would take design courses,
20      right?
21  A.  Correct.
22  Q.  Right, right.
23  A.  Yeah, in refrigeration and all those sorts of things.
24  Q.  All right.  Did you ever -- were you ever employed in
25      any capacity with respect to designing refrigerators?



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

ESQUIRE
DEPOSITION SOLUTIONS

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                February 9, 2012

49

1  A.  I was employed, if you look in here, you'll see for a
2      period of time at Freund Precision/Freund Medical, and
3      then ultimately Slush Puppie, where I did a lot of
4      design of commercial slush freezers and refrigeration
5      equipment, and ice cream dispensing equipment.
6  Q.  Okay.  And when you worked for Freund, what type of --
7      Freund is F-r-e-u-n-d.
8  A.  It's a German pronunciation.  Freund is --
9  Q.  Oh, yeah?
10 A.  But he just told everybody Freund.
11 Q.  All right, that's funny.  Freund does mean friend?
12 A.  It does.
13 Q.  Okay.
14 A.  And so he just said Freund.  That's the way he
15     pronounced his name.
16 Q.  Okay.  So what types of -- well, strike that.  How many
17     different types of refrigerators did you design while
18     at Freund?
19 A.  Well, at Freund or Freund, when I was there, you know,
20     I -- I -- I did all the Slush Puppies.  Basically, it
21     was specifically for Slush Puppies freezers, Slush
22     Puppies equipment.  So, you know, I'm going to say -- I
23     mean, I don't know how to break it down.  But there
24     were -- we had visual machines, we had -- I don't know
25     what you'd -- you know, countertop, we had floor

50

1      models, and then like I said, a very specialized ice
2      cream dispensing machine, we had slush vending
3      machines.  I mean, it's hard to --
4  Q.  Okay.
5  A.  -- to really pin it down to a number per se.
6  Q.  Did any of the items designed, that you designed while
7      working at Freund involve refrigeration systems similar
8      to the one involved in this case?
9  A.  I think they were very similar.  I mean, it wasn't for
10     a commercial refrigerator, if that's what you're asking
11     me.  But they were very similar.
12 Q.  All right.
13 A.  And that the same systems, principals are employed.
14 Q.  Okay.  And when -- in the commercial setting, the
15     similar systems that you designed, were they freezers,
16     or refrigerators, or both?
17 A.  The interesting thing about slush equipment is, is, I
18     mean, you would -- the -- the systems primarily were
19     capable of doing freezing, so they were a lower
20     temperature model, so they weren't -- whereas
21     refrigeration tends to be a somewhat higher
22     temperature.
23 Q.  Right.  And I'm assuming, but maybe you'll correct me
24     if I'm wrong, the need for lower temperatures with
25     respect to these systems that you were designing was to

51

1      keep Slush Puppies cool or cooler, right?
2  A.  To cool them down below the freezing point, if that's
3      what you're trying to get to.  I mean, that's usually
4      where you -- refrigeration and then freezing, you know.
5      That's where that terminology comes from.
6  Q.  Okay.  But were -- I guess, was there some sort of
7      system that you designed, like a walk-in freezer, or a
8      walk-in fridge or something like that, or no?  Am I --
9      because when I think of the Slush Puppie equipment, I'm
10     thinking of the actual dispensers.  Is there some other
11     system that you're talking about?
12 A.  No, I didn't -- from a walk-in freezer standpoint, no.
13     I mean, you're talking about an appliance.
14 Q.  Right.
15 A.  Basically a commercial appliance that is used.
16 Q.  And the appliance is something -- strike that.
17            I'll ask you this.  Is the appliance that
18     you're talking about something in a factory setting, or
19     this is in a store setting.
20 A.  Talking about in use?
21 Q.  Yes.
22 A.  It could be both.  I mean, when you say factory, I'm
23     not sure exactly what you mean.  But, I mean, they can
24     be used in commercial environments as well, you know,
25     including stores.

52

1  Q.  Okay.  Were there particular aspects of the
2      refrigeration system that your designs pertained to?
3  A.  I'm not sure I understand your question, I apologize.
4  Q.  I guess, well, let me ask you this.  So you designed
5      certain things when you worked at Freund.  And I'm
6      wondering if, with respect to any particular product
7      that you designed, did you design the whole product,
8      top to bottom, or a particular component?
9  A.  Yes.  I was response -- basically, I was responsible
10     for the full design, implementation, manufacturing and,
11     ultimately, field support.
12 Q.  Okay.
13 A.  Testing, what have you.  I mean, the whole nine yards.
14 Q.  Okay.  And was it all for Slush Puppie?
15 A.  From what I can recall.
16 Q.  Okay.  And so when you say that the products were
17     similar, you're -- to the refrigeration in this case,
18     you're referring to the manner in which the cooling
19     system works, correct?
20 A.  From the control standpoint, from -- yeah.  Basically,
21     the systems employed, the mechanics of it, the
22     insulation of it, the cabinets.  I mean, you know, it's
23     --
24 Q.  Right.
25 A.  -- very, very similar.



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

53

1   Q.  But with respect to actual end use, not similar, right?
2   A.  How so?  I mean, yeah.  These things -- actually, Slush
3        Puppie did sell these to individuals, they did have
4        them in their homes per se.
5   Q.  But, I mean, it's not storing food inside where
6        somebody is opening the door and getting stuff out,
7        right?
8   A.  Well, it's storing food inside, but you're dispensing
9        it through a nozzle or some, you know, orifice.  You're
10       not placing separate items in and out of it, I guess
11       you'd say.  Is that where you're going?
12  Q.  Okay, right, right.  Its use is limited to one thing
13       and that's Slush Puppies?
14  A.  Well, in a broad sense.  I mean, it was designed for
15       frozen beverages or frozen desserts.
16  Q.  All right.
17  A.  The reason I say that is, I mean, Slush Puppie had a
18       wide variety.  I mean, they have adult beverages and
19       all those sorts of things, too.  So --
20  Q.  Okay.  Other than Freund, what was your other
21       experience with respect to designing refrigeration
22       equipment?
23  A.  I actually worked directly for Slush Puppie after
24       leaving Freund.
25  Q.  Okay, so you left.  And then were you essentially doing

54

1        the same thing for Slush Puppie?
2   A.  Yes, I was basically their -- in charge of their
3        engineering, you know, manufacturing and customer
4        support, parts, the whole nine yards.
5   Q.  Okay.
6   A.  I believe they called me their chief engineer, as I
7        recall.
8   Q.  At Slush Puppie?
9   A.  Yes.
10  Q.  Before -- before Freund, you worked at MedVenture
11       Technology?
12  A.  Not before.  It's after.
13  Q.  Oh, I'm sorry.
14  A.  It's reverse chronological order.
15  Q.  Gotcha, gotcha.  So after you were working on your own,
16       was your first employment you had an outside employer
17       was with Enginetics?
18  A.  Enginetics, yes.
19  Q.  Okay.  And this basically says you designed aft facing
20       seats for troop compartments?
21  A.  It was 9g aft facing seats was the primary project that
22       I was hired for, was a military project --
23  Q.  Okay.  So no --
24  A.  -- with the C5B.
25  Q.  No engineering experience with respect to refrigeration

55

1        at Enginetics, right?
2   A.  No.
3   Q.  The next job was Technology Incorporated, and it says
4        here project engineer from '85 to '86.  Again, it's
5        fair to say that your job there didn't -- did not
6        involve any engineering experience with respect to
7        refrigeration, right?
8   A.  I don't recall.  We were doing a variety of government
9        projects, and whether or not one or more of those
10       involved a refrigeration, I'm not sure.  I don't recall
11       specifically.
12  Q.  And then under Freund Precision/Freund Medical, I might
13       be mistaken.  I thought you were saying that that's
14       where you designed a lot of the refrigeration equipment
15       for Slush Puppie before you --
16  A.  That's correct.  That's -- that's -- exactly.  I mean,
17       they were transferring some of their design and
18       manufacture to us.
19  Q.  Okay.  But then under your CV here it says,
20       responsibilities included managing design engineering
21       group to reverse engineer/electro/mechanical spare
22       parts for DESC, Defense Electronics Supply Center, at
23       Wright Patterson Air Force Base in Dayton, Ohio.
24  A.  Yes.
25  Q.  And design, develop, manufacture and commercialize

56

1        medical devices and commercial equipment.  So I guess
2        I'm just asking, the refrigeration experience is not
3        listed on your CV in particular.  Is that just
4        because --
5   A.  I thought I mentioned designing for Slush Puppie.  I
6        didn't note -- don't know that I used the words
7        refrigeration or not.  But I was just trying to
8        summarize the -- my --
9   Q.  Okay, yeah.  Actually, I don't see Slush Puppie on
10       here.  Do you have it in front of you with the CV?
11       Maybe I have it, maybe I missed it.
12  A.  My CV.  Okay.  Oh, I have -- basically, I think what I
13       did is I just left it under the Slush Puppie
14       Corporation, is essentially what I was doing for Slush
15       Puppie, I was doing at Freund, so --
16  Q.  Gotcha.  Okay.  So that brings us to Slush Puppie from
17       '91 to '93.  And it says our chief engineer, right?
18  A.  Yes.
19  Q.  Okay.
20  A.  And only engineer.
21  Q.  Okay.  Have you ever had any involvement with the
22       design and manufacture of -- strike that.
23           Have you ever had any involvement with
24       respect to the design of refrigerators similar to the
25       refrigerator that was involved in this case?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                           February 9, 2012

57

1   A. Define similar. I mean, you're obviously looking for
2     something specific. I --
3   Q. In terms -- yeah. I'm just talking about a fridge that
4     a consumer would buy at -- at a store, appliance store,
5     for use in the house to keep food and drinks cold, that
6     kind of refrigerator.
7   A. Okay.
8   Q. Have you ever designed refrigerators like that?
9   A. No.
10   Q. Have you ever published any articles with respect to
11     refrigeration design in any capacity?
12   A. No.
13   Q. Under your specialized training listed on the third
14     page of your CV, the first item there is Fire Findings,
15     investigating solid fuel burning appliance fires 2009,
16     16 hours tested. Who -- who -- was that Fire Findings?
17     Is that who put on the course?
18   A. Yes.
19   Q. Okay.
20   A. Either up in Michigan, I don't recall exactly the
21     address. But -- Jack Sanderson's one of the
22     proprietors, he actually investigates. He's a fire
23     investigator.
24   Q. Okay. And then the next says Mike Holt, eight hours,
25     Fire Findings, investigation of residential dryer

58

1     fires, Benton Harbor, Michigan, 16 hours tested?
2   A. Now, that was -- you -- Mike -- yeah, there's Mike
3     Holt, and then there's Fire Findings.
4   Q. Oh, I'm sorry. Sorry about that.
5   A. No problem.
6   Q. Yeah, Mike Holt was eight hours I take it, and --
7   A. Right. That was NEC, National Electric Code.
8   Q. Which provisions of NEC did that cover?
9   A. Essentially, he was -- he was going through the --
10     primarily focused on what he deemed to be the 101
11     essential keys or essential rules in the NEC Code.
12   Q. Okay. The Fire Findings, solid fuel burning appliances
13     and -- appliance fires, 2009, were there particular
14     appliances that were discussed with that -- that
15     course?
16   A. We were primarily focused on heat generating appliances
17     for the solid fuel burning. I mean, you were talking
18     about pellet stoves, fireplaces, fire inserts, wood
19     burning. Those sorts of things.
20   Q. Okay. The next one on here is Fire Findings,
21     investigation of gas and electric appliance fires,
22     Benton Harbor, November 2007, 30 hours tested. What
23     appliances were covered in that course?
24   A. I don't recall specifically, but it was a -- it was --
25     they touched upon a wide variety.

59

1   Q. Okay. Any of that involve refrigeration?
2   A. I don't specifically recall. I'm sure they touched
3     upon it, but to what degree, I don't recall.
4   Q. Okay. The last two are motor vehicle, then the very
5     last one is traffic accident reconstruction, Lynn
6     Fricke.
7   A. Yes, the one you were talking about.
8   Q. I'm dying to ask Chuck if he's related. So have you
9     ever done accident reconstruction before?
10   A. To a degree.
11   Q. Okay. Okay. The next item on your CV is familiar
12     technologies. And the first item is commercial and
13     residential appliances and lighting. It lists
14     environmental control systems, computers, washers,
15     dryers, fans, stoves, ovens, toasters, entertainment,
16     et cetera. By the e-t-c, et cetera, does that include
17     refrigerators?
18   A. Yes. You could also say it's refrigerator being a
19     subset of environmental controls. It's controlling a
20     small environment, right, within another environment.
21   Q. And familiar technologies, fair to say you're not
22     holding yourself out as an expert with respect to every
23     single one of these items, right? You're just saying
24     they're technologies that you're familiar with?
25   A. Well, when you say expert, I'm not sure exactly what

60

1     you mean. But certainly familiar enough to --
2   Q. I mean, for example, the extent to which you're
3     familiar with computers, washers, dryers, fans, stoves,
4     ovens and toasters and entertainment stuff, your level
5     of familiarity is based on the extent to which you've
6     actually studied and worked with them, right?
7   A. Yes.
8   Q. And you've certainly worked on some things more than
9     others, right?
10   A. Clearly.
11   Q. Okay. Now, under air conditioning and refrigeration
12     equipment, I assume the reference to refrigeration
13     equipment, your familiarity comes from your experience
14     from your work at Freund and Hush Puppy, right?
15   A. Freund and Slush Puppie, primarily.
16   Q. Okay.
17   A. I mean, I've done a lot of hands-on, like I told you,
18     in repairing appliances and working with different
19     things.
20   Q. Okay. So you list here chillers, cooling towers, heat
21     pumps, package units, compressors, condensers,
22     evaporators and ammonia systems. Have you actually
23     designed those systems for any entity, company?
24   A. Not all these.
25   Q. Okay.



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                    February 9, 2012

**61**

1  A.  I -- to varying degrees, I've employed them, or worked
2      around them or investigated them.
3  Q.  Okay.  Commercial heating equipment, fire protection
4      equipment, gas, lawn and garden equipment, hydraulic
5      and pneumatic equipment, manufacturing shop equipment,
6      material and equipment analysis you have.  And what is
7      your experience with respect to material and equipment
8      analysis?  And it says here equipment failure analysis,
9      accident analysis.
10 A.  Can you help me find where -- oh, material -- it's
11     under the heading material equipment analysis?
12 Q.  It's under the heading familiar technologies.
13 A.  Yeah, okay.
14 Q.  Under there, it says material --
15 A.  The subheading would be material and equipment
16     analysis?
17 Q.  Right.
18 A.  Equipment failure analysis, accident analysis.
19 Q.  Yes.  So I guess I'm just asking about what your
20     experience is with respect to that type of analysis?
21 A.  Well, like I said, I've been fixing things since --
22     you know, my mother will tell you since I could --
23     about the time I could walk.  And then through my
24     career as an engineer in design development, I've done
25     a lot of failure analysis.

**62**

1  Q.  Okay.
2  A.  And sometimes that involved accidents.  And then also
3      with my experience with, obviously, with Unified
4      Investigations and Sciences, I focused much more on
5      that.
6  Q.  The last item on the third page is residential
7      equipment, heating equipment, air conditioning
8      appliances and controls.  Is that the same -- your
9      experience there is with respect to -- refer to
10     hands-on?
11 A.  Yes, yes.  I mean, experience both, like I said, from
12     the repair side, and then it relates a lot to what I --
13     my engineering experience over the years, and then
14     certainly, in the fire investigate -- forensic
15     engineering side of things.
16 Q.  Okay.  The fourth page, manufacturing plant and
17     facility systems equipment.  Does any of that have to
18     do with refrigeration?
19 A.  It would in the sense of preventative maintenance.  You
20     know, the manufacturing of it.  Let's put it that way.
21     The work environment is similar to the manufacture
22     environment where these refrigerators are produced.
23 Q.  Now, lastly, under familiar technology, manufacturing
24     and processing equipment, you wouldn't consider a
25     refrigerator to be processing equipment, correct?

**63**

1  A.  Not in the sense that we're talking about.  I mean,
2      this -- this -- obviously, a refrigerator is for
3      storage rather than for processing.
4  Q.  On page four is a list of patents.  Is there any
5      patents pertaining to refrigeration systems?
6  A.  I'm not sure if Slush Puppie ever got a patent on their
7      ice cream dispensing or slush equipment.  I don't
8      specifically recall.
9  Q.  When -- when it lists here awarded 20 U.S. patents to
10     date, is that patents awarded to you personally, or to
11     the company for which you were working when you
12     designed --
13 A.  Well, when you say awarded, I mean, essentially, if
14     you're talking about -- I mean, I was named as an
15     inventor.
16 Q.  Okay.
17 A.  And all these were -- are basically owned or signed
18     over to a company.
19 Q.  Gotcha.  There's a lot of medical device patents here.
20     And I think you were saying you weren't sure if Slush
21     Puppie got patents on refrigeration --
22 A.  Right.  I know that we definitely talked to patent
23     attorneys, you know.  Whether or not, how far they
24     pursued those and whether or not they were issued, I'm
25     not sure.

**64**

1  Q.  Okay.  So currently, you're employed by Unified.  What
2      is your full-time -- full-time job?
3  A.  When you say full-time job?
4  Q.  I assume it's --
5  A.  I mean, my -- my primary income is derived from working
6      for Unified Investigations and Sciences.
7  Q.  Okay.  And that would be as a forensic engineer?
8  A.  Correct.  Senior forensic engineer.
9  Q.  And your areas of studies at University of Cincinnati
10     was mechanical engineering, right?
11 A.  Primarily.  I was actually torn between mechanical and
12     electrical, so I took a lot of electrical courses,
13     anticipating getting a dual degree, which I never did
14     finish.  But I always tried to max out my course load
15     every -- to a fault almost, as my advisors would tell
16     me.
17 Q.  So did you take any -- well, strike that.
18        Let me ask you this first.  What is forensic
19     engineering?
20 A.  Essentially, forensic -- that's a good question.  You
21     describe it in a -- I would say it's the economical
22     application of engineering and science to -- helping to
23     understand or -- and identify causes and origins of
24     losses.
25 Q.  All right.  And did you take any coursework in forensic



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                   February 9, 2012

65

1    engineering at University of Cincinnati?
2  A.  Not that was specifically called that.  I mean, I took
3    courses in product liability and failure analysis.
4  Q.  Was this at -- at Cincinnati?
5  A.  Yes.
6  Q.  How many courses did you take?
7  A.  I don't recall.  I mean, you know, we --
8  Q.  Product liability and failure analysis, did any of the
9    courses that you took pertain to product liability and
10   failure analysis with respect to refrigerators?
11  A.  It was very general.  Whether or not we touched upon
12   refrigerators, I don't specifically recall.
13  Q.  Did you take courses like strength of materials?
14  A.  In fact, it was called basic strength of
15   materials.
16  Q.  Did you take any courses in metallurgy?
17  A.  Yes.
18  Q.  Did you obtain any degrees in metallurgy?
19  A.  No.
20  Q.  Other than the product liability and failure analysis
21   coursework that you took at Cincinnati, did you take
22   any other coursework in that subject?
23  A.  Not that I can -- not that I can specifically recall.
24  Q.  All right.  With respect to your experience in forensic
25   engineering, where does that come from?

66

1  A.  Really, what it boils down to is it's a -- you're
2    relying on all your experience to understand how things
3    are put together and how they're designed, you know,
4    how things work, how things can fail.  You use all that
5    in determining what's -- and interpreting evidence.
6    You know, seeing and just basically -- so -- so to
7    answer your question, I mean, it's a culmination of
8    life experience.  And one of the things that's been
9    very helpful to me is -- is having such a broad
10   background and large degree of hands-on experience, as
11   well as the manufacturing, design development,
12   commercialization, and then product support out in the
13   field.
14  Q.  Okay.
15  A.  You know, I pretty much -- I have a really good big
16   picture view, whereas a lot of people maybe primarily
17   focused on design, you know.  See, working for smaller
18   companies, you wear multiple hats.  Working for a large
19   company, you're more narrowly focused.  And my career
20   focused on small companies because I liked the multiple
21   hats, the big picture.
22  Q.  With respect to performing forensic analysis to
23   determine a particular failure, is there some sort of
24   scientific methodology that you would follow?
25  A.  Yes.

67

1  Q.  Okay.  And is that, generally speaking, the same
2    methodology you would follow in any type of forensic
3    analysis?
4  A.  Yeah.  I mean, essentially, you're talking about the --
5    yes, it's the same.
6  Q.  Okay.  And the methodology that you follow, where did
7    you learn that?  Is that from your experience, or is
8    that something you took -- you learned in a course?  Or
9    it's written down in a book somewhere?
10  A.  It's -- scientific method is probably the most common
11   area, you know, the core tool.  You learn that both in
12   experience, schooling, and then experience on the job.
13   And you use that in design development.  Basically, any
14   kind of problem solving.  That's -- that's your core.
15  Q.  Okay.  And so from both experience and schooling.  So
16   would that be Cincinnati, the schooling part of it?
17  A.  Primarily.
18  Q.  Is there some sort of treatise or textbook or manuals
19   that you follow that sets forth the methodology that
20   you would sort of be governed by in doing a failure
21   analysis?
22  A.  There are plenty of guides available to us.
23  Q.  And are there any in particular that you use?
24  A.  Well, NFPA 921 would be -- obviously, would be one.
25  Q.  Is that something that you relied upon in this

68

1    particular case?
2  A.  Yes.
3  Q.  NFPA 921 is a guide that you would follow in a case
4    like this involving a fire where you're trying to
5    determine what caused the fire and where the origin
6    was, right?
7  A.  It's a guide for fire and explosion analysis.
8  Q.  Have you read NFPA 921, the whole thing?
9  A.  I believe so.  I mean, when you say read the whole
10   thing, I'm -- yes, I mean, I read the book.
11  Q.  Okay.  And the methodology recommended in 921, you
12   agree with that?  It's good methodology?
13  A.  I think it's a good guide.
14  Q.  Yeah.  When you were at the scene on June 2nd, 2010,
15   what version of NFPA 921 were you relying on?
16  A.  2008.
17  Q.  When you authored your report, which version of NFPA
18   921 were you relying upon?
19  A.  Primarily 2008.
20  Q.  With respect to your work on this case in determining
21   the cause or origin of this fire, did you rely upon any
22   of your engineering -- mechanical engineering
23   background?
24  A.  Absolutely.
25  Q.  Okay.  What -- what particular aspects of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                          February 9, 2012

---

**69**

1    engineering -- mechanical engineering are we talking
2    about?
3    A.   I mean, I'd just say all my -- I mean, I don't know how
4    to answer that question, to be honest with you, I mean.
5    Q.   I mean, I guess I'm a little confused because you have
6    a degree in mechanical engineering, but your expertise
7    is in the area of forensic engineering, right?  And so
8    I guess what I'm wondering is to what extent is there
9    overlap between those two fields, and to what extent
10   were you looking at it from a mechanical standpoint
11   versus --
12        MR. MOSS:  Well, let me just object to the
13   form of the question.  It's just ambiguous.  He's a
14   mechanical engineer, he does forensic investigations.
15   I don't know that that's even possible to answer.
16        THE WITNESS:  I'm a licensed professional
17   engineer.
18   BY MR. FRANCO, CONTINUING:
19   Q.   Okay.  What does a -- oh, strike that.
20        The licensure, is that something from the
21   State of Indiana?
22   A.   One.  I mean, for this particular case, the loss
23   occurred in Indiana.
24   Q.   But you're licensed in other states?
25   A.   Yes.

---

**70**

1    Q.   Which other states?
2    A.   Ohio, Kentucky, Tennessee, Illinois, we already
3    mentioned Indiana.
4    Q.   Okay.  And --
5    A.   I also hold a -- a record at NCEES.
6    Q.   And what is that?
7    A.   It's a council record that allows you to basically --
8    their goal was to -- your file -- they try to maintain
9    a file that would meet state licensure.  So that what
10   you can do is you can go -- so they uphold to a higher
11   level than some states so that essentially, it acts
12   like the state licensure through concomitantly.
13   Q.   Okay.  And was there a particular mechanical system at
14   the site of this fire that you inspected and examined
15   and tested?
16   A.   I mean, multiple.
17   Q.   Which -- okay.  Which ones, I guess?
18   A.   I mean, I -- essentially, I looked at the area of
19   origin.
20   Q.   Before you go on I'll say mechanical systems.  So is
21   the area of origin a mechanical system?
22   A.   Well, it contains mechanical systems.  I mean, I
23   don't -- I guess what I should ask you is define a
24   mechanical -- in your language, what's your definition
25   in the sense of --

---

**71**

1    Q.   Well, you know what?  It was a bad question, actually,
2    because -- I apologize.  Your opinion was that the area
3    of origin was the refrigerator so, therefore, the
4    refrigerator would be the mechanical system, right?
5    A.   Right.
6    Q.   Okay.  Other than the refrigerator, were there other
7    mechanical systems that you inspected and examined?
8    A.   Yes, I looked -- yes.  The other appliances, and just
9    items that we found throughout the structure.
10   Q.   Okay.  From an engineering -- mechanical engineering
11   standpoint, did you do any testing, engineering testing
12   or engineering analysis on any of the appliances that
13   were in the kitchen?
14   A.   I did analysis, but I didn't do any testing per se.  I
15   mean, you know, certainly no destructive testing.
16   Q.   And your analysis is based on visual observation,
17   right?
18   A.   Yes.
19   Q.   Okay.
20   A.   Sorry.
21        VIDEO OPERATOR:  It's fine, don't worry.
22   BY MR FRANCO, CONTINUING:
23   Q.   Do you consider yourself an expert in the area of fire
24   or explosion investigation and analysis?
25   A.   In what sense?

---

**72**

1    Q.   Well, I guess -- strike that.
2        Let me ask you this.  Is -- is forensic
3    engineering a different field, would that be considered
4    a separate field from fire investigation?  Or would you
5    consider that one and the same, or overlap?
6    A.   Overlap.
7    Q.   Okay.  Did you ever take any courses in explosion
8    dynamics or fire dynamics?
9        MR. MOSS:  Well, what do you mean by fire
10   dynamics?  As a separate -- you believe that's some
11   discipline called fire dynamics?
12   BY MR. FRANCO, CONTINUING:
13   Q.   Yeah, if there's a course that you took on the subject
14   of fire dynamics?
15   A.   Not specifically.
16   Q.   Did you take any courses with respect to analysis of
17   fire patterns or burn patterns?
18   A.   No.
19        MR. MOSS:  I -- just for the record, you
20   know, he's gone through in detail seminars, et cetera,
21   he's attended.  I'm sure they dealt with some burn
22   patterns, et cetera.  I mean, I'm not following your
23   questions, but I'm hoping we get to the substance of
24   this sometime soon.
25   BY MR. FRANCO, CONTINUING:

---



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

73

1   Q.   Are you certified as a fire investigator by the
2        International Association of Arson --
3   A.   No.
4   Q.   Are you certified as a fire protection specialist --
5        strike that.
6             Are you certified as a fire protection
7        specialist by the Certified Fire Protection Specialist
8        Board?
9   A.   Easy for you to say.  No.
10  Q.   Okay.  Are you licensed by any governmental
11       subdivisions to conduct fire or explosion
12       investigations?
13  A.   I'm not sure I understand your question.
14  Q.   Has any governmental body licensed you to conduct fire
15       or explosion investigations?
16  A.   Well, as part of my professional engineering licensing.
17            MR. MOSS:  Yeah.  My objection is your
18       question seems to assume there's some license like
19       that.  I don't know if that's fair to say.
20            MR. FRANCO:  No, I'm not assuming that there
21       is a license or that it's required even.
22  BY MR. FRANCO, CONTINUING:
23  Q.   I'm just asking if you've ever been licensed by any
24       state or federal or local government to perform fire
25       investigations?

74

1   A.   Only as a professional engineer.
2   Q.   Okay.  All right.  Other than your license as a PE, is
3        there -- do you have any other licensures?
4   A.   I have the one -- I think --
5   Q.   Yeah, you told me about the other ones.
6   A.   -- we covered it, yeah.
7   Q.   Those two, or is that -- is there more?
8   A.   That's all I can recall.
9   Q.   Okay.  Have you ever studied heat and plane vector
10       analysis?
11  A.   Not specifically.
12  Q.   Okay.  I know you talked about taking courses like
13       material analysis or strength of materials.  Did you
14       take any courses in materials flammability?
15  A.   I don't recall specifically, but I have a lot of
16       experience through the design of manufacturing various
17       products, so I understand the science, I understand the
18       process, I understand the testing.
19  Q.   Does your experience in the area of materials
20       flammability from the design side, would that include
21       your experience at Freund, and also Slush Puppie?
22  A.   Absolutely.
23  Q.   And which -- with respect to design of refrigeration
24       systems, let's just talk about Freund for now.  Were
25       there particular flammability issues that were of

75

1        concern in the dispenser, design of the dispenser?
2   A.   Yeah.  I mean, we had to meet UL, NSF and CSA, and
3        ultimately, ETL was another test lab that -- test lab
4        that came into play.
5   Q.   What particular materials are we talking about in that
6        system, in the Slush Puppie dispenser system?
7   A.   I mean, everything from the refrigerant to the polymers
8        involved, components.
9   Q.   And so what analysis would you do from an engineering
10       standpoint to determine the materials flammability of
11       refrigerants, polymers and stuff like that?
12  A.   Work with the manufacturers to make sure that what we
13       were using was appropriate for the application, and at
14       times, do our own testing.
15  Q.   Did you ever do materials testing with respect to --
16       strike that.
17            Did you ever do material flammability
18       testing with respect to any plastics, things like that?
19  A.   Yes.
20  Q.   Okay.  What type of plastics?
21  A.   Mainly -- okay.  I can narrow it down to mainly
22       thermoplastics.  There were some thermosets, but
23       primarily thermoplastics.
24  Q.   And when you say testing, are you talking about testing
25       to the point of combustion, or what type of testing?

76

1   A.   At times.
2   Q.   Okay.
3   A.   We're talking about material properties, so strength,
4        flammability.  Combustion certainly would be one of
5        them.
6   Q.   Okay.  I was looking at your CV, maybe I missed it.
7        Are there any professional organizations that you're a
8        member of?  Is there a lot, or --
9   A.   Well, there's some.
10  Q.   Okay.  All right.  Let me -- are there any professional
11       organizations that you're a member of that pertain to
12       fire investigation or cause and origin investigation?
13  A.   No.  I mean, not specifically.  When you say a member,
14       I assume you're saying a paying member?
15  Q.   Paid or honorary?
16  A.   I mean, I subscribe to, you know, a lot of publications
17       and, obviously, we -- as it -- our organization gets a
18       lot of these things that we have -- are privy to.
19  Q.   But are you personally a member of any organizations,
20       professional organizations pertaining to fire
21       investigations or cause and origin investigations?
22  A.   Let me see.  I'm not -- I'm not sure.
23  Q.   Okay.  Have you ever been on the NFPA committee?
24  A.   No.
25  Q.   Okay.



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

77

1  A.  No.  Actually, I've had the privilege of talking to
2      people who have, but I've not personally.
3  Q.  Okay.  Have you ever been on the Society of Fire
4      Protection Engineers?
5  A.  No.
6  Q.  Are you a member of the American Society for Testing
7      and Materials?
8  A.  No.
9  Q.  What about the International Society of Fire Service
10     Instructors?
11 A.  No.
12 Q.  Are you in the Society of Professional Engineers?
13 A.  Which ones are you talking about?  Are you just talking
14     --
15 Q.  Are you a member of any of them?
16 A.  I don't know if I'm -- again, I don't know if I'm a
17     current member or not.  It's not something I've been
18     keeping up with.
19 Q.  Are you a member of the American Academy of Forensic
20     Engineers?
21 A.  No.
22 Q.  You mentioned that the NFPA, you considered it to be a
23     guide.  I think you agreed it was a good guide to
24     follow.  But do you look at -- do you rely on it as
25     being authoritative in your field of work?

78

1  A.  Define authoritative.
2  Q.  Something that you must follow?
3      MR. MOSS:  No.  He said it's a guide.
4      That's what he already said.
5  BY MR. FRANCO, CONTINUING:
6  Q.  Okay.  So you don't have to follow it, right?
7      MR. MOSS:  No.  He said he did follow -- I
8  mean, you know what?  Let me object to the form of the
9  question.  It's been asked and answered, you're
10 badgering him.  We're an hour and a half into this.
11 Actually, more, two hours, and we haven't gotten to any
12 substance.  And this dep is going to end at 4:30.  He's
13 driving six hours.  I'm not prepared to stay beyond
14 that.
15     MR. FRANCO:  Why is it not going past -- I
16 mean --
17     MR. MOSS:  Because that's it.  I'm telling
18 you right now, I'm leaving at 4:30.
19     MR. FRANCO:  You can't do that.  I
20 subpoenaed this witness.
21     MR. MOSS:  Okay.  Well, you'll come back.
22 If you want to spend five hours going through the same
23 questions and you're on his resume still, reading from
24 your phone.
25     MR. FRANCO:  Well, my notes are on my phone.

79

1  That's why I'm reading from my phone.
2      MR. MOSS:  Okay.  I -- whatever method you
3  want, I don't care what website you go to.
4      MR. FRANCO:  Well, I'm just saying, I
5  subpoenaed the witness and I get the full time.
6      MR. MOSS:  Yeah.  The full time ends at the
7  end of the workday.
8      MR. FRANCO:  Wait a minute.  I sent an
9  e-mail out saying we could start at noon if we agreed
10 that it could -- that it will go long.  And you said
11 let's start at noon.
12     MR. MOSS:  Long would be a workday.  I --
13 you wanted 10:00, we gave you 10:00.  You asked to
14 accommodate you, we said noon.
15     MR. FRANCO:  Okay.
16     MR. MOSS:  He's driving six hours.  He's not
17 going to be leaving here and driving 'til midnight.
18     MR. FRANCO:  Well, if we have to come back,
19 we have to come back.  That's all I'm saying.
20     MR. MOSS:  Well, you'll have to go to where
21 he is.
22     MR. FRANCO:  Well, look, Mike.  I e-mailed
23 you, I said --
24     MR. MOSS:  My name's not Mike.
25     MR. FRANCO:  I'm sorry, Bruce.

80

1      MR. MOSS:  I know what the e-mail said, but
2  I find this just wholly inefficient.
3      MR. FRANCO:  Well, I'm sorry but I've got to
4  cover the CV here.
5      MR. MOSS:  You want to just keep covering
6  the same line over and over again?
7      MR. FRANCO:  I'm not --
8      MR. MOSS:  Two hours on a CV?
9      MR. FRANCO:  No.
10     MR. MOSS:  Then I guess maybe we need the
11 magistrate's help into, you know, what kind of proper
12 questions, how many hours to spend on the CV.
13     MR. FRANCO:  Well, that's fine.  And we can
14 take it up with the magistrate.  All I'm saying is that
15 --
16     MR. MOSS:  Okay.  So why don't you move into
17 something more substantive than the CV, and then we'll
18 take up with the magistrate --
19     MR. FRANCO:  Well, I disagree.  The CV is --
20     MR. MOSS:  How many more hours you should
21 have with the CV.
22     MR. FRANCO:  Look.  You know what the rule
23 provides in terms of how much time I get.  We asked if
24 we could start at noon and it would go long, if that
25 was okay with you and Mr. Kelly?  And you said, okay,



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

---

81

1    let's start at noon.
2        MR. MOSS: Yeah. Long to me is the end of
3    the workday. Long to me isn't 'til midnight. I'm not
4    prepared to stay here.
5        MR. FRANCO: I didn't say stay here 'til
6    midnight. I'm just saying --
7        MR. MOSS: I'm not going to. I don't care
8    what you say.
9        MR. FRANCO: Stay until as long as the rule
10   allows me to stay. That's all I'm saying.
11       MR. MOSS: How many hours do you want?
12       MR. FRANCO: Well, I don't know how long
13   it's going to take until I'm done here. But I'm
14   certainly entitled up to the limit provided by the
15   rules.
16       MR. MOSS: What's the limit provided by the
17   rules?
18       MR. FRANCO: Seven hours.
19       MR. MOSS: Okay. I'm not -- I don't have
20   seven hours today.
21       MR. FRANCO: Well, hey. That's why I
22   e-mailed and asked if it would be okay?
23       MR. MOSS: No, you never said you would --
24   intend to take seven hours.
25       MR. FRANCO: I didn't say I'm going to take

---

82

1    seven hours.
2        MR. MOSS: Try to get to something
3    substantive. So far, all we've done, in over two
4    hours, is your view of questioning his CV.
5        MR. FRANCO: Well, it's a major issue in the
6    case.
7        MR. MOSS: Major issue? You have his CV.
8        MR. FRANCO: Let's take a break.
9        VIDEO OPERATOR: All right. It is 2:20, and
10   we are going off the record. I need to switch out the
11   DVD's.
12       (Recess taken at 2:22 p.m.)
13       VIDEO OPERATOR: It is now 2:33, and we are
14   back on the record in the videotaped deposition of
15   William Mers Kelly. Counsel.
16   BY MR. FRANCO, CONTINUING:
17   Q. Okay. Mr. Kelly, back to where we left off here. NFPA
18      921 is something you consider to be a guide, right?
19   A. Yes, sir.
20   Q. Are there instances in which it's -- you think it's
21      permissible to deviate from following that guide?
22   A. Define deviate.
23   Q. To not follow it?
24   A. To not follow it?
25   Q. Right.

---

83

1    A. I can't think of any specifically.
2    Q. All right. Now, I think the CV that with was
3       attached -- or marked as an exhibit today, you might
4       have indicated is not the most current one. The one
5       you have today is the most current one?
6    A. Yes.
7    Q. What's on the one today?
8    A. As I mentioned, the primary difference is deposition
9       testimony experience.
10   Q. Gotcha. Okay. All right. Do you have Exhibit 1 in
11      front of you? Yes, you do.
12   A. Do you want both of these?
13   Q. Yeah, thanks. I'll hand you back Exhibit 1.
14   A. Okay.
15   Q. Do you have a copy of your deposition experience in
16      front of you, your own copy?
17   A. I do not, but I think I can get one. I tried to have
18      all that available here. I do have a copy of my most
19      current CV, so I think it's in there. That's the
20      testimony, okay.
21   Q. Mind if I just see it real quick?
22   A. You want the whole thing, or just --
23   Q. Just the list of testimony.
24   A. I believe it matches up what with what you have there.
25   Q. Okay.

---

84

1    A. There may have been one additional, I don't remember.
2    Q. Okay. I'm going to hand what you've -- your own copy
3       back to you.
4    A. Okay.
5    Q. And I'll go through the one that I have on my list, and
6       then you can just read to me what I didn't read off of
7       my list, okay? That's probably the fastest way. Looks
8       like January 1998, you gave a deposition as a fact
9       witness, a case Bifur-Tech versus Medlecture, is that
10      right?
11   A. Okay. I didn't -- I'm not seeing it on my list, but
12      okay.
13   Q. Okay. Well, I guess, let me just ask you, do you
14      recall testifying as a fact witness in that case,
15      Bifur-tech versus --
16   A. I was deposed.
17   Q. Okay. And then I have on my list, this is the version
18      that I got, and it's dated October 6th, 2011 -- I
19      thought it was attached.
20   A. It was -- those were part of the exhibits to the
21      report, I think.
22   Q. Right.
23   A. They were separate. And then what I did is in our
24      latest update on-line for CV's, it's now incorporated
25      in it.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                    February 9, 2012

85

1  Q.  Okay.  Well, let's just go to the August 18, '09.  Is
2     that one your version?
3  A.  Yes.
4  Q.  And that's the Sentry Insurance versus Nordyne,
5     N-o-r-d-y-n-e?
6  A.  Yes.
7  Q.  All right.
8  A.  They're a furnace manufacturer.
9  Q.  And then there was also May 5, 2011, we might have
10    talked about this one, Arch Insurance versus
11    Broan-Nutone?
12 A.  Right, that was a deposition.
13 Q.  Okay.  And then September 13th through 14th, Arch
14    Insurance versus Broan-Nutone?
15 A.  That was actually a trial.
16 Q.  Gotcha.  September 30th, EMC Hamilton versus Houston,
17    Inc.?
18 A.  Hutson, Inc.
19 Q.  Hutson, Inc.?
20 A.  Brandeis and Sennebogen.
21 Q.  Okay.  Are there other ones now I haven't read?
22 A.  Kentucky Farm Bureau -- let's see.  What basically --
23    well, let me put my glasses on so I can -- my eyes are
24    starting to get tired.  You want me to read it to you?
25 Q.  Just the one -- just the case name, that's all.

86

1  A.  Kentucky Farm Bureau Mutual Insurance Company, a/s/o
2     Mallie Hodson, plaintiff, and Mallie Hodson intervening
3     plaintiffs versus Wade Hatchell Heating and Cooling,
4     Inc.  Do you want the civil action or whatever?
5  Q.  No, that's okay.  Just the -- was there another one, or
6     is that it?
7  A.  I believe that is it.
8  Q.  Okay.  So for all the cases in which you've testified
9     either at deposition or trial, did any of those involve
10    refrigerators?
11 A.  No.
12 Q.  Have you ever been retained in a case, other than this
13    one, where you testified that the -- strike that.
14       Have you ever been retained in a case other
15    than this case where you rendered the opinion that a
16    refrigerator caused a fire?
17 A.  Any case that I've ever -- yes.
18 Q.  Right.  And none -- are any of those listed on the --
19 A.  I've not been deposed.
20 Q.  All right.  Okay.  Roughly, how many have you
21    testified -- strike that.
22       Roughly, how many cases have you rendered
23    the opinion that a refrigerator failed and caused a
24    fire.
25 A.  I don't recall specifically.  You want me to estimate?

87

1  Q.  Roughly.
2  A.  Roughly, half dozen.
3  Q.  Of those roughly half dozen, were any of those Kenmore
4     brand refrigerators?
5  A.  I don't recall.
6  Q.  Of those roughly half dozen, were any of those LG brand
7     refrigerators?
8  A.  I don't recall.
9  Q.  Of those roughly half dozen, were any of them purchased
10    from Sears, if you recall?
11 A.  I don't recall.
12 Q.  Okay.  Let's turn to Exhibit 1 which is your report.
13    Okay.  First, on the second page of your report, under
14    exhibits, it lists the 47 digital photographs, pictures
15    of a similar Kenmore model refrigerator, LG and Sears
16    Kenmore refrigerator model, dated June 30, 2005, and a
17    DVD containing 508 bulk photos that were taken.  Again,
18    those are all things that are in this box here, right?
19 A.  Yes.
20 Q.  Gotcha.
21 A.  And those were all things that are part of this report.
22 Q.  Okay.  Page two, paragraph three says, my knowledge of
23    the circumstances regarding this loss at the time of
24    this report was based on discussions with Mr. Steve
25    Cottingham, Unified Investigations and Science --

88

1     Sciences senior investigator, and discussions with Mr.
2     Magee, the insured, Mr. Dan Murray, a neighbor, and
3     multi-party exam participants.  Were those
4     conversations -- those were the conversations you had
5     at the site on --
6  A.  At the scene exam primarily, yes.
7  Q.  Other than your actual examination at the site and your
8     conversations with those individuals, is there any
9     other basis for your understanding of how the fire
10    actually occurred that day?
11 A.  I'm not sure I understand your question.
12 Q.  Bad, bad question.  Other than -- I shouldn't have said
13    how.  Other than your conversations with Mr.
14    Cottingham and the other individuals at the site, and
15    also your observations of the artifacts at the site, is
16    there any other bases for your understanding of the
17    facts and circumstances leading up to the fire?
18 A.  As more of the background?
19 Q.  Yeah, right, right.
20 A.  Okay.  Those are my sources.
21 Q.  Okay.  So Mr. Magee was there on -- or, strike that.
22       Mr. Meyer was there on June 2nd?
23 A.  Yes.
24 Q.  What did Mr. Meyer tell you about what he observed when
25    he was at the site?



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                          February 9, 2012

89

1    A.   What we did is we had him actually walk through what
2         his recollections of the occurrences of the day of
3         the -- date of loss.  So he talked about his initial
4         observations from the road, driving up the driveway,
5         meeting two individuals there.  Then the main thing we
6         were focused on from that point is we had him stand in
7         the doorway, just do a walk through.  We were actually
8         at the scene, so he could actually just go through the
9         motions of exactly what he did and what he saw that
10        day.
11   Q.   Okay.  And what did he explain to you, particularly
12        with respect to observations of fire?
13   A.   The -- he -- basically, he observed heavy fire from the
14        road.  In other words, this bright glow, flames
15        emanating from the roof.  I think he said it was behind
16        or beside the main peak of the roof.
17             His main focus was making sure nobody was in
18        the house.  So he went through the patio door, looked
19        in, saw fire and a lot of smoke, didn't see anybody;
20        then headed around, tried to get in the garage.  I
21        think he ultimately got into the garage and found there
22        was no cars in the garage.  He tried to make entry
23        through the garage door, entry door into the house,
24        again was met with heavy smoke.  Don't recall any
25        flames; debated about and worked on trying to get

90

1         things out of the garage, I guess, at some point.  But
2         anyway, worked his way around to the back of the house.
3             At that point he saw heavy fire emanating
4         from the back of the house and decided, okay -- that I
5         think he went into a little bit of a salvage mode for
6         -- you know, getting things out of the garage that
7         hadn't been burned yet possibly, and then decided he
8         wanted to -- before he got blocked in by the fire
9         department to go ahead and leave.  He didn't think he
10        had much more to add.
11   Q.   Okay.  When he was telling you all this, who was
12        present for that conversation?
13   A.   Everyone at the -- who signed that sign-in sheet,
14        basically.  So everybody, all the parties at the
15        multi-party exam.
16   Q.   All right.  And the sign-in sheet is the June 2nd one?
17   A.   Yes.
18   Q.   Actually, let me hand it back to you.  Kelly Exhibit 4,
19        the first page of Exhibit No. 4, just tell me who all
20        is on that sign-in sheet?
21   A.   Myself, Bill Mers Kelly, Ryan Cox, with Kodiak, who was
22        representing Whirlpool, and Steve Cottingham, Unified
23        Investigations and Sciences.
24   Q.   Okay.  So Mr. -- Mr. Meyer was saying all this, and
25        both you, Ryan and Steve were also present for that?

91

1    A.   Yes, absolutely.
2    Q.   All right.  And then was Mr. Magee also hearing this?
3    A.   He was -- he was there off and on during the day.  I
4         don't recall specifically whether it was there.  I'm
5         thinking he was there during that interview, but I'm
6         not 100 percent positive.
7    Q.   Okay.  At the scene, did you talk to Mr. Magee, and did
8         he explain to you what appliances were located where in
9         the house, and what was plugged in?
10   A.   Yes.
11   Q.   Okay.  And what did he tell you?
12   A.   The things that stand out most in my mind, I mean,
13        again, he did this in front of all of us because we
14        went through the background.  And then we -- he talked
15        about how the house was wired, when the house was
16        completed, things that are in my notes, basically.  The
17        one thing that was real interesting was is he talked
18        about a home run for each appliance.  In other words,
19        each appliance had its own circuit and own breaker,
20        which was unusual.  I mean, he was trying to be very
21        cautious.  I mean, this was his castle, per se.
22   Q.   Okay.
23   A.   And so he -- he was going out of his way to do what he
24        thought was best.
25   Q.   Okay.  Did he tell you anything about the electrical

92

1         system in the house and how it was constructed or set
2         up?
3    A.   Yes.  I believe it's in my notes.  I don't recall all
4         the details.  But essentially, it was constructed --
5         the house was constructed in 2004.  The electric -- I
6         think he -- the electrical contractors, for some
7         reason, ended up not doing the final finish work.
8    Q.   Okay.
9    A.   Which mainly consisted of switches and, you know, the
10        things you put in after your finish painting.
11   Q.   Okay.
12   A.   So it's more covers and things like that, I think.
13   Q.   All right.  And you say it's in your notes.  The notes
14        that you're referring to, are those the handwritten
15        notes that we copied earlier today?
16   A.   Yes, there's two pages.
17   Q.   All right.  I'm going to mark our next exhibit.
18             (Exhibit No. 7 marked)
19   BY MR. FRANCO, CONTINUING:
20   Q.   Kelly Exhibit No. 7 is your handwritten notes that we
21        copied.  It's two pages.  And I've put the sticker on
22        the top center of the first page just so I didn't cover
23        your notes here.  Let me just hand you the exhibit, and
24        why don't you just tell me what Mr. Magee related to
25        you as being plugged in and what not plugged in.

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

WILLIAM C. MERS KELLY, PE                    February 9, 2012

93

1    A.  So to answer your question about what was plugged in
2    and not plugged in, he talked about -- if you --
3    basically on the background of what he did that
4    morning, he talked about getting clothes out of the
5    dryer, so I would assume that that was plugged in.
6            (Mr. Moss exited deposition room at 2:52
7        p.m.)
8            THE WITNESS:  He started the dishwasher
9    before he left.  Did no cooking or anything that
10   morning.  Let's see, so the dishwasher would have been
11   energized.  Bill insisted every appliance was on its
12   own circuit, all outlets -- all outlets not used.  He
13   talked about a coffee maker that he got from his mom.
14   He was thinking it was like a Mr. Coffee 1977 vintage.
15   A black and Decker toaster, plugged in, blender not
16   plugged in.  Black and Decker can opener was plugged
17   in.  Range top was -- that was the sole propane
18   appliance, my recollection, it was not used that
19   morning.  And refrigerator, obviously, was plugged in.
20   The lights weren't on in the house when he left.
21   BY MR. FRANCO, CONTINUING:
22   Q.  Is that it, or --
23   A.  I think that's -- those are the things that answer your
24   question.
25   Q.  Okay.  Do you know what was -- what electronics or

94

1    appliances were in the room upstairs?
2    A.  I don't recall.
3    Q.  Do you know what electronics or appliances were in the
4    living room, or I think they called it the greater room
5    also?
6            (Mr. Moss reentered deposition room at 2:54
7        p.m.)
8    BY MR. FRANCO, CONTINUING:
9    Q.  Do you know what was in there?
10   A.  I don't -- specifically, I don't -- I don't recall.  I
11   know we talked about it.  I mean, I was your typical
12   television, elec -- you know, electronics type things.
13           (Mr. Moss exited deposition room at 2:54
14       p.m.)
15   BY MR. FRANCO, CONTINUING:
16   Q.  Were there ceiling fans anywhere in the house?
17   A.  I believe so.
18   Q.  Do you know where?
19   A.  I don't recall.
20   Q.  Okay.  The -- was the refrigerator taken from the scene
21   on June 2nd?
22   A.  Yes.
23   Q.  Okay.  Who was in charge of collecting the evidence on
24   June 2nd?
25   A.  Steve and I were with -- under Ryan's supervision.  So,

95

1    I mean, we all three worked together.  But we were
2    responsible because we were representing the
3    homeowners, people who owned, you know, that particular
4    piece of property.
5    Q.  Okay.  What other appliances were taken on the 2nd?
6    A.  There's an evidence list.  I'm thinking it was the
7    refrigerator and some of the dig -- you know, I don't
8    recall exactly what else.
9    Q.  Okay.
10   A.  But it'll be listed on our evidence list.
11   Q.  Was that attached to your report or no?
12   A.  It was attached to Steve's report.
13           (Mr. Moss reentered deposition room at 2:55
14       p.m.)
15   BY MR. FRANCO, CONTINUING:
16   Q.  Steve's report.  Okay.
17   A.  If you go back to his exhibits, or actually, in the
18   latter part of his report, I think he's also -- he's
19   got a list in there.
20   Q.  All right.  It's not on this one.
21   A.  That looks like it.  Those are it, on the front, if
22   you -- yeah.
23   Q.  These are all me.
24   A.  Okay.
25   Q.  So let's get to June 2nd.

96

1    A.  About the first one -- okay.
2    Q.  Oh, here we go.
3    A.  There you go.  It seemed like it was like three items.
4    Q.  Well, let me just hand it to you.  This was previously
5    marked as Cottingham Exhibit No. 2, and I'll just turn
6    to the page that I believe is the one you're referring
7    to from the evidence list.  Is that the June 2nd
8    evidence list?  Or I might be wrong about that, I'm not
9    sure.
10   A.  Well, it's labeled as the June 2nd.  But see, it shows
11   all these grids.
12   Q.  Show it to the -- okay.  Yeah.
13   A.  Those were all done -- we didn't do that that day.
14   Q.  Okay.
15   A.  So I don't know why it was labeled that way.
16   Q.  Okay.  But your recollection is that it was the fridge
17   and what else that was taken?
18   A.  Essentially, it was the refrigerator, there was --
19   there was various artifacts, you know, from our
20   excavation of the refrigerator.  Primarily what we were
21   trying to do is at that point, there was some weather
22   heading in, we were running out of daylight.  We wanted
23   to protect area -- the area of origin, you know, things
24   that were in the area of origin.
25   Q.  Okay.



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                    February 9, 2012

97

1   A.  And then there was some discussion at that point as
2       to -- because I think, if you -- as I recall, Ryan was
3       representing Sears and, I think, Whirlpool. And so he
4       was making calls because I think at some point we
5       figured out it was LG, possibly, instead of Whirlpool.
6       So we were reluctant to take too much.
7   Q.  Okay. Did Mr. Magee tell you who manufactured the
8       dishwasher?
9   A.  I'm sure he did. I don't recall.
10  Q.  Was the dishwasher manufacturer notified with respect
11      to the scene inspection on June 2nd?
12  A.  I don't recall.
13  Q.  Okay. You were mentioning -- mentioning other
14      artifacts that were taken. Were any other appliances
15      taken on the 2nd?
16  A.  I don't -- I don't believe so. I -- like I said, the
17      thing I specifically remember is refrigerator, and then
18      some of the artifacts that we were -- as we were
19      excavating it. So in that -- in that proximity. I
20      don't -- we didn't really go -- we didn't go --
21      everything -- I don't think we went any further.
22  Q.  Okay.
23  A.  That's my best recollection. If -- like I said, there
24      should be a list.
25  Q.  Okay. The -- the -- the exhibit that I handed you,

98

1       which I'll just hand it back to you, it's Cottingham
2       Exhibit 2.
3   A.  Let me make sure I don't mix these up, use my notes
4       here still. Okay.
5   Q.  It's Cottingham Exhibit 2.
6   A.  There we go.
7   Q.  Those were all the evidence lists that Mr. Cottingham
8       gave us. So I just -- I just don't know if you can tell
9       from looking at it which one is pertaining to the day
10      that you were actually there.
11  A.  The first one, the one on top here looks to me like --
12      well, it talks about the refrigerator, back of the
13      refrigerator, and sifted debris, yes.
14  Q.  Okay. Gotcha.
15  A.  That's my recollection.
16  Q.  Gotcha. There's three different dates on here and
17      that's why I was confused.
18  A.  I understand. There's a date that it was actually --
19      the date of loss, the date that it was actually
20      collected, and the date it was submitted.
21  Q.  Okay. Gotcha.
22  A.  I know it's -- it can be confusing, all these
23      documents, yes.
24  Q.  All right. Now, with respect to your understanding of
25      the construction of the house, you learned that from

99

1       Mr. Magee, and he told you that it was built in 2004,
2       right?
3   A.  Yes.
4   Q.  Do you know what the floor in the living room and the
5       floor upstairs, what those floors were made out of?
6   A.  Are you talking about the actual sub-flooring itself,
7       or, I mean --
8   Q.  No.
9   A.  -- what are we talking about?
10  Q.  Not the sub-floor, but the, whatever the flooring was
11      that was --
12  A.  The floor coverings?
13  Q.  Right.
14  A.  In the kitchen, we were able to see it was like a
15      linoleum. I don't recall specifically the rest of it,
16      whether, you know, carpet or hardwood. There was -- I
17      don't recall.
18  Q.  Okay. You indicate in your report that Mr. Magee lived
19      by himself. That's something that he told you at the
20      scene that day?
21  A.  Yes.
22  Q.  Okay. Looking at, you know, page two of your report,
23      paragraph five there, it says Mr. Magee got up around 4
24      a.m. EDT, put some clothes in the dryer, took a shower,
25      got clothes from the dryer, put the dishes in the

100

1       dishwasher and started it before leaving about 4:25
2       a.m. EDT to go to McDonald's to get something to eat.
3       He turned off all the lights and he did not cook
4       anything that morning before leaving. Then later on it
5       says that Dan Meyer was driving up to the structure
6       about 5:30 a.m. EDT, and made entry through the dining
7       room door where he saw heavy smoke and flames in the
8       direction of the kitchen area. I just wanted to ask
9       you first about what Mr. Magee told you -- your
10      understanding was, based on what he told you, the
11      dishwasher was running when he left, right?
12  A.  He turned it on before he left.
13  Q.  And then about 5:30, you have -- strike that.
14          About 5:30 in the morning, your
15      understanding is that we have Dan Meyer seeing the
16      house on fire, right?
17  A.  Right.
18  Q.  Your report says that -- with respect to Dan Meyer, it
19      says he saw heavy smoke and flames in the direction of
20      the kitchen area. I just want to make sure I
21      understand. Is that referencing what he saw when he
22      says he opened that door?
23  A.  Yeah. He stood there, basically was pointing in the
24      general direction and describing what he saw.
25  Q.  Okay. Did he say anything else about where the flames



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

101

1   were coming from, or anything like that?
2   A.  No, not -- I mean, basically, he saw flame, you know,
3       and heavy smoke, and he talked about turning on the
4       lights.  And just basically, his focus was on
5       identifying whether anybody was trapped or within the
6       structure.
7   Q.  Okay.  And that's something that Mr. Meyer told you at
8       the site when everyone was there?
9   A.  Yes.
10  Q.  Okay.  I'm going to ask you this question because I
11      asked if of Mr. Cottingham.  Does anything that Mr.
12      Meyer said with respect to where he observed flames
13      have any bearing on your opinion with respect to the
14      actual origin of the fire?
15  A.  It's a data point.  I mean, you know, it's -- I'm not
16      sure how better to answer that.
17  Q.  Okay.  I mean, where -- where Mr. Meyer observed flames
18      doesn't affect your opinion that the origin of the fire
19      was the fridge, does it?
20  A.  When you say doesn't affect, I mean, it's a data point
21      that seemed to support what we were looking at.
22  Q.  What -- so what he says, it supported your -- your
23      opinion with respect to the origin?
24  A.  Yeah.  I didn't see any -- certainly didn't contradict
25      it.

102

1   Q.  Did you ever listen to a recorded statement that he
2       gave?
3           MR. MOSS:  You may have read a transcribed
4       statement.
5           THE WITNESS:  Yeah.  I just became aware of
6       Ryan going back on his own without certainly my
7       knowledge, I don't know who -- and Steve's knowledge,
8       and getting a recorded statement of some sort.  And I
9       just saw the -- recently saw the transcript.
10  BY MR. FRANCO, CONTINUING:
11  Q.  Okay.
12  A.  As in -- I think maybe a day or two ago.
13  Q.  Okay.  I don't have a transcript.  I just listened to
14      the recording.  So somebody must have typed it up,
15      right, and given it to you?
16  A.  Yes.
17  Q.  Okay.  And did you ever listen to the actual recording?
18  A.  No, I have not been privy to that yet.
19  Q.  Okay.  Did anything you read in the transcript of
20      his -- strike that.
21          Is the transcript you reviewed in your file
22      here?
23  A.  Should be, if -- I think it's in there.  I mean, it was
24      certainly part of the -- it should be in there.
25  Q.  Okay.  I didn't see it.  All I saw was the photographs

103

1   and then the stuff that we just marked.
2   A.  I have a copy of it with me if you --
3   Q.  Yeah, that'd be great.
4   A.  I apologize if it's not in there.  I don't know why it
5       wouldn't.
6   Q.  It's okay.  I was just wondering if it was in there or
7       not.  But is there anything that he said that you read
8       in the transcript of the statement he gave that
9       contradicts the opinion that the origin of the fire was
10      the refrigerator?
11  A.  Nothing that I saw.
12  Q.  The fact that Mr. Meyer observed flames, says he
13      observed flames coming out of the front -- strike that.
14          The fact that Mr. Meyer said that he didn't
15      see flames coming out of the two front kitchen windows
16      when he was coming up the driveway, that doesn't affect
17      your opinion.
18  A.  No.
19  Q.  Okay.  If --
20  A.  Sorry, I don't mean to keep moving.
21          VIDEO OPERATOR:  Don't worry about it.
22  BY MR. FRANCO, CONTINUING:
23  Q.  If the fire originated in the kitchen, and specifically
24      originated in the fridge in the kitchen, and the
25      witness, Mr. Meyer, is coming up the driveway, and

104

1   before he gets to the driveway, he saw flames coming
2   off the roof?
3   A.  Uh-huh.
4   Q.  If the origin was in the fridge, wouldn't you expect
5       the witness to see a well developed fire in the
6       kitchen, and flames coming out of those front windows?
7   A.  Not necessarily.
8   Q.  Let's go to page 4, paragraph 4 of your report.  It's
9       that last paragraph before conclusions.  It says the
10      extreme extent of the fire damage and limited amount of
11      inspection of this refrigerator during the June 2, 2010
12      scene examination, prevented identification of a
13      specific failure mode within this refrigerator at the
14      time of this report.  So I just want to say, ask you,
15      based on what's in your report, you can't testify
16      within any degree of engineering certainty as to what
17      it was in the refrigerator that actually failed and
18      caused the fire, can you?
19  A.  That's correct.
20  Q.  Paragraph two on the same page says some of the
21      localized damage to this refrigerator was consistent
22      with electrical activity, indicating that the initial
23      fire occurred inside the refrigerator.  Do you have any
24      pictures of that you can show me?
25  A.  Okay.  You paraphrased that, right?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                      February 9, 2012

---

105

1  Q.  Oh, did I?
2  A.  Yeah, but that's all right.
3  Q.  Hang on.
4  A.  I think you covered the intent, but --
5  Q.  I didn't think I did.  I didn't mean to paraphrase, but
6      is that generally what -- what that says right there?
7  A.  Yes.
8  Q.  Okay.  So do you have pictures that show this localized
9      damage that you're referring to?
10 A.  I'm sure there are in my -- well, photographs.
11 Q.  Are they -- are there any that are attached to your
12     report?
13 A.  I don't -- I don't recall.  I'd have to look.
14 Q.  All right.  Before we look at the pictures, what is it
15     about this localized damage that you're seeing that
16     leads you to believe there was electrical activity?
17 A.  We excavated some conductors from within the
18     refrigerator itself, and then -- and in the area, close
19     proximity to it with -- that exhibited some beading and
20     notching consistent with electrical activity.
21 Q.  You saw these conductors at the scene on June 2nd?
22 A.  Yes.
23 Q.  And other than the conductors, was there something else
24     that you were referring to when it says in that
25     paragraph two that there was some of the localized

---

106

1      damage to the refrigerator consistent with electrical
2      activity?  Is there something else in addition to that?
3  A.  Yeah.  When you look at the condition of the steel
4      remnants of the refrigerator, there were -- there were
5      multiple perforations.  Steel doesn't generally burn in
6      a fire.
7  Q.  When you say multiple perforations, what part of the
8      refrigerator, if you can tell, are you talking about
9      where you saw the perforations?
10 A.  In the structural steel.  You know, as far as -- a lot
11     of it was -- I mean, I don't know that I recall
12     specifically which parts.  I mean, this refrigerator
13     was reduced from, you know, close to six feet tall down
14     to the highest point was 16 inches, so --
15 Q.  Lot of damage, correct?
16 A.  It was most I've ever seen.  It was amazing.
17 Q.  Okay.  So -- well, let me get to that.  I mean, the
18     fact that it went from around six feet tall, down to
19     like 16 inches, that's obviously substantial fire
20     damage, right?  I mean --
21 A.  Yes.
22 Q.  -- pretty substantial?  So when you're talking about
23     multiple perforations, as we sit here, you could
24     probably find pictures and show me this?
25 A.  Sure.

---

107

1  Q.  But the fact of the matter is that you have a fridge
2      that went from six feet level to 16 inches, and that in
3      and of itself supports your opinion, right?
4  A.  Yes, lot of heat.
5  Q.  But the connection to electrical activity was the
6      conductors that were found at the site on June 2nd?
7  A.  Primarily.  I mean, I -- yes.
8  Q.  All right.  And the basis for your opinion, this is
9      based on your visual observation of the refrigerator at
10     the site on June 2nd?
11 A.  Yes.
12 Q.  And also your visual observation of the conductors,
13     right?
14 A.  All the artifact -- yes, the artifacts at the scene
15     when I was there June 2nd.
16 Q.  All right.  Look at page three, paragraph four.  Toward
17     the bottom of paragraph four, it says electrical
18     conductor and component fragments consistent with those
19     used in this type of refrigerator were found in and
20     around this refrigerator.  A few of these fragments
21     exhibited damage consistent with electrical activity.
22     I guess I just want to ask you first, is that the same
23     electrical conductors that you're referencing also on
24     page --
25 A.  Yes.

---

108

1  Q.  Page four?
2  A.  Yes.
3  Q.  All right.  Now, when you were gathering the
4      refrigerator on June 2nd, there were other items that
5      were found within the fridge that didn't belong in the
6      fridge, right?
7  A.  I don't specifically recall that.
8  Q.  Did -- did you -- strike that.
9          When you inspected the remnants of the
10     refrigerator at the site, do you recall ever seeing
11     other remnants, artifacts that did not belong in the
12     fridge?
13 A.  Well, I mean, surely, you've got some structural things
14     that fall down from the fire.  Is there anything
15     specifically you're looking for?
16 Q.  Anything at all that you might have found?
17 A.  Oh, sure.  I mean, there's -- I mean, when you have a
18     fire like that, you've got things raining down.
19 Q.  Okay.
20 A.  What was extremely interesting is is there wasn't like
21     a big weight or anything sitting on top of it that
22     looked like it crushed it.
23 Q.  Okay.  So, again, just -- I'm sorry to jump around
24     because I see it in two parts of the report.  Back on
25     page four where you're talking about the localized

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

109

1    damage, when you're talking about the actual structure
2    of the fridge, is there a particular part, you know,
3    local part that you're talking about, or is that
4    just -- when you -- I'm not sure what you mean by that,
5    localized damage. Is that a specific area of the
6    fridge you're referring to, or are you just saying that
7    it's local to the whole fridge? I'm not sure.
8  A.   There was areas within the refrigerator that were more
9    damaged than others.
10 Q.   Okay. And that -- in what particular areas would you
11   say of the fridge were more damaged than others?
12 A.   Basically, with the perforations that I was seeing in
13   the structural steel.
14 Q.   So if we imagine the fridge in front of us, and now
15   it's down to 16 inches, right?
16 A.   Uh-huh.
17 Q.   After the fire, the perforations you observed would be
18   on what parts of the structural steel are you talking
19   about?
20 A.   I mean, if you're talking about structural steel for a
21   refrigerator, you've got the steel shell, then you've
22   got some structural components within that steel shell
23   that support different load carrying members in the
24   refrigerator. I mean, you know, obviously, you have
25   doors and shelves and things like that that are going

110

1    on. And typically, a refrigerator like this has a
2    plastic polymer liner that's blown -- or actually, it's
3    vacuum formed.
4  Q.   Okay. I think -- well, let me ask you this. Because
5    you told us that you can't testify with any engineering
6    certainty as to what it was that actually failed in the
7    fridge, is it still -- is it true that you also can't
8    tell us with any degree of engineering certainty that
9    the conductors that were found actually belonged to the
10   refrigerator?
11 A.   Without further analysis. I mean, you know, I got --
12   some of them definitely came from the refrigerator. I
13   mean, they were consistent with loads, and would be
14   used to construct a refrigerator like that. And there
15   wasn't anything else that I found in and around it that
16   would have had those same conductors in it.
17 Q.   Okay. But can you make that determination without
18   further analysis?
19 A.   Just for the record, what determination are we talking?
20   Just to make sure we're clear.
21 Q.   Okay. That the conductors that you found at the site
22   on June 2nd, 2010, as having these electrical activity,
23   that those conductors actually belonged to the subject
24   refrigerator?
25 A.   Okay. And the question is?

111

1  Q.   Is that a determination that you can make?
2  A.   I mean, again, they're consistent with it.
3  Q.   I understand that. But my -- my question is more
4    specific. Are you able to say with a reasonable degree
5    of engineering certainty that those conductors that you
6    found belonged to the fridge?
7  A.   I mean, yeah, there's nothing that led me to believe
8    otherwise.
9  Q.   Okay. And you hold that opinion to a reasonable degree
10   of engineering certainty?
11 A.   Uh-huh.
12 Q.   Yes?
13 A.   Yes.
14 Q.   Sorry.
15 A.   I'm sorry.
16 Q.   No, that's all right. Okay. And that's based on
17   your -- again, your visual observation of the
18   conductors at the site, right?
19 A.   Yes.
20 Q.   Pretty much you agree that the -- pretty much the whole
21   house burned to the ground, with the exception of part
22   of the garage, right?
23 A.   Well, I mean, the house was heavily damaged by fire.
24   Let's put it that way.
25 Q.   Okay. I mean, everything that was in the kitchen

112

1    before the fire occurred ended up in the basement after
2    the fire occurred?
3  A.   Well, parts of it did.
4  Q.   Okay.
5  A.   I mean, certainly not everything. In fact, the vast
6    majority was on the sub -- was on the crawl space.
7  Q.   Okay. What parts of the kitchen were remaining up on
8    the first floor after the fire?
9  A.   Essentially everything except for the dishwasher. You
10   know, the dishwasher and that counter area was
11   overhanging the basement. That went down. But the
12   rest of it was above the crawl space, and remained in
13   the crawl space area.
14 Q.   Okay. I forgot to ask you this. The conductors that
15   you found at the site, did you take pictures of them at
16   the site?
17 A.   I did.
18 Q.   Are those attached to your report?
19 A.   I don't know if specifically the report. They're
20   certainly part of my bulk photographs.
21 Q.   Well, before we look for those also, why don't you tell
22   me what it is that you observed specifically on the
23   conductors that led you to believe that there was
24   electrical activity?
25 A.   Beading, notching, just isolated damage.



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                    February 9, 2012

113

1  Q.  Okay. And do you have an opinion as to what caused the
2      electrical activity that was observed on those
3      conductors that you found?
4  A.  Most electrical activity is caused by as a result of
5      the fire. So basically the fire impairs the insulation
6      and the isolation of the -- of electrical components
7      and allows them to come in contact with each other and
8      with other conducting surfaces.
9  Q.  Okay. I'm glad you said that because that leads me to
10     believe that I was confused about your opinion. Are
11     you saying that the electrical activity, or the
12     evidence of the electrical activity that you observed
13     on the conductors that you saw at the site you believe
14     was actually caused by the fire?
15 A.  I didn't say that necessarily, but could well have
16     been. And what I'll tell you is that's usually the
17     case.
18 Q.  Okay.
19 A.  But --
20 Q.  I mean, that's nothing unusual in a fire at some other
21     house, let's say, and all the appliances get burned in
22     the house, and you would expect to see evidence of
23     electrical activity on those wires, right?
24 A.  Which we did.
25 Q.  Correct.

114

1  A.  Right.
2  Q.  Okay. Now, you've told us that it was your opinion
3      that the conductors that you found belonged to the
4      refrigerator. Can you tell us within a reasonable
5      degree of engineering certainty what part of the
6      refrigerator those conductors belonged to?
7  A.  Some of them were certainly from the controls area.
8  Q.  And what led you to believe that?
9  A.  Parts of the controls were still there.
10 Q.  I'm sorry, I guess --
11 A.  Like, for instance, like a toroidal transformer. I
12     mean, things that you would expect to be in the control
13     circuitry for that refrigerator.
14 Q.  Okay. When you were at the site on June 2nd, did you
15     physically inspect that controls area?
16 A.  I mean, again, well, there's -- but the -- when you say
17     controls area, I'm not exactly sure what you're
18     referring to.
19 Q.  Well, what were you referring to when you said the
20     controls area?
21 A.  Well, what I'm referring to is, is in -- in the
22     refrigerator, there's going to be controls.
23 Q.  Right.
24 A.  And this particular one has solid state controls as
25     well as the compressor -- the traditional compressor

115

1      controls analog.
2  Q.  Okay. And I was asking you if you could tell us within
3      a reasonable degree of engineering certainty what
4      component of the refrigerator, the conductors you found
5      belonged to -- correct me if I'm wrong but I thought
6      you said the controls area, is that --
7  A.  I was talk -- I was referring to some of the solid
8      state controls.
9  Q.  Okay. And on this model refrigerator, where would that
10     be?
11 A.  Above the compressor.
12 Q.  Okay.
13 A.  Okay. Above the compressor compartments.
14 Q.  All right. Would you -- do you -- did you take a
15     picture of the -- I think I asked you this, you said
16     you did take a picture of the wires, the conductors,
17     the beading and the notching, that stuff. Would you
18     mind pulling that up for me?
19 A.  You want to start at the beginning, or do you just want
20     me to pull up some general ones? Because I've got some
21     ones that are real easy to see first.
22 Q.  The ones you took at the site that showed you.
23 A.  Well, I mean, I took a bunch of photographs at the
24     site. I can show you some of the conductors -- I mean,
25     the ones that jump out at me right away just from

116

1      looking at the -- the collage I have around the screen.
2  Q.  Well, I -- maybe I asked -- I forgot to ask you this,
3      before we dig into the photos, were there a lot of
4      conductors that you found within the fridge?
5  A.  I won't say a lot of conductors that I found that
6      you're going to be referring to. There were a lot of
7      pictures of conductors.
8  Q.  Okay. I'm -- what I -- I want you to see if you can
9      find pictures that you took of the conductors that you
10     believed to be part of or belong to the refrigerator.
11     So I guess I know you took lots of pictures of
12     conductors. Do all of those belong to the
13     refrigerator?
14 A.  I would -- without going through every one, one by one
15     by one, I believe so but I'm not totally certain. I
16     mean, I'm sure I took pictures. Well, let's put it to
17     you this way. To answer your question, I took a
18     picture of a lot of conductors with -- throughout that
19     structure, okay? So there's a lot of pictures in here.
20     The ones you're -- I think you're referring to
21     specifically are from the refrigerator?
22 Q.  Right.
23 A.  There are pictures of those in here.
24 Q.  Okay. Can I see those? Or actually, before we do,
25     just reference the JPEG number for me, if you could?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                    February 9, 2012

117

1   A.  I'll have to pull them up and go through them.  I mean,
2       like I said, I can start with ones that jump out at me
3       because they have a blue background from where --
4       taking them -- picture on a --
5   Q.  On a mat board?
6   A.  On a mat board.
7   Q.  Okay.
8   A.  So --
9   Q.  But before we do that, let me just ask you this.  I
10      think you said you just -- you took a lot of them.  But
11      again, I'm referencing only the ones that you believe
12      were part of the actual refrigerator.  And so is
13      there -- of the ones that you believe that are part of
14      the refrigerator, are you saying that all of those are
15      the ones that you're referencing in the report?  Or is
16      there particular ones you're referencing in this
17      report?
18  A.  There's no particular ones.  I mean --
19  Q.  Gotcha.
20  A.  -- if you look through here, you'll see what I -- as we
21      were going -- working the scene, I took a lot of
22      pictures of the refrigerator, its position in the -- in
23      the structure, a lot of the other appliances that are
24      there.  And then as we started excavating we took more
25      and more close-ups, more and more pictures of what we

118

1       were findings, where we were finding it, so we had good
2       documentation.
3   Q.  Okay.  I -- what -- I understand a lot more now just
4       based on what you just told me.  So, okay, that's part
5       of this process.
6   A.  Not a problem.
7   Q.  Okay.  So, yeah, just show me the one that stands out
8       first, so you don't have to dig through a million
9       pictures.
10  A.  Okay.  And when I say stand out, I mean they're -- they
11      have this bright blue background where I can just see,
12      you know what I'm saying.
13  Q.  Right, perfect.
14  A.  Where we actually laid them on that.  You want to --
15  Q.  Just one example of one that you saw at the site, took
16      a picture of, and that you believe belonged to the
17      actual refrigerator?
18  A.  Okay.  Say number 241 --
19  Q.  Okay.
20  A.  -- shows two conductors.
21  Q.  And the JPEG reference 241, is that to the bulk photos
22      that you produced?
23  A.  Yes.
24  Q.  Okay.  Can you just flip through your --
25  A.  Yeah.  All my -- all my photographs are numbered 1

119

1       through, I think, 508.
2   Q.  Okay.  Can I see just them.
3   A.  Sure, I'm sorry.
4   Q.  Just real quick, just so I just know what I'm looking
5       at here.  Gotcha.
6   A.  That's a good overview of the two where they had the
7       spade lock connectors and the spade still in them.
8   Q.  Okay, great.  And then so again, back to what we were
9       discussing earlier, the fact that you saw evidence of
10      electrical activity on those particular wires in that
11      JPEG 241, that's not unusual, right?  Is it?
12  A.  No.
13  Q.  I mean, does the fact that you observed electrical
14      activity on various conductors that were found within
15      the fridge tell you what it was in the fridge that
16      failed?
17  A.  No.
18  Q.  Okay, gotcha.  All right.  Let's go to page four of
19      your report, and let me just ask you, you've got two
20      conclusions here being given within a reasonable degree
21      of engineering certainty.  And it says, number one is,
22      the fire loss was caused by a fire within the involved
23      Sears Kenmore Elite brand Trio refrigerator.  And
24      number two is, this failure resulted in the ignition
25      and consumption of the combustible internal components

120

1       of this refrigerator.  And that's your opinions in this
2       case, right?
3   A.  Yes.
4   Q.  Okay.  Mr. Cottingham said in his report and at his
5       deposition that he -- the origin of the fire was low
6       and internal to the refrigerator.  And I assume that's
7       something you agree with, right?
8   A.  The origin?
9   Q.  Right.
10  A.  It was certainly internal, and -- and the fire was low.
11      I'm not sure exactly -- you know, what low -- low is
12      one of those --
13  Q.  Right.  No, I --
14  A.  -- vague terms, okay.  But --
15  Q.  I mean, you don't disagree with him on that though, do
16      you?
17  A.  No.
18  Q.  Okay.  Okay.  Let's go to page three, paragraph three,
19      and let me just ask you a quick question about
20      something that Bill Magee told you.  It says in
21      paragraph three, towards the bottom of the paragraph,
22      Mr. Magee provided documentation that identified the --
23      strike that.
24          Well, I don't know where I found where he
25      said that, but let me just ask you this.  Didn't Mr.



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                    February 9, 2012

121

1    Magee tell you that he purchased one fridge at one
2    point, and then it was a warranty, and they sent it
3    back and got a new one?
4  A.  Well, he purchased one, it failed.
5  Q.  Right.
6  A.  I think within a year or so.  I don't remember or
7    recall the time period.  And then this was a
8    replacement for it.
9  Q.  Okay.  I mean, that's what I wanted to ask you about.
10    Does the fact that that first fridge failed in some
11    way, does that have any bearing on your opinions with
12    respect as to --
13  A.  No.
14  Q.  -- why this fridge in this case failed?
15  A.  No.
16  Q.  Okay.  And by the way, do you know what it was that
17    failed?
18  A.  I think he said something about a compressor or
19    something.
20  Q.  Okay.  Now, same page three, paragraph three, the first
21    sentence.  Examination of the structure revealed heavy
22    fire damage and collapse with the extreme localized
23    damage in the area of the kitchen refrigerator.  Then
24    you referenced photos 1 through 07?
25  A.  Uh-huh.  Yes, I'm sorry.

122

1  Q.  All right.  Now, is that a -- your independent opinion,
2    or is that an opinion that you're relying on Mr.
3    Cottingham for?
4  A.  No, that's --
5  Q.  That's your opinion?
6  A.  Yes.
7        (Mr. Moss exited deposition room at 3:35
8        p.m.)
9  BY MR. FRANCO, CONTINUING:
10  Q.  Now, so what is the localized damage you're referring
11    to in the area of the fridge?  What specifically are
12    you looking at when you see that?
13  A.  Summarizing more than anything else.  The refrigerator
14    was actually sitting on the gravel in the crawl space.
15    So when you look at -- if you look at the overall
16    damage to the structure, and then you look at where the
17    refrigerator is at, you could see it burnt hot and
18    early.
19  Q.  Okay.  Now, all the appliances ended up down below,
20    right?  After the fire?
21  A.  Well, when you say down below, I'm not sure what you
22    mean.
23  Q.  The kitchen floor was basically gone, right?  And then
24    some ended up in the -- some of the stuff ended up in
25    the crawl space, and some ended up somewhere else down

123

1    below, right?
2  A.  Okay.
3  Q.  I don't know if it was crawl space or what it was.  But
4    it was not the same level as the kitchen floor --
5  A.  Okay.
6  Q.  -- right?
7  A.  Yes.
8  Q.  Okay.  So I guess what I'm wondering is if everything
9    is on the floor, and there's no kitchen floor to
10    actually look at, what is the localized damage you're
11    referring to?
12  A.  You look at layering.
13  Q.  Okay.
14  A.  The other appliances were sitting on things that had
15    burned and fallen down before they fell down.
16  Q.  Okay.  And on June 2nd, 2010, when you were at the
17    scene, did you know what was underneath the washing --
18    or dishwasher at the time?
19  A.  I'm not sure I understand your question.
20  Q.  You were saying that there was layering underneath the
21    floors, right?
22  A.  Well, the dishwasher's in the basement.  So it was on
23    top of -- I can show -- we can go through my pictures
24    if you want to see what it was sitting on top of.
25  Q.  I guess, so what layering were you referring to?  I'm

124

1    not --
2  A.  Well, you were asking about localized damage.
3  Q.  Right.
4  A.  And so I was primarily focused on the layering that
5    was of the refrigerator versus the items that are
6    around it, the appliances that are around it.
7  Q.  I guess help me understand that.  What do you mean by
8    the layering?  The layering of the floor, or what was
9    underneath there?
10  A.  The layer of debris.
11  Q.  Gotcha.
12  A.  See, what you -- what -- 'cause -- you -- the layer,
13    basically, when you look at -- it's kind of like
14    excavating in a geological -- as you uncover layers,
15    you can see what's happening earlier and earlier and
16    earlier in the fire.
17  Q.  Gotcha.  So you're saying --
18  A.  Because those things fall first.
19  Q.  I got it.  So like a -- like an archeology dig?
20  A.  Yes.
21  Q.  Okay.  So that's the layering you're talking about?
22  A.  That's the layering I'm talking about.
23  Q.  Okay.  And so are you saying that the layering --
24    strike that.
25        Let me just look at it here.  So the first



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

125

1   sentence in paragraph three, examination of the
2   structure revealed heavy fire damage.  So what you're
3   saying, and correct me if I'm wrong, but you're
4   basically saying that at least in that part of the
5   kitchen, the floor is heavily damaged.  So you've got a
6   lot of stuff collapsing, but the localized damage that
7   you're referring to is the layering that you observed
8   underneath the refrigerator?
9   A.  Yeah.  The position and -- of the refrigerator and what
10      was underneath it and around it.
11  Q.  And what was it about the position that was
12      unique to the refrigerator, as opposed to some other
13      appliance that was down in the space below?
14  A.  It went through the floor quick and early, because, I
15      mean, like I said, and there was actually an area of
16      exposed gravel.  I mean, there was nothing between the
17      refrigerator and the gravel sub-scrape -- substrate
18      that was in that crawl space.
19  Q.  And I guess what you're saying is that with respect to
20      the other appliances, like the dishwasher, did you find
21      materials between the dishwasher and --
22            (Mr. Moss reentered deposition room at 3:39
23      p.m.)
24            THE WITNESS:  Well, understand, the
25      dishwasher fell into the basement, and it fell in on

126

1   top of other things that were burnt down there.  So --
2   so you could tell from a timing stand -- you know, you
3   basic -- I shouldn't say -- it fell on top of other
4   things that were in the basement, and then they ended
5   up ultimately being burned.
6   BY MR. FRANCO, CONTINUING:
7   Q.  Okay.  While you get your photos up, can you pull up
8       one of the fridge that shows the perforations we talked
9       about?
10  A.  Twenty-six kind of shows you a good overview.
11  Q.  Is that part of your report, or is that --
12  A.  I don't recall which -- by number which photographs I
13      put in my report.  If you want to go through the report
14      photos --
15  Q.  Yeah.
16  A.  -- we could -- we could do that.
17  Q.  Actually, turn to page --
18  A.  You want to do that?
19  Q.  Yeah.  Turn to page 16 of 27.
20  A.  Do you have a -- let me -- I'm going to need a report
21      with --
22  Q.  Oh.  Here, I'll mark that.
23  A.  I prefer to use the one with the exhibit, yeah.
24  Q.  Let's --
25  A.  This is the report.  Are you going to --

127

1   Q.  We just need to get more stickers here.
2   A.  Okay.
3            COURT REPORTER:  If you just want to put a
4       number on this, and then we'll fill in the particulars
5       when we break.
6            MR. FRANCO:  Okay.
7            COURT REPORTER:  The last one we marked was
8       7.
9            (Exhibit No. 8 marked)
10  BY MR. FRANCO, CONTINUING:
11  Q.  Okay.  I'm marking Exhibit No. 8, which is Exhibit 1 to
12      your report consisting of pages 1 through 27 of the
13      photographs attached -- attached to the report.
14  A.  So that's Exhibit -- this is Exhibit 1 in its entirety
15      then?
16  Q.  Yes.
17  A.  Okay.
18  Q.  I believe it is.  But when you just referenced just now
19      JPEG number 26, is that the photograph on page 16?
20  A.  On page 16?
21  Q.  Yep, 16 of 27?
22  A.  No.
23  Q.  Okay.
24  A.  Oh, yeah.  Page 16 of 27 shows the lower front door of
25      the refrigerator, and then the area where the -- the

128

1   area in front of the refrigerator after we lifted up
2   the door.
3   Q.  Okay, all right.  Because it says photograph 26.
4       That's why I was asking.  That's all.
5   A.  Yeah.  Well, basically of the --
6   Q.  Of the report, not --
7   A.  Exhibit, I'm sorry.
8   Q.  Got it, gotcha.
9   A.  Now I understand --
10  Q.  That's okay.
11  A.  -- what you're trying to.
12  Q.  That's okay.
13  A.  These -- the numbers in the report do not correspond to
14      the bulk photograph numbers.
15  Q.  Okay.  So let me take a quick look at photo 26 on your
16      laptop, JPEG 26, I should say.
17  A.  Okay.  Let me get back to it again here.  Okay.
18  Q.  And if you'd just pull that around, I'd appreciate it.
19      Great.
20  A.  Trying to give you a perspective.
21  Q.  Yeah.  And so the perforations, can you help me
22      understand what I'm looking at here, what you see?
23  A.  Well, I'd have to go back to -- there's other
24      photographs in here.  But, I mean, you'll -- if you
25      look in here, you'll see, you know, a lot of



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

129

1    perforations in the steel structure that's left.
2    Q.  That I can see on photograph 26?
3    A.  Yes.
4    Q.  Okay.  And maybe just help me, point it out on that
5        screen and I'll just -- just so I understand what
6        you're talking about.
7    A.  Okay.  I mean, if you're looking at the refrigerator
8        here, you'll see a -- I mean, little holes throughout
9        the --
10   Q.  Okay.  And are we looking -- what part are we looking
11       at, if you know?  If you know?
12   A.  That's -- I mean, when you say what part are we looking
13       at, we're looking at basically -- if you're looking at
14       this picture.
15   Q.  Yeah.
16   A.  Underneath here is the compressor area.
17   Q.  Okay.
18   A.  So you've got a metal enclosed compartment down there.
19       And then on top of that you have the rest -- basically
20       what used to be the rest of the refrigerator.  So, you
21       know, the two -- it's going to be the refrigerator box,
22       both the freezer area and the two refrigerator.
23   Q.  Okay.  And that's --
24   A.  And so this is -- primarily what you're seeing here is
25       the sheet metal enclosure for -- for that.  What's the

130

1    remnants of it.
2    Q.  And those -- what you're talking about is that sort of
3        like a holding steel at the perforations --
4        perforations?
5    A.  Uh-huh.
6    Q.  Yes?
7    A.  Yes.
8    Q.  I'm sorry, she's --
9    A.  No, you're -- no, I appreciate that.
10   Q.  Okay.
11   A.  Fall into bad habits sometimes.
12   Q.  Attached to your report now, those -- I think it's
13       Exhibit 8.
14   A.  Yes.
15   Q.  It's Exhibit 8 from today, Exhibit 1 from --
16   A.  Of the report, right.
17   Q.  Are there pictures attached that show the -- what you
18       referenced on page three, paragraph three, heavy fire
19       damage and collapse of -- in the localized area of the
20       kitchen refrigerator?  The layering that we talked
21       about?  All that stuff?  Is that --
22   A.  If you could help me, where are you reading that at?
23       Is this -- is this basically the first paragraph, the
24       first sentence of the first paragraph under
25       observations and evaluations?

131

1    Q.  No.  Page three, paragraph three.
2    A.  Which I think is -- starts with examination of
3        structure yield heavy --
4    Q.  Localized damage, right.
5    A.  The photographs -- yeah.  What I'm showing there is is
6        I'm referring to one through seven, basically.
7    Q.  Oh, there we go.  Okay.  One through seven of the
8        report, right?  Okay.
9    A.  Of the photo exhibit for the report, yes.
10   Q.  Right, gotcha.  And looking at photo seven, is that in
11       particular what you're referring to?
12   A.  I mean, that's one of them, one of the seven.  What I
13       -- what I was trying to do there is give you a
14       perspective.  Overall view, and then kind of come into
15       the refrigerator and then back out again, so you could
16       see just in general the level of destruction around the
17       refrigerator versus other areas.
18   Q.  Well, so looking at photo seven, based on what you just
19       said, this area is depicting the area of damage around
20       the refrigerator, and you're trying to show in relation
21       to other areas that aren't as damaged, right?
22   A.  Right.  And this -- actually this area is, yeah, behind
23       the refrigerator.  But, yes.
24   Q.  Okay.  So which areas in this picture are not as
25       damaged as the area --

132

1    A.  If you look at -- five is the one I was showing you, or
2        was consistent with the one I was showing you earlier.
3    Q.  Okay.
4    A.  If you see how basically the refrigerator is buried
5        under all the debris.
6    Q.  Okay.
7    A.  And -- and the bottom door is found face down in front
8        of it under the debris.  And then what was under -- and
9        you look at what's underneath it.  Like I said, that's
10       where we saw the bare gravel.  You could see that --
11       you know, everything was consumed in that area.
12   Q.  Okay.
13   A.  All -- all the combustibles, or the vast majority of
14       combustibles were consumed in that area.  And this was
15       sitting directly on the crawl space, the gravel crawl
16       space.
17   Q.  Okay.  And but in relation to the other parts that were
18       not as damaged?
19   A.  Yeah.  If you -- if you go back to some of the bigger
20       -- like if you look at photo four.
21   Q.  Okay.
22   A.  You'll see it's sitting there.  And then you look to
23       the right and you'll see a lot of the framing structure
24       still intact.  So you're looking down into the
25       basement, finished basement area.  And you're also



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

133

1    looking towards the -- you know, side of the house.
2    Q.  What's that wall to the right of where the fridge is?
3         Do you see that?
4    A.  The concrete wall?
5    Q.  Yeah.
6    A.  That's -- that's basically the foundation wall that's
7         running -- it also forms -- it divides the basement
8         from the crawl space.
9    Q.  Okay.  And then in photograph four, to the right of
10        that wall would be -- at least down below would be the
11        basement, right?
12   A.  Correct.
13   Q.  What would have been above the basement at the time of
14        the fire?
15   A.  I didn't go back to the actual diagrams.  But in that
16        general areas, there was a dining room and --
17   Q.  Okay.  But it looks to me from that picture that what
18        was above the basement is also now in the basement?
19   A.  That's correct.
20   Q.  Okay.  So I guess maybe I'm not understanding.  What is
21        it that is -- I thought you were saying earlier that as
22        you look to the right, it's not as damaged as it is in
23        the area where the fridge is.  So but the floor is gone
24        to the right, so what is --
25   A.  What I'm looking at is just the remnants of the

134

1    structure there.  You can see the supports, the
2    partitions.  As you get farther and farther away from
3    the refrigerator, you see more and more structure.
4    Q.  Oh, okay.  So you're talking about those wood beams
5         down at --
6    A.  The partition.  Well, yeah.  I mean, among other
7         things.  I mean, if you just look at what -- the
8         structure that's left, I'm just trying to give you in
9         general.
10   Q.  Yeah.  I see the concrete wall there.  But then also,
11        which wood parts are you referring to with those --
12   A.  Well, you see the partition -- the partitions down in
13        the basement.  And some of them are kind of sticking
14        up.  And then -- and then the ones that are still above
15        the basement to the right.
16   Q.  Okay.  Assuming that the fire had started in the living
17        room, are you saying that you would not see this type
18        of damage to the -- those wood structures in relation
19        to the area where the fridge is?
20   A.  I was mainly focused more on the refrigerator itself.
21        I mean, you've got to take all these things in context.
22        You can't just pull one thing out.  But what I'll tell
23        you is I could not come up with a hypothesis for the
24        fire starting, like you were saying specifically in the
25        living room.  That was one we discussed at length, that

135

1    would give you this level of damage to the
2    refrigerator, and putting it in -- put it in the
3    position that it was in relative to the rest of the
4    structure.
5    Q.  With the origin of the fire being the area of the
6         fridge, can you tell me how the fire spread in the
7         house?
8    A.  That's going to be more Steve's purview.  But what I'll
9         tell you is, is looking at all of -- essentially, when
10        you're looking at the condition -- I'm looking
11        primarily at the condition of the refrigerator and
12        where it's at in the structure.  And I can tell you
13        with the level of destruction, and the fact that
14        everything's -- all of the combust -- the vast majority
15        of combustibles within it were burned away, which then
16        removes the structure in a way it then collapsed in on
17        itself.  That's showing me the fire is coming from
18        within the refrigerator, not from without.
19   Q.  Gotcha.  Let's look at paragraph three on page three of
20        your report.  That second sentence of paragraph three
21        says this extremely concentrated damage occurred with
22        this refrigerator closely surrounded by drywall on
23        three sides.  First, let me just ask you, the extremely
24        concentrated damage occurred with the drywall on three
25        sides.  That's your opinion; you're not relying on Mr.

136

1    Cottingham for that, are you?
2    A.  Right.  I'm talking about the refrigerator there.
3    Q.  Okay.  Fair to say, from looking at the pictures we
4         just looked at, the drywall and the floor and the --
5         around the refrigerator was consumed by the fire,
6         right?
7    A.  You're taking about the dry -- the -- first of all, on
8         the drywall, you're not talking about drywall on the
9         floor, but you're talking about the drywall partitions
10        that surrounded the refrigerator on three sides?
11   Q.  Right, the drywall was in the, well, alcove, I guess;
12        is that what they call that?  The alcove was consumed
13        by the fire, right?
14   A.  Yes.
15   Q.  Okay.  How do you know that the drywall didn't protect
16        the fridge for some period of time until it was
17        completely consumed by the fire?
18   A.  Well, it would have.
19   Q.  Okay.  So it -- it did?  Is that -- I mean, that's what
20        you --
21   A.  Well, it depends on when you say protected.  I mean, it
22        isolated it from other parts of the structure.  And
23        that's when we've been talking about fire starting in
24        the living room, it has to basically wrap around or go
25        through that drywall to get to the refrigerator.

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

WILLIAM C. MERS KELLY, PE                          February 9, 2012

137

1   Q. Okay. The appliances in the kitchen, did you do
2     anything to determine which of them have the highest
3     fuel load?
4   A. I'm not sure what you're referring to.
5   Q. Do you know what -- do you know what fuel load means?
6   A. Yes.
7   Q. Okay. And what does it mean?
8   A. Basically, you're talking about amount of available
9     fuel and energy that could be released when you burn
10    that fuel.
11   Q. Did you determine that with respect to any of the
12    appliances in the kitchen?
13   A. Interesting question. Yeah, I would say -- yeah,
14    it's -- yeah, yes.
15   Q. Which ones?
16   A. Well, the refrigerator is going to be with its -- the
17    urethane foam, part -- the two part urethane foam, the
18    plastic liner, the polymer liner, its contents, the
19    refrigerant. I mean, that's going to be a heavy fuel,
20    if that's what you're asking, versus a microwave that
21    has fewer combustible components, or a dishwasher or --
22   Q. Okay. Or oven?
23   A. Oven, or range. Right, right. Range top.
24   Q. Assuming that the fridge -- I want you to assume for
25    the sake of argument that it was attacked on fire -- by

138

1     fire from the front.
2   A. Okay.
3   Q. Would you agree that the structure, the drywall on the
4    three sides would concentrate the heat in that area of
5    the fridge?
6   A. Yes.
7   Q. Let's look at -- referencing the report numbered now
8    photograph 27 of the report.
9   A. Okay. Photograph number 27?
10   Q. Yeah. Sorry. Photograph 29.
11   A. Twenty-nine.
12   Q. Which is page 27 of the photos. You agree that that --
13    is that -- well, strike that.
14       It says close up view of the floor under the
15    involved refrigerator bottom door. What are you
16    showing this picture for?
17   A. The sub -- basically, we've got the unburned remnants
18    of the sub-floor that was underneath the refrigerator.
19   Q. Okay.
20   A. The bottom door of the refrigerator, probably I'd
21    better be clear.
22   Q. Gotcha. I mean, it's not pristine, right?
23   A. No. But what's interesting is the bottom side, in
24    other words, the crawl space side is heavily charred.
25    And then if you flip it over, you'd see the top side is

139

1     not. In fact, there's some areas where we could
2    actually saw some of the linoleum in the control
3    surface of the refrigerator.
4   Q. Okay. Let me just make sure I'm understanding you. I
5    guess by looking at the sub-floor, you're able to tell
6    which side was up, facing --
7   A. Yes.
8   Q. -- above, and which side of it was facing below towards
9    the crawl space?
10   A. Yes. And we took pictures before we excavated it to
11    show you the position it was in.
12   Q. Okay. And looking at photo 29, I think you're -- it's
13    showing us all this char in that photo, right?
14   A. Yes.
15   Q. And is that -- are we looking at the side of the
16    sub-floor that would have been facing the crawl space?
17   A. Yes.
18   Q. Okay. And what -- I think, if I understand you
19    correctly, what you're saying is that there is more
20    evidence of burning on the underside of the sub-floor
21    below the fridge, is that right?
22   A. This particular piece is, yes.
23   Q. Okay. So hypothetically assume for the sake of
24    argument that the fire started in the kitchen in the
25    area of the stove. After the fire, if you found

140

1     sub-floor like this underneath the fridge, I guess what
2    I'm asking is, are you saying that you would not see
3    that type of burning underneath the sub-floor?
4   A. I -- I don't -- try the question again. I'm sorry.
5   Q. Sure, yeah. I'm just trying to understand, if the fire
6    had started somewhere else in the kitchen other than
7    the fridge, and you came upon the scene and found this
8    sub-floor that you see in photograph 29, would you be
9    able to say that -- that -- well, strike that.
10       Assuming that the fire started somewhere
11    other than the fridge, are you saying that you wouldn't
12    see this type of burning on the under part of the
13    sub-floor?
14   A. I'm not saying that necessarily, okay. I mean, this is
15    just one piece of evidence. There's a lot of different
16    factors that go into something like this. But what
17    that's showing me is that door on the refrigerator fell
18    early and protected that floor, and the burning
19    underneath, in my mind, okay, clearly shows that,
20    again, this is -- this is all occurring early in the
21    fire, not late.
22   Q. Okay. Do you know what caused the door -- well, strike
23    that.
24       How many doors are on the fridge?
25   A. Three.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                    February 9, 2012

141

1    Q. And which door came off?
2    A. The one that was protecting this particular area we're
3       talking about is the bottom door.
4    Q. Okay.
5    A. It was -- it was on the floor first.
6    Q. Okay. And do you know what caused it to come off?
7    A. Well, yeah. I'm sure fire damage.
8    Q. Okay. Okay.
9    A. I mean --
10   Q. All right. I can't recall right now, it's been so
11      long. But the other doors, were they found on or off
12      the fridge?
13   A. Off.
14   Q. Do you know how?
15   A. They were in front and basically layered on top of
16      that -- the door, the bottom door.
17   Q. Okay.
18   A. And what's interesting was is there was a layer of
19      debris between the bottom door and those doors.
20   Q. And what does that mean? Why is that of interest?
21   A. Again, it shows the bottom door fell off very early
22      because it was laying directly on the floor, nothing in
23      between it, so no fall down noted burn debris, you
24      know, that -- and that flooring is then on -- directly
25      on the gravel. So -- and then you've got the other

142

1       doors that fall down some period after -- later after
2       other materials have fallen -- you know, fallen down.
3    Q. When you got to the site, the fire was obviously
4       extinguished by the fire department and the firefighter
5       personnel?
6    A. Yes.
7    Q. Do you know that -- for sure that none of that stuff
8       was moved by the firefighters and fire extinguishing
9       efforts?
10   A. None of what stuff?
11   Q. The doors and -- the two doors, and the bottom --
12      bottom door?
13   A. Yes.
14   Q. How do you know that?
15   A. Just looking at the evidence and the way they're
16      buried. I mean --
17   Q. Yeah. Help me understand, what is it about the way
18      it's buried that would tell you --
19   A. Okay. You've got --
20   Q. -- it couldn't have been moved?
21   A. Okay. You've got -- if you can picture -- you
22      understand how the structure's constructed, right? So
23      in this particular case, you've got a crawl space. On
24      the bottom surface of that crawl space you have gravel.
25      Above that, you have your wood sub-flooring and your

143

1       trusses. And then on top of that, the sub-flooring,
2       you've got your floor finishing treatments. Okay. In
3       this case, you've got the vinyl covering. Okay. So
4       during the fire, this -- this lower door falls down and
5       protects the out -- the floor before it becomes burnt.
6       Okay. So the portion of the floor it's covering is
7       protected by that metal door. And also the front
8       surface of the door, you can see there's still painted
9       areas in parts where the fire didn't impinge on it. So
10      that's laying in direct contact with the other. And
11      they're somewhat clean, if you know what I'm trying to
12      say. And then you cover that with fire debris, typical
13      what would have fallen down around it. And then you
14      add the doors on top of it. For someone to have moved
15      all that, they would have had to have been very
16      carefully and deliberately, basically, tried to
17      actuate -- again, the fact that it wasn't burned tells
18      you it wasn't exposed to the fire. It was protected by
19      the metal door. I mean, the things together made
20      sense, that's where they originally were. They weren't
21      blown around by a fire hose, or deliberately picked up
22      by somebody and moved around.
23   Q. And you talked about the extreme damage to this fridge.
24      But I think you called it -- like how it collapsed in
25      on itself?

144

1    A. Yes, uh-huh.
2    Q. And what you observed was it was pretty unusual that
3       everything was so -- tell me if I'm wrong, but the most
4       severe you've ever seen on a fridge, basically?
5    A. Yes.
6    Q. All right. And all of the -- all of the combustible
7       contents within the fridge that you saw on June 2nd
8       were totally consumed by the fire?
9    A. The vast majority, certainly. I mean, yeah, they
10      were -- if not wholly consumed, very close.
11   Q. And that's what you'd expect if the fridge was the
12      origin of the fire, right?
13   A. Yes.
14   Q. Okay.
15   A. And it's not what I would expect if it was attacked by
16      the fire.
17   Q. All right. Right. In other words, if the fridge was
18      attacked by fire external, you're saying you would not
19      expect to see combustibles surviving inside, and you
20      wouldn't expect to see plastic, you know, the -- the
21      plastic components of the fridge in the fridge after
22      the fire, would you?
23   A. I would, to -- to some degree. I mean, again --
24   Q. Oh, you would, you would. I'm sorry, right.
25   A. If it's attacked by the fire, I would expect it to be



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

145

1    different than what I'm seeing here.
2    Q.  Right.  I -- I misspoke.  So you're saying that if --
3        if the fridge was attacked by fire external to the
4        fridge, you would expect to see some combustibles in
5        the fridge surviving the fire?
6    A.  Well, I would -- I would expect to see heavy damage but
7        I would not expect to see this.
8    Q.  The degree -- you wouldn't expect to see the degree of
9        damage that you saw?
10   A.  Well, and the positioning.  I mean, there's a lot of --
11       I wouldn't expect to see the refrigerator in this
12       condition.
13   Q.  Right.  Okay.  One second.  Where is my report?
14   A.  You need -- oh, because I still have the exhibits here
15       with my report and --
16   Q.  That's okay, I've got it.
17   A.  Okay.
18   Q.  Page three, paragraph four.  I've already asked you
19       questions about those conductors that you found and the
20       electrical activity.  Strike that.
21       I asked you that question already.  Okay.
22       Page three, paragraph five, damage to all other
23       appliances was consistent with varying degrees of fire
24       attack.  And then you reference various photos here.
25       There was no evidence of branch wiring or other

146

1    competent ignition sources located under the floor
2    under the refrigerator.  Okay.  So first let me ask
3    you, what is branch wiring?
4    A.  Branch wiring is -- the reason they call it branch is
5        the basic -- it's the wiring -- the structural wiring
6        for the house or the structure in this case.  So it's
7        the wiring that typically runs through walls or floors.
8        And it's copper or aluminum, and it's distributing the
9        power from the service, electrical service located in
10       the structure to various outlets, appliances,
11       receptacles, switches, lighting.
12   Q.  Gotcha.
13   A.  So they call that branch wiring, basically.
14   Q.  And is this sort of a reference to what Mr. Magee told
15       you about being a -- what did he say, call it?
16   A.  Well, each one was a home run or basically --
17   Q.  Home run, right.
18   A.  Yeah.  Each appliance was on its own circuit.
19   Q.  Is that what that means, there's no branch wiring with
20       a home run?  Is that something --
21   A.  No.
22   Q.  It's different?
23   A.  What I'm saying is I didn't find any branch wiring
24       underneath -- run underneath the floor in that area.
25   Q.  Ah, okay.

147

1    A.  Branch wiring can run -- be run through walls or floors
2        or ceilings.
3    Q.  I understand, okay.  Now, the photos you reference are
4        the ones attached to your report.  And 05, I believe,
5        is of the refrigerator.  What is -- oh, I see.  06
6        shows a range top and a microwave?
7    A.  Right, and relative position to the refrigerator.  Just
8        trying to give you a sense of where everything was.
9    Q.  Okay.  And it says that the damage to all other
10       appliances was consistent with varying degrees of fire
11       attack.  I guess, are you just basically saying that
12       some appliances were burned more than others?  Or tell
13       me if I'm wrong.
14   A.  They were burned differently.  Let's put it that way.
15       I mean, we -- I don't -- when you say more, I'm not
16       sure I understand what you mean.
17   Q.  Okay.  So it's not -- so you're not saying it's the
18       degree to which each of those other appliances were
19       burned.  You're just saying that they had a different
20       appearance?
21   A.  It's the con -- yes.  Basically, it's the context.
22   Q.  And what is it about the context?  Did we -- I think we
23       talked about that already, correct?
24   A.  Well, I mean, clearly, when you -- you could see what
25       they -- structurally, they're still intact.

148

1    Q.  Okay.
2    A.  And you could see their position relative to the other
3        debris and just their overall condition, contents, you
4        know.  I mean, there's -- if you open them up, you
5        could -- like in the microwave, for instance, you could
6        still see the wiring in there.
7    Q.  Okay.
8    A.  The internal components were where you would expect
9        them to be.
10   Q.  All right.  And did you know what was actually under
11       the floor, under the fridge pre-fire?
12   A.  When you say know, I mean, I could tell you based on
13       what -- as we excavated, what we found, which would
14       give you a pretty good indication of what was under the
15       fridge.
16   Q.  Okay.  What was it?
17           (Mr. Moss exited deposition room at 4:12
18           p.m.)
19           THE WITNESS:  There was a -- the copper line
20       that ran to the -- propane line that ran to the LP
21       range top, and the structural components we talked
22       about before.  That's what we found.
23   BY MR. FRANCO, CONTINUING:
24   Q.  Okay.  Did you tell me already what the floor covering
25       in the kitchen was?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                              February 9, 2012

149

1   A. There's pictures in here, but it looked like a vinyl.
2   Q. Help me understand, pre-fire condition.
3          (Mr. Moss reentered deposition room at 4:12
4      p.m.)
5   BY MR. FRANCO, CONTINUING:
6   Q. Would it be refrigerator sitting on top of -- did you
7      say vinyl?
8   A. Whether -- sometimes they -- they put a floor covering
9      between a refrigerator and a floor. We didn't find any
10     evidence of that. The -- what I was -- the primary
11     area where we found evidence of the unburnt floor
12     covering was in front of the lower door when it flipped
13     down.
14  Q. Okay.
15         THE WITNESS: Good pear?
16         MR. MOSS: This stuff's all I got.
17         THE WITNESS: No, no, no. It's -- you can
18     always tell a good one.
19         MR. MOSS: It's making a mess.
20         THE WITNESS: They're good, too.
21  BY MR. FRANCO, CONTINUING:
22  Q. Okay. Looking at page four now, paragraph one. That
23     first paragraph, you talked about some of that already.
24     But I want to talk about the degree of inward collapse
25     and the position of the doors. With respect to the

150

1      inward collapse, I think you've already told us that
2      that's something -- the severity of that is something
3      that you hadn't seen on a fridge before, right?
4   A. Yes.
5   Q. Okay. Are you saying that that type of inward collapse
6      could not occur if the fire attacked from outside the
7      fridge?
8   A. Basically, the overall context, everything I was
9      seeing. I looked at damage, type of damage and the way
10     the configuration -- the final configuration of the
11     refrigerator. You know, that whole context, yes. It
12     could not have occurred -- I could not come up with a
13     hypothesis that would allow me, based on the evidence,
14     to conclude that it started outside the refrigerator
15     and moved its way in. It just wouldn't look like that.
16  Q. Paragraph two on page four says the degree of fire
17     consumption and damage to the internal components --
18     let me stop right there. Is that referring to
19     consumption and damage to the components of the
20     refrigerator?
21  A. Yes.
22  Q. Okay. We already talked about the electrical activity
23     in paragraph two, right? Okay. So in paragraph three
24     on page four, it's your opinion that the fridge was not
25     attacked by fire from the front, correct?

151

1   A. Yes.
2   Q. Okay. What is the basis for that opinion?
3   A. I'm losing my microphone here, give me a second.
4   Q. Well, let me ask you this. Is the basis for that
5      opinion that there's a lack of external damage to the
6      bottom of the refrigerator door exterior on the floor
7      in front?
8   A. That's part of it.
9   Q. What else?
10  A. The overall condition of the refrigerator, the position
11     of it relative to the sub-floor, the crawl space, the
12     gravel. I mean, there's a lot of factors. Those are
13     the primary ones.
14  Q. Okay. Okay. The first sentence on paragraph three
15     says with the refrigerator closely surrounded on three
16     sides by fully enclosed drywall partitions, external
17     fire attack would have interrupted power to the
18     refrigerator before the fire reached internal
19     components unless it occurred from the front. So is
20     the basis for your opinion that power to the fridge was
21     not interrupted before reaching internal components of
22     the fridge, is the basis for that your belief that the
23     fridge was not attacked by fire from the front?
24  A. I'm not sure I understand your question. But what I'm
25     trying to convey there is, is if you -- the power

152

1      cord's on the back, the refrigerator is protected on
2      three sides by the drywall.
3   Q. Okay.
4   A. So -- so that what -- your exposure would be from the
5      front.
6   Q. Yeah. I think I understand that. But what I'm trying
7      to figure out is, I think -- and correct me if I'm
8      wrong. But I think what you're saying in the report is
9      that power was not interrupted first in this case,
10     right? In other words -- or, I'm sorry, I misspoke.
11     It says external fire attack would have interrupted the
12     power to the refrigerator before the fire reached the
13     internal components unless it occurred from the front.
14     So I guess what you're saying, if the fire did occur
15     from the front, you wouldn't expect power to be
16     interrupted, right?
17  A. Well, what I was saying there, remember, you were --
18     you've been asking me about, you know, fire from the
19     living room side. So basically a fire attacks the
20     refrigerator from the rear, the living room side, you
21     know, or the sides, it has to go through that drywall.
22     That's where the branch wiring is run which powers the
23     refrigerator, plus the power cord of the refrigerator
24     is hanging in that area. So as the fire is burning to
25     get to the refrigerator, involve the refrigerator from



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                    February 9, 2012

153

1  those directions, it would involve that wiring first,
2  which would likely interrupt the power to the
3  refrigerator. That's what I'm trying to say.
4  Q.  Gotcha. I gotcha. Okay. Let's look at your
5  conclusions again here.
6  A.  Okay.
7  Q.  Which for the first one, the fire loss was caused by a
8  failure within the involved Sears Kenmore Elite brand
9  Trio refrigerator. I just need to just ask you, did we
10  discuss today all the bases for that opinion? Is there
11  --
12  A.  I don't know how to answer that question but --
13  Q.  Well, let me ask you this. Is there something critical
14  that you think, hey, here's a big reason why I believe
15  that, and you didn't ask me that question?
16  A.  Nothing glaring. But, I mean, I'm sure there's further
17  discussion --
18  Q.  Sure.
19  A.  You know, opportunities there.
20  Q.  Okay. Again -- strike that.
21      Paragraph two of the conclusions, this
22  failure resulted in the ignition and consumption of the
23  combustible internal components of this refrigerator.
24  I think we talked about that a little already. But
25  same question, is there anything glaring that you

154

1  think, hey, there's a big, major reason why this
2  happened and we haven't talked about that yet?
3  A.  Not that I can think of, I mean, again --
4  Q.  I understand. I'm just --
5  A.  -- we've talked about a lot.
6  Q.  Yeah.
7  A.  I think -- I thought the report spells it out pretty
8  clearly.
9  Q.  Okay. Now, I don't think I asked you this one. Do you
10  know what the first combustible was that actually
11  ignited?
12  A.  No.
13  Q.  Let's go to page two, paragraph four. Just a little
14  bit of background on information you got from Mr.
15  Magee. I'm sorry, it's paragraph five. The morning of
16  the fire, Mr. Magee got up at 4:00 a.m., EDT, put some
17  clothes in the dryer, took a shower, got the clothes
18  from the dryer, put the dishes in the dishwasher, and
19  started it before leaving about 4:25 a.m. EDT to go to
20  McDonald's to get something to eat. First I wanted to
21  ask you, you've got Dan Meyer seeing the fire around
22  5:30, which is about an hour after Mr. Magee starts
23  that dishwasher, right?
24  A.  Well, yes.
25  Q.  Roughly?

155

1  A.  Roughly, right.
2  Q.  And did you do anything to rule out the dishwasher as
3  being the cause of the fire?
4  A.  Yes, I looked at it.
5  Q.  And what specifically did you do to rule it out?
6  A.  I looked at the position, looked at the damage relative
7  to the refrigerator. And the biggest thing is is when
8  you look at the damage to the refrigerator, again, if
9  you rule out external attack, it makes it pretty easy.
10  But -- but I did look at, you know, everything
11  including the dishwasher, I looked at the electrical
12  service, all that.
13  Q.  Okay. Did you find conductors in the dishwasher also
14  that had evidence of electrical activity on them?
15  A.  I don't recall specifically, but I know I looked in
16  there. I certainly found, you know, electrical
17  conductors and things.
18  Q.  I mean, it wouldn't surprise you if --
19  A.  No.
20  Q.  -- there was conductors in there that had electrical
21  activity?
22  A.  No.
23  Q.  You testified it doesn't surprise you to find it in the
24  fridge, right?
25  A.  No. I -- I -- again, no.

156

1  Q.  You'd expect it. Okay.
2  A.  I'd expect it under certain conditions.
3  Q.  Right. Other than your visual observations of the
4  dishwasher, did you do any other testing or analysis to
5  rule it out as a cause?
6  A.  Other than inspecting it there at the scene, I did not
7  do any physical testing or destructive testing.
8      VIDEO OPERATOR: You lost your mic again.
9      THE WITNESS: I'm sorry, I got my foot
10  hooked in it. Sorry about that.
11  BY MR. FRANCO, CONTINUING:
12  Q.  Let's look at on page two, you list exhibits. And one
13  of them is the -- number three is the LG and Sears
14  Kenmore refrigerator recall. Strike that.
15      I think I asked you that already. Okay. Do
16  you want to do that now?
17      MR. MOSS: Sure. Let's take a break.
18      MR. FRANCO: Almost done.
19      VIDEO OPERATOR: All right. It is currently
20  4:26 and we are going off the record.
21      (Recess taken at 4:40 p.m.)
22      VIDEO OPERATOR: This is DVD number three in
23  the video deposition of William Mers Kelly. We are now
24  back on the record and it is 4:40. Counsel.
25  BY MR. FRANCO, CONTINUING:



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                           February 9, 2012

157

1  Q.  Okay.  Mr. Kelly, back on the record here.  Earlier
2      today I was asking you some questions with respect to
3      your experience in designing refrigeration systems.
4      Now I want to ask you in particular with respect to the
5      subject model refrigerator.  First, I guess, what's
6      your basic understanding of this particular model of
7      refrigerator?  It's -- what kind, how big was it, and
8      what was it?  You know, how many cubic feet, I guess,
9      or whatever, and --
10 A.  Okay.  I think -- you know, some of that's in the
11     report.  But, I mean, are you looking for dimensions?
12     Are you looking for just -- just type of construction?
13     I mean, what -- what --
14 Q.  Yeah.  Let's start with the type of construction
15     basically.
16 A.  Okay.  You've got a steel metal enclosure, a shell per
17     se, that has structure to support internal structure
18     and doors and things.  You also have a vacuum formed
19     polymer liner that's attached inside that steel
20     enclosure both of the doors and the shell.  And then
21     what they -- what you do is you -- that -- the cav --
22     the space between that polymer interior member and the
23     structural steel outer member is filled with a two part
24     urethane foam.  In this day and age, it's the low CFC
25     or -- it's HC foam.

158

1  Q.  All right.  Now, with respect to the -- strike that.
2          You've already told us, I think, that you
3      don't have any opinion as to what it was that -- what
4      it was within the fringe that actually failed.  So my
5      next question would be you don't have any opinions with
6      respect to any particular defect or problem in the
7      manufacturing process for this fridge, do you?
8  A.  When you say opinion --
9  Q.  Well, let me just ask, do you have an opinion that the
10     fridge was defective in some way?
11 A.  Well, there's -- I know there's been some evidence of
12     some failures within these refrigerators that's come to
13     be known to me here recently.  I haven't really had a
14     chance to really dig into it.  So I -- I know of some
15     known failure modes within this refrigerator.
16 Q.  Okay.  Well, first, how did you learn this information?
17 A.  In talking to Mr. Fricke, Chuck or Charles Fricke, and
18     Steve Cottingham.
19 Q.  When did you speak with them?
20 A.  I've spoke to them off and on over a long period of
21     time.
22 Q.  About how recently when you learned about -- you're
23     telling me about this new information you learned?
24 A.  Last night on my way up here, I had opportunity to
25     check in with Chuck and Steve.

159

1  Q.  Phone conversation?
2  A.  Yes.
3  Q.  Okay.  Who else was on the line?
4  A.  Just -- it was a one-on-one conversation with --
5      between myself and Mr. Fricke.
6  Q.  Okay.  Steve wasn't in on that conversation?
7  A.  No.  I talked to him previously, actually, the day
8      before.
9  Q.  Okay.  And so Mr. Fricke told you about -- what did he
10     tell you?
11 A.  That there's some issues with this -- known issues with
12     this refrigerator.  There's been a lot of complaints
13     on-line, which I had seen and known about when I
14     searched by model number later here recently.  And then
15     also that there's a new article in Consumer Reports
16     that's coming out concerning this particular
17     refrigerator, which I haven't had a chance to read
18     or --
19 Q.  Okay.  And so when you say this particular
20     refrigerator, you're referring to --
21 A.  This particular series or model.
22 Q.  Okay.  So in particular, the model refrigerator that
23     Mr. Magee had at the time of the fire?
24 A.  Yes, basically be consistent.
25 Q.  And did Mr. Fricke tell you in particular what the

160

1      issue was?
2  A.  The one thing we discussed is the -- there was -- there
3      was an issue with it that was causing the light inside
4      to remain on.
5  Q.  And as of the time of your report you've authored, you
6      did not have any opinion that some part of the fridge
7      was defective, did you?
8  A.  When you say opinion, I mean, I -- I -- I did not
9      uncover any evidence that would lead me to a specific
10     failure within this refrigerator.
11 Q.  Okay.  So did you -- all right.  All right.
12 A.  You're getting tangled up, too.  That's all right.
13 Q.  Yeah.  After your conversation with Mr. Fricke last
14     night, do you have an opinion as to whether or not
15     there's a defect in some component of this fridge?
16 A.  An opinion as to -- you mean, just based on what he was
17     saying, I mean, certainly that -- that is a failure
18     mode that could result in the type of damage and fire
19     we're seeing here.
20 Q.  But I'm talking about Mr. Magee's fridge.  Do you have
21     an opinion that Mr. Magee's fridge was designed
22     defectively?
23 A.  Again, I have not read enough -- I haven't read the
24     information myself.
25 Q.  I understand.

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                    February 9, 2012

161

1   A.  But what was conveyed to me is, is there's a problem
2       with the same type of refrigerator that he had, that
3       same model number, that same series.
4   Q.  So based on that, do you have an opinion?
5   A.  That -- opinion?
6   Q.  That Mr. Magee's fridge, some component of it was
7       defective?
8   A.  Well, certainly, if -- if what's being explained to me
9       is true, then -- then -- and -- and that is consistent
10      with his refrigerator, then that component, at least --
11      or that there -- there is a known problem with that
12      part of the refrigerator.
13  Q.  I understand that.  But I'm just asking if your opinion
14      is that based on what Mr. Fricke told you, some
15      component of the fridge, Mr. Magee's fridge was in fact
16      designed in a defective manner?
17  A.  Based on what he was telling me.  Again, without
18      reading it for myself, based on what he was telling me,
19      this defect was present in this refrigerator.
20  Q.  Okay.  Do you have the opinion that it was defective,
21      Mr. Magee's fridge, yes or no?
22          MR. MOSS:  Well, I don't know if it is yes
23      or no.  He's just told you -- he has told you, yes, he
24      believes there's a defect, he learned that, and the
25      foundation for which he got from Mr. Fricke.

162

1           THE WITNESS:  I mean, that -- that, I think,
2       says it all right there.
3   BY MR. FRANCO, CONTINUING:
4   Q.  Okay.  So you believe there's a defect in Mr. Magee's
5       fridge?  Yes?
6   A.  Yes.
7   Q.  Okay.  And that's based on what Mr. Fricke told you?
8   A.  Yes.
9   Q.  Yes.  Is it based on anything else?
10  A.  Not at this point.
11  Q.  Okay.  And is it your opinion within a reasonable
12      degree of engineering certainty that Mr. Magee's fridge
13      was defectively designed in some manner?
14  A.  Yes.  Designed or manufactured.  I mean, there was a --
15      basically, there was a defect that caused this fire.
16  Q.  And the basis for that opinion is what Chuck Fricke
17      told you on the phone?
18  A.  No, no.  It's based on -- as we've been going through
19      here pretty thoroughly, based on the evidence.
20  Q.  Okay.  But when you authored the report, you didn't
21      hold the opinion that the fridge was defective, did
22      you?
23  A.  It caused a fire.  So I don't know how you define
24      defective, okay?
25  Q.  I understand that, I understand that.  Did you -- you

163

1       didn't say in your report there was a defect in this
2       refrigerator?
3   A.  I did not use that verbiage.  I said that the
4       refrigerator caused the fire.
5   Q.  Okay.
6   A.  And in my mind, that's defective, but I didn't use that
7       word.
8   Q.  Okay, okay.
9   A.  It certainly wasn't designed to do that.
10  Q.  All right.  I think I understand now.  You're saying at
11      the time you authored the report, your opinion was that
12      the refrigerator caused the fire; at that time, you
13      didn't know what particular component failed, right?
14  A.  I didn't find any evidence of a specific failure.
15  Q.  Right.
16  A.  I mean, I've investigated, as I mentioned before, many
17      fires involving refrigerators.  And I know, based on
18      past experience, of those and recalls and what have
19      you, and also working in the field, what can cause
20      fires.
21  Q.  And --
22  A.  But at that time, I was not aware of this specific
23      issue and failure.
24  Q.  Right.  And then but last night you learned from Mr.
25      Fricke that there's been some issues with this

164

1       particular model?
2   A.  Yes.
3   Q.  And what in particular?  With the component, did you
4       say?
5   A.  I said that basically what he's explaining to me is
6       that there was a -- there was a -- a defect that was
7       allowing the light to stay on continuously.
8   Q.  Okay.
9   A.  Even when the doors were closed.
10  Q.  And did you do any engineering analysis to determine
11      whether or not the -- that problem, the light staying
12      on, existed in the Magee refrigerator?
13  A.  I have not.  I just heard about it last night when I
14      was driving so --
15  Q.  All right.
16  A.  And actually, to clarify, I may have heard it outside
17      of that conversation recently.
18  Q.  Okay.  From whom?
19  A.  I'm thinking now, I think Steve may have mentioned it
20      to the point -- basically the generic failure part of
21      the thing.  Not the Consumer Reports article and that
22      whole -- was new last night, had not heard that before.
23  Q.  Okay.
24  A.  But the general failure mode or problem issue, defect I
25      had heard about before.

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

ESQUIRE
DEPOSITION SOLUTIONS

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                    February 9, 2012

165

1  Q. Okay.
2  A. And I think it was in preparation for this deposition.
3  Q. And you mean talking to Steve?
4  A. Steve, and/or other parties, like --
5  Q. In addition to Steve and Charles Fricke, anyone else
6     that you talked to about this issue with the light bulb
7     staying on?
8  A. One of the paralegals here, you know, when I was
9     getting some information, asking some questions, I
10    think mentioned it.
11 Q. Okay. One of the paralegals here at this law firm,
12    Black and Moss?
13 A. Yes.
14 Q. And what information did you get from the paralegal?
15 A. Just, again, generically. The -- you know, this issue
16    with the light staying on within the refrigerator.
17 Q. I think I asked you this one, you didn't do any
18    engineering analysis to determine if the issue with
19    light staying on existed in Mr. Magee's fridge, did
20    you?
21 A. I've not been asked to do that.
22 Q. And did you do -- strike that.
23       Similarly, I assume you didn't do any
24    engineering analysis to determine whether a light
25    staying on could cause a fire within a fridge?

166

1  A. You're asking me if I've done any testing or analysis?
2  Q. Right.
3  A. I mean, I have not done any physical testing.
4  Q. Okay.
5  A. To basically prove that that could happen, but I
6     could -- it's no stretch of the imagination to conceive
7     of a way it could happen.
8  Q. Okay. And --
9  A. So empirically, yeah. I don't have -- I mean, there's
10    no doubt in my mind that it could happen.
11 Q. Okay. And how is it that it could happen in this
12    particular case?
13 A. Well, again, I haven't -- I need to get more
14    information to be able to answer the particulars for
15    this. But, I mean, whenever you have heat and
16    electricity in the same area, in an unintended manner,
17    and building up to an unintended level, to me,
18    there's -- there's always some risk of fire. There's
19    --
20 Q. Okay. Can you tell me what temperature the light bulb
21    would need to reach in order to cause any combustibles
22    within a fridge of this model to ignite?
23 A. No. I don't know enough yet to be able to make those
24    kind of --
25 Q. Okay. Did you do any analysis with respect to the

167

1     electrical design of this model refrigerator?
2  A. Analysis, as in --
3  Q. Anything. Research, reviewed documents, anything?
4  A. As far as the specific design of this refrigerator or
5     the specific --
6  Q. Design of the electrical components?
7  A. No.
8  Q. Okay. Do you know, with respect to this issue that Mr.
9     Fricke and others told you about with light bulbs
10    staying on in model refrigerators like this Magee
11    refrigerator, do you know what it was that was causing
12    the light bulbs to stay on?
13 A. My understanding from him, again, there is in high
14    level conversations, is there was an issue with the
15    design of the circuit board and a specific relay on
16    that board.
17 Q. Do you know if the circuit board in this case was
18    recovered from the fire?
19 A. I do not know for sure. I mean, I can tell you that I
20    didn't find it. I just found pieces of it.
21 Q. Okay. I didn't know. I was just -- maybe it was
22    totally burned up in the fire.
23 A. Again, I don't know. I didn't examine -- I didn't get
24    to dig through it and really examine everything, so I
25    don't know.

168

1  Q. Okay.
2  A. I suspect not.
3  Q. All right. Let's get through this relatively quickly
4     here. All right. Since you hold the opinion
5     independently of Mr. Cottingham that the origin of the
6     fire was within the refrigerator, just tell me how it is that
7     you define quote, unquote, origin of fire?
8  A. It's basically in the discussion we've had, whether the
9     fire started inside the refrigerator or outside. In
10    other words, whether the refrigerator's a victim of the
11    fire or the cause of the fire.
12 Q. Generally speaking, is there a difference between the
13    area of origin versus the point of origin?
14 A. I would just say that one's more specific possibly. If
15    you say a point, you're thinking, you know, versus an
16    area. I think that's the intended meaning.
17 Q. And how do you define a fire pattern?
18 A. How do I define a fire pattern?
19 Q. Yes.
20 A. I mean, it's a pattern that's created by a fire. Also
21    you could say by heat of a fire, by the byproducts of
22    the fire, byproducts of combustion.
23 Q. Do you know what is meant by the term heat shadowing
24    pattern?
25 A. Yes. In fact, I took some pictures down in the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                          February 9, 2012

169

1    basement of that phenomenon, just I'd have them.
2    Q.  And what does it mean, heat shadowing pattern?
3    A.  Well, basically, you've got -- just like you cast a
4        shadow -- energy's energy.  So whether it's light or --
5        visible energy, or whether it's more of the higher
6        energy, heat energy, infrared, what have you, a solid
7        object will cast a shadow on another solid object.  And
8        so you'll shade -- that shaded portion will be shaded
9        or -- from the energy, the heat energy as well as the
10       length.
11   Q.  Do you know what a -- how do you define a low burn
12       pattern?
13   A.  What they're talking about there is, is a burn pattern
14       -- typically, one of the things you have people look
15       for is -- is the orientation of a burn -- and location
16       of a burn pattern.  So when they talk about a low
17       pattern, typically what they're talking about is one
18       that's lower than others.  So you're looking for --
19       because fire typically wants to burn up and out.
20   Q.  Did you use analysis of low burn patterns in this case?
21   A.  Again, Steve's focus was more on the structure.  And a
22       lot of the terms you're using would be in regards to
23       the structural origin cause and narrowing it down to an
24       area.  I used more specific to the refrigerator and the
25       condition of the refrigerator.

170

1    Q.  But the only reason why I'm asking is because part of
2        your opinions is that the severity of the damage to the
3        structure --
4    A.  Structure being the house or the refrigerator?
5    Q.  Right.  The house I thought?
6    A.  Okay.
7    Q.  Isn't that part of your opinion, that there was -- the
8        observations that you made on June 2nd with respect to
9        the severity of the damage to the structure, in
10       particular, those layers underneath the fridge, as
11       opposed to the other areas, that led you also to
12       conclude that the --
13   A.  Well, again, I'm assisting Steve in the origin and
14       cause.  I'm there to back him up, but that's his
15       primary thing.  I'm -- once we've narrowed it down,
16       then I'm focused on the refrigerator in the context of
17       that refrigerator.  So within the context of the
18       refrigerator, plus I can tell you, I mean, you know,
19       it's -- I agree with his opinions on the rest of it.
20       Makes sense to me.  I mean, with my knowledge.
21   Q.  All right.  Your own investigation in the cause of
22       this fire on June 2nd, did you follow NFPA 921?
23   A.  I used 921 as a guide.
24   Q.  Did you deviate in any respects from 921 on that date?
25   A.  Define deviate.

171

1    Q.  Did you not follow any particular provision of NFPA 921
2        that would have, you know, covered your investigation?
3    A.  That was necessary for my investigation?
4    Q.  Right.
5    A.  No.
6    Q.  Do you know if Mr. Cottingham did any vector analysis
7        at the site?
8    A.  When you say vector analysis?
9    Q.  Flame vector analysis?
10   A.  I mean, certainly, we had discussions along those
11       lines.  I don't know specifically what formal analysis
12       he did.
13   Q.  Did you do any flame vector analysis?
14   A.  Like I said, we had discussions.  I did not do any
15       formal flame vector analysis.
16   Q.  Close here to being done so -- does NFPA list what it
17       is that you should rely upon in determining the origin
18       of a fire?  What evidence of things you should do and
19       rely upon?
20   A.  It does give you guidelines for basically doing that
21       type of work.
22   Q.  And were there things in particular that NFPA says you
23       should rely on in doing an origin investigation that
24       you did in this case?
25   A.  Like -- I mean, I use it as a guideline.  So, I mean,

172

1        is there anything specific you're looking for?
2    Q.  Let me ask you this.  Did you -- we've talked about
3        today your observations of witness statements -- or
4        your -- strike that.
5            We talked about today your conversations
6        with Mr. Magee and Dan Meyer.  Aside from those
7        conversations, did you do any analysis of fire
8        dynamics?
9    A.  When you say fire dynamics, I didn't do any -- I mean,
10       again, formal.  I mean, Steve and I walked through the
11       structure.  We talked about what fit, what didn't fit,
12       what the evidence was telling us.  So we did a lot of
13       basically challenging each other's -- our thought
14       processes.  Yeah, basically -- he had already had a
15       chance to review the scene.  I did.  And then we then
16       compared notes.  So in a sense, you know, we went
17       through these types of things.  But so I'm not sure
18       exactly what you're asking.  But formally, that was not
19       part of what I -- I was requested to do.
20   Q.  Okay.  Do you know what arc mapping is?
21   A.  Yes.
22   Q.  Okay.  What is it?
23   A.  What you're doing is it's -- it's the process of
24       identifying electrical activity on conductors or arcing
25       per se, and identifying the location of that relative



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

173

1   to the area of origin. So it's a tool that you can use
2   to help narrow down your -- the area of origin.
3   Q. And did you do any arc mapping at this site on June
4   2nd?
5   A. At a high level. Basically what I did is I observed,
6   you know, arcing, but found out very quickly that it
7   wasn't going to be a useful tool in this particular --
8   you know, overall. It was -- again, it was another
9   data point. As we've talked about, there's been a --
10  there was a lot of arcing going on.
11  Q. Why wouldn't arc mapping have been a useful tool in
12  this situation? Just -- is it because of the damage or
13  --
14  A. Well, again, when -- maybe I misspoke and gave you the
15  wrong impression. It was -- it's a -- it's a useful
16  tool, but it wasn't -- I didn't heavily rely on it and
17  spend a whole lot of time doing it formally, and
18  document it formally because, in this case, it was --
19  the amount of arcing was so extensive, and the amount
20  of damage was so extensive that -- again, it was a data
21  point. But it wasn't worth spending a lot of time
22  going further. It was pretty obvious what was going
23  on.
24  Q. And what is meant by the term fire effect?
25  A. In -- in what context?

174

1   Q. Well, let's say in the context of an origin
2   investigation?
3   A. I mean, can you give me a little more?
4   Q. Do you have an understanding of how NFPA defines fire
5   effect?
6   A. I think I know what you're talking about. I mean, you
7   know, that's -- that specific term. But what you're
8   talking about is effect of a fire on -- and its
9   surroundings, is what I think you're referring to.
10  Q. Okay.
11      (Exhibit No. 9 marked)
12      THE WITNESS: I bet your hands get tired in
13  that business. I just noticed that.
14      MR. MOSS: Carpal tunnel.
15      THE WITNESS: That's right. They ought to
16  design you a little rest where you get --
17  BY MR. FRANCO, CONTINUING:
18  Q. I'll just hand you Kelly Exhibit No. 9. This is your
19  fee schedule. I just wanted to make sure, what was
20  your rate?
21  A. Again, this -- yeah. This is the fee schedule for our
22  service center, the Kentucky service center.
23  Q. Oh, okay. That -- is your --
24  A. My rate is included in here.
25  Q. Gotcha. What is your rate?

175

1   A. Two hundred dollars an hour, per hour.
2   Q. Are you an officer of the company, of Unified?
3   A. No. I wish.
4   Q. Roughly, how many times have you been retained by the
5   firm of Black and Moss?
6   A. I don't recall.
7   Q. More than five?
8   A. To be honest with you, I don't know.
9   Q. Have you ever been retained by Johnson and Bell?
10  A. Not that I can recall. You have the list. So -- yeah.
11  Q. Oh, that list you gave us today?
12  A. Yes. I mean, basically that's the search of our
13  database by, you know, client.
14  Q. Okay, gotcha. So if Johnson and Bell wasn't on that
15  list, you wouldn't have been retained by them? Just,
16  obviously, if you know?
17  A. I -- yes. I mean, again, that isn't a complete list,
18  but I don't recall that name.
19  Q. Similarly, if LG Electronics and Sears were not on that
20  list, you don't --
21  A. I can tell you I'm pretty sure I haven't been retained
22  by them.
23  Q. All right. Okay. The issue that Mr. Fricke informed
24  you of with respect to overheating -- or strike that.
25      I think Mr. Fricke told you that there was

176

1   an issue with this particular model and other models
2   involving light bulbs staying on, is that right?
3   A. Uh-huh, yes.
4   Q. With respect to any of your experience, work
5   experience, have you ever had any involvement with
6   respect to the design of lights or lighting assemblies
7   for refrigeration systems?
8   A. For the slush machines, I did.
9   Q. What type of lights was that?
10  A. We primarily used fluorescents.
11  Q. And how many volts did those fluorescents run?
12  A. Well, we used line voltage, and then what we did was we
13  stepped it down to meet UL, because it was for the top
14  lights.
15  Q. Stepping down to what?
16  A. Below 20 -- I think it was below 28, and I think we
17  went down to 24.
18  Q. Okay. So step it down from -- what?
19  A. Okay. Your line voltage is typically -- you know, in
20  this case, we were using 120 volt AC. We would
21  transform it down to 24 volts AC, I believe, for the
22  light. I'd have to go back. But that -- that gets you
23  below the threshold of what's considered high voltage
24  potential for UL.
25  Q. All right. And the design of these -- you actually



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

177

1    designed what component?  The whole lighting assembly
2    or --
3    A.  I designed the lighting assembly, and I worked with
4    the -- a Canadian company actually who designed the
5    circuit board, the circuitry to fire the fluorescent
6    bulb -- the light tube, bulb.
7    Q.  And the fluorescents, how many watts were the
8    fluorescents?
9    A.  What I can tell you is is I don't -- I don't -- one of
10   the -- I don't remember the exact wattage.  But the --
11   it was their typical 24 inch bulb.
12   Q.  Okay.
13   A.  We used a one inch diameter, and we used the high
14   filament temperature, you know, we were using the high
15   end to give you full color transmission, maximum color
16   transmission.
17   Q.  And what was the -- help me understand what the light
18   was intended to illuminate.  We've got a --
19   A.  You've seen these visual slush machines.
20   Q.  Yeah.
21   A.  They have a -- basically, one of the big things that
22   catches your eye when you walk in is they have lighting
23   that illuminates both the Slush Pupple, or whatever the
24   signage is, as well as the product being swirled around
25   in the clear visual bowls.  So that's the hallmark of a

178

1    visual machine.
2    Q.  And you said that you worked with a Canadian company
3    with respect to the circuit board?
4    A.  Yes.  They designed the actual lighting circuit for me,
5    the custom circuit board to drive that light fixture.
6    Q.  And when the slushie machine was plugged in and let's
7    say it's in use at a store?
8    A.  Yes.
9    Q.  Is the light always on, or is it on and off?
10   A.  The light is always on when the machine is producing
11   saleable product.
12   Q.  Okay.
13   A.  That's the way it was designed.  It was intended to be
14   on during machine operation.  Every slush machine goes
15   into a defrost cycle, typically during non-business
16   hours but not necessarily.  It's whenever they set it
17   to do it.  And when it was in defrost, one of the
18   indications would be the light was off.
19   Q.  So with respect to the light, you designed the lighting
20   assembly, right?
21   A.  The enclosure, the mounting of the circuit board, the
22   wiring, you know.  Basically we took all the components
23   assembling the light fixture that met the requirements.
24   Q.  And what was the Canadian company?
25   A.  Please?

179

1    Q.  What was it that the Canadian company did with respect
2    to the circuit board?
3    A.  They designed the actual circuit, laid out the board,
4    and produced and manufactured -- I believe they
5    produced and manufactured the board for us.  I know for
6    sure they designed the circuit, laid it out on the
7    circuit board and did, you know, assembled that.  I
8    don't recall whether -- I'm pretty sure that they
9    produced the actual circuit board, finished product a
10   well.
11   Q.  And what provision of UL did you bring it into
12   compliance with?
13   A.  I don't recall the specific numbers.  It's been long
14   enough now that I'd have to look them back up again.
15   Q.  And the slushie machines were for sale and/or use in
16   the United States?
17   A.  Well, both within and outside the country.  I mean,
18   Canada as well as Europe.
19   Q.  When you designed the lighting assembly, did you do any
20   testing with respect to potential fire hazards?
21   A.  Absolutely.
22   Q.  What type of testing did you do?
23   A.  UL mandates a lot of different testing.  You've got the
24   -- you've got flammability requirements for the
25   materials.  You've got, obviously, for the circuit

180

1    board itself within mounting requirements for it, and
2    isolation, wiring of sockets.  I think in one of the
3    tests we -- with UL, was they -- you basically test
4    voltage ranges and basically failure modes for your
5    circuitry.  I don't recall all the specific tests.  But
6    we certainly had to -- there were -- there were basic
7    tests you had to perform to make sure that you were
8    using appropriate materials, in the appropriate manner,
9    with the appropriate spacings where they weren't likely
10   -- as likely to result in a fire.  You're trying to
11   minimize that.  You can never 100 percent eliminate it
12   but you can minimize it.  There are certain standards
13   you have to do.
14   Q.  With respect to the materials, did you ever test any of
15   the materials to the point that they combusted?
16   A.  Yes.
17   Q.  Okay.  Which -- which materials on the slushie
18   machines -- well, strike that.
19        In the testing that you did, for this --
20   A.  It wasn't required for UL.  But, I mean, we -- clearly,
21   for my own sake, you know, sake, I just like to verify
22   some things.  So I -- yeah, I did some informal
23   testing.
24   Q.  And what was it that combusted?
25   A.  In --


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                    February 9, 2012

181

1   Q.  During your testing?
2   A.  I mean, you've got to understand, I was -- when I was
3       -- I was testing things to failure.  So, I mean, I
4       combusted anything that was around it just to
5       understand how it was going to react, what kind of
6       circumstances it would take to ignite it.
7   Q.  Okay.
8   A.  So, I mean, you know, some of the things you do, like
9       with UL, with transformers and circuit boards, you'll
10      do a -- you'll lay the gauze over the top and see
11      whether that's ignited, and if it is, you know, how it
12      burns.  And basically the vertical versus the
13      horizontal burn ratings of the materials.  The other
14      thing was important was making sure these things didn't
15      discolor over short periods of time.
16  Q.  I see.
17  A.  Because even if they don't combust, if you expose them
18      to certain environments and certain conditions, they
19      can discolor and look bad.
20  Q.  So I understand that UL would have a requirement for
21      materials that you use in their ratings with respect to
22      combustion?
23  A.  Yes.
24  Q.  But if I understand you, you're saying that in addition
25      to that, you actually tested certain materials to the

182

1       point that they actually combusted?
2   A.  I did some verification tests, just to make sure that
3       what I was getting was what we thought we were getting.
4       Primarily because what ends up happening is after
5       you -- these materials can have these ratings.  But
6       then after you process them through a manufacturing
7       process, it's good that there's some verification just
8       to make sure you haven't altered those properties, or
9       you don't have any unintended consequences.  At least
10      as much as possible you're trying to minimize that
11      possibility.
12  Q.  I understand you were telling me earlier about Mr.
13      Cottingham did mostly the investigation pertaining to
14      the structure of the house, and yours pertained
15      primarily to the refrigerator.  But did you do any
16      depth of char measurements at the scene of the fire?
17  A.  When you say depth of char, I mean, I certainly
18      observed.  That is, went around and observed the depth
19      of char.
20  Q.  Did you actually measure the depth of char?
21  A.  No.
22  Q.  Almost done.
23  A.  Okay.
24          MR. MOSS:  That's the first time I've
25      believed you.

183

1   BY MR. FRANCO, CONTINUING:
2   Q.  Just one other thing, it was the photo.  Before your
3       deposition today, I'm sure you looked at your report,
4       is that right?  Was there anything else that you
5       reviewed other than your report in preparation for
6       today?
7   A.  Basically I went through my files to make sure that I
8       had provided you everything that you had requested, or
9       at least provided it to counsel here.  And then I think
10      they provided it to you.
11  Q.  Okay.
12  A.  So I reviewed everything that you have, essentially.
13  Q.  Okay.  So nothing else other than what's in this room?
14  A.  No.  I mean, not that I can think of.
15  Q.  All right.  You're familiar with what to do with your
16      signature for this deposition?  Or you want me to
17      explain?
18  A.  I'm familiar, but go ahead.
19  Q.  All right.  Do you want to waive or reserve?
20          MR. MOSS:  He'll sign it.  He'll reserve.
21          THE WITNESS:  That's what I -- yes.
22          MR. FRANCO:  Show he'll reserve.  Okay.
23          THE WITNESS:  I'd like to review it and sign
24      it.
25          MR. FRANCO:  You got it.  All right.  I

184

1   think we're done.  Thank you.
2           THE WITNESS:  Thank you.
3           VIDEO OPERATOR:  All right.  It is now 5:24.
4   This concludes the video deposition of William Mers
5   Kelly.  We're now off the record.
6           (Deposition concluded at 5:24 p.m.)
7                       * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

WILLIAM C. MERS KELLY, PE                                    February 9, 2012

185

1    STATE OF MICHIGAN )
                       ) SS
2    COUNTY OF MACOMB  )
3    CERTIFICATE OF NOTARY PUBLIC
4         I certify that this transcript is a complete,
5    true, and correct record of the testimony of the witness
6    held in this case.
7         I also certify that prior to taking this
8    deposition, the witness was duly sworn or affirmed to tell
9    the truth.
10        I further certify that I am not a relative or an
11   employee of or an attorney for a party; and that I am not
12   financially interested, directly or indirectly, in the
13   matter.
14        In witness whereof, I have hereunto set my hand
15   at Warren, Michigan, County of Macomb, State of Michigan,
16   Monday, February 20, 2012.
17
18
19
20
21   _____
22   Robert E. Bouck, CSR-3530
23   Certified Shorthand Reporter
24   Notary Public, Macomb County, Michigan
25   My Commission expires: August 3, 2013

186

1         DEPOSITION ERRATA SHEET
2
3
4    Our Assignment No. 310950
5    Case Caption:   CITIZENS, V. LG ELECTRONICS, ET AL.
6         CASE NO: 3:11-CV-40
7
8         DECLARATION UNDER PENALTY OF PERJURY
9    I declare under penalty of perjury that I have read the
10   entire transcript of my deposition taken in the captioned
11   matter or the same has been read to me, and the same is true
12   and accurate, save and except for changes and/or
13   corrections, if any, as indicated by me on the DEPOSITION
14   ERRATA SHEET hereof, with the understanding that I offer
15   these changes as if still under oath.
16   Signed on the _____ day of _____, 2012.
17
18
19   _____
20        WILLIAM C. MERS KELLY, P.E.
21
22
23
24
25

187

1    DEPOSITION ERRATA SHEET
2    Page No._____ Line No._____ Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____ Line No._____ Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____ Line No._____ Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____ Line No._____ Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____ Line No._____ Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____ Line No._____ Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____ Line No._____ Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25   WILLIAM C. MERS KELLY, P.E.

188

1    DEPOSITION ERRATA SHEET
2    Page No._____ Line No._____ Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____ Line No._____ Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____ Line No._____ Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____ Line No._____ Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____ Line No._____ Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____ Line No._____ Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____ Line No._____ Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25   WILLIAM C. MERS KELLY, P.E.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com